# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

**James E. Marina (N.J. Bar No. 050791996)**
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

| | |
|---|---|
| GENERAL MOTORS LLC, GENERAL MOTORS COMPANY, | CASE NO.  20-12659 |
| Plaintiffs, against | COMPLAINT |
| JOSEPH ASHTON, | DEMAND FOR JURY TRIAL |
| Defendant. | |

1

# TABLE OF CONTENTS

**Page**

COMPLAINT ................................................................................................................3

INTRODUCTION .......................................................................................................3

THE PARTIES.............................................................................................................6

JURISDICTION AND VENUE ..............................................................................16

DETAILED ALLEGATIONS .................................................................................16

I.      ASHTON IS APPOINTED TO GM'S BOARD OF DIRECTORS. ............16

II.     GM LEARNS OF ASHTON'S WRONGDOING AT THE CHR...............19

III.    GM LEARNS OF ASHTON'S INVOLVEMENT IN FCA AND FCA
        NV'S BRIBERY SCHEME. .........................................................................24

        A.      Marchionne Prepares on Behalf of FCA and FCA NV to Force
                a Takeover of GM by Merger .........................................................28

        B.      Defendant Ashton and President Williams Are Key Players in
                the Takeover Conspiracy.................................................................31

        C.      FCA Initiates Operation Cylinder ..................................................32

        D.      2015 CBA Negotiations ...................................................................34

IV.     ASHTON AND THE OTHER CO-CONSPIRATORS TOOK STEPS
        TO FRAUDULENTLY CONCEAL THEIR WRONGDOING AND
        RESULTING DAMAGE. ...............................................................................42

CAUSES OF ACTION ...........................................................................................52

REQUESTS FOR RELIEF ....................................................................................59

**COMPLAINT**

General Motors LLC and General Motors Company (individually or collectively, "GM") for their Complaint, allege as follows:

**INTRODUCTION**

1.      From August 2014 to December 2017, Joseph Ashton, a former high-ranking officer of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), served as a director on GM's Board. In that role, Ashton owed unqualified fiduciary duties including the highest duties of loyalty, care, confidentiality, and disclosure to GM. Ashton collected from GM hundreds of thousands of dollars in compensation for his service as a director.

2.      GM recently discovered that before and during his tenure as a director, Ashton sat at the center of two sprawling and long-running criminal schemes. Each scheme was intended to and did cause massive harm to GM. Despite his fiduciary duties, Ashton failed to disclose and in fact affirmatively concealed these schemes from detection while serving as a director on GM's Board. GM discovered these schemes only recently, following dozens of indictments and guilty pleas involving Ashton and his co-conspirators.

3.      On December 4, 2019, Ashton pled guilty to conspiring to commit wire fraud and money laundering. As Ashton admitted, between 2012 and 2016, he and

two other high-level UAW officials, Michael Grimes and Jeffery Pietrzyk, orchestrated a criminal kickback scheme to siphon money from the UAW-GM Center for Human Resources ("CHR"), where they served on the Board and were responsible for or had influence over the approval of contracts. The CHR was established primarily to educate and train UAW-represented GM employees. All funding for the CHR came from GM. Ashton and his co-conspirators abused their CHR positions by, among other ways, inflating contracts and demanding hundreds of thousands of dollars in kickbacks from vendors. The CHR money used to pay vendors was funded by GM pursuant to the UAW-GM National Agreement and should have been used to educate and train GM's employees. Instead, the inflated payments were improperly used to line the pockets of Ashton and his co-conspirators.

4.     Ashton also played a central role in another scheme to harm GM while serving as a GM director. The United States Attorney for the Eastern District of Michigan has been conducting a wide-ranging investigation into corruption by and between FCA US LLC ("FCA") and Fiat Chrysler Automobiles N.V. ("FCA NV") on the one hand and certain former union leaders on the other. As has been repeatedly admitted, starting no later than July 2009, FCA and FCA NV paid millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" and, in return, received "benefits, concessions, and advantages

for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." FCA and FCA NV authorized these bribes specifically to harm GM and to advance their long-term goal to force higher costs on GM and assist FCA NV in forcing a merger with GM. Very recently, GM learned that FCA and FCA NV established and used offshore bank accounts to further their scheme. As described below, Ashton was the recipient of one or more of these funded accounts.

5.      Ashton was uniquely situated to further this scheme. From 2010 to 2014, Ashton was one of the five highest-ranking UAW officers serving as Vice President of the UAW's GM Department. Based on reasonable belief and inference, in return for secret compensation from FCA and FCA NV through foreign accounts, Ashton used his influence to deny GM specific structural labor concessions it should have otherwise received but for FCA and FCA NV's bribes. After he joined GM's Board in 2014, Ashton was privy to detailed highly confidential information concerning GM's view of and strategic response to FCA and FCA NV's ongoing merger inquiries, as well as GM's approach and expectations for collective bargaining negotiations. Again in return for secret compensation from FCA and FCA NV through foreign accounts and while owing GM the highest duties of loyalty, care, confidentiality, and disclosure, Ashton passed confidential GM information to the UAW and FCA and FCA NV. Ashton never disclosed this criminal scheme or

his role in the scheme to anyone at GM. In part due to Ashton's disloyalty and breaches of confidence, GM was forced to incur billions of dollars in increased labor costs.

6.      In sum, as described in detail below, while serving as a GM director Ashton embezzled CHR funds, provided by GM, and participated in a criminal scheme to harm GM through higher labor costs and assist FCA NV in forcing a merger. Ashton's criminal conduct violated every conceivable duty owed to GM. Through this action, GM seeks to recoup monies paid by GM to Ashton for service as a director on GM's Board. In addition, GM seeks to determine the full extent to which Ashton breached his fiduciary duties to GM and the full extent of the resulting damages caused to GM, and to recover for the same.

## THE PARTIES

### Plaintiffs

7.      **General Motors LLC**: Plaintiff General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. General Motors LLC is a subsidiary of General Motors Holdings LLC, which is a wholly owned subsidiary of Plaintiff General Motors Company. General Motors LLC is the largest automaker in the U.S. and an iconic American company that manufactures and sells automobiles in the U.S. under brands including

Chevrolet, Cadillac, Buick, and GMC. General Motors LLC is an employer in the automotive industry, which has a substantial effect on interstate commerce.

8.     **General Motors Company**: Plaintiff General Motors Company (herein referred to as "GM Company" or "New GM") is a Delaware corporation with its principal place of business in Detroit, Michigan, and the ultimate parent of General Motors LLC.

**Defendant**

9.     **Joseph Ashton**:  Ashton is an individual currently residing in New Jersey. Ashton served on the UAW's Executive Board from 2006 to 2014, including as Vice President of the UAW's GM Department from 2010 to 2014, and previously as the Regional Director for Region 9 from 2006 to 2009. From 2014 to December 2017, following his retirement from the UAW, Ashton served as the UAW Trust's[1] designee on GM's Board of Directors. In December 2017, Ashton abruptly resigned that position. On December 4, 2019, Ashton pled guilty to conspiracy to commit honest services wire fraud, 18 U.S.C. § 1349, and conspiracy to commit money laundering, 18 U.S.C. § 1956(h).

---

[1]   The UAW Trust was established as a result of the 2007 CBAs between the UAW, FCA, GM, and Ford, which assigned retiree health care liabilities to an independent Voluntary Employee Beneficiary Association. Pursuant to restructuring following the 2008 financial crisis, the UAW Trust obtained the right to appoint a director to GM's Board.

### Significant Non-Parties and Other Entities

10.    **FCA US LLC (formerly known as Chrysler Group LLC):** FCA is an automotive company based in Auburn Hills, Michigan, formerly known as Chrysler Group LLC, the successor of Chrysler LLC. "Chrysler" is used herein to refer individually or collectively to Chrysler Group LLC and Chrysler LLC. FCA is a wholly owned subsidiary of FCA NV, a publicly traded foreign entity listed on the New York Stock Exchange. FCA manufactures and sells automobiles in the U.S. under brands such as Chrysler, Jeep, Dodge, and Ram.

11.    **Fiat Chrysler Automobiles N.V. (formerly known as Fiat):** FCA NV, the successor of the Italian automotive company formerly known as Fiat S.p.A. ("Fiat"), is the ultimate parent company and owner of FCA US LLC. FCA NV is organized under the laws of the Netherlands, as a Naamloze Venootschap, and its principal executive offices are in London, England.

12.    **Alphons Iacobelli:** Iacobelli was employed as the Vice President of Employee Relations at FCA and as the Co-Chairman of the UAW-Chrysler joint training center (National Training Center or "NTC") and its Joint Activities Board from 2008 to 2015. In this role, Iacobelli was a senior official at Chrysler and FCA responsible for negotiating and implementing labor agreements with the UAW. Through his position with Chrysler and FCA, Iacobelli had the authority and acted as an agent for Chrysler and FCA to direct the financial affairs of and approve

payments made by the NTC. On January 22, 2018, Iacobelli pled guilty to subscribing a false tax return, pursuant to 26 U.S.C. § 7206(1), and conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was sentenced to 66 months in prison and a $10,000 fine and ordered to pay $835,523 in restitution.

13.     **Jerome Durden:** Durden was employed as a financial analyst at Chrysler and FCA in its corporate accounting department beginning in 1985. In 2008, he was assigned by Chrysler to act as the Controller of the NTC and as Secretary of the NTC Joint Activities Board. He served in those roles until 2015. In his capacity as the Controller of the NTC, Durden, as an agent for Chrysler and FCA, had the authority to approve and did approve payments made by the NTC. On August 8, 2018, Durden pled guilty to failure to file tax returns, 26 U.S.C. § 7203, and conspiracy to defraud the U.S., 18 U.S.C. § 371, and was sentenced to 15 months in prison and ordered to pay $8,811 in restitution.

14.     **Michael Brown:** Brown was employed as a Director for Employee Relations at Chrysler and FCA from 2009 to 2016. During that time, Brown was personally involved in the negotiation and administration of the national collective bargaining agreements ("CBAs") between Chrysler/FCA and UAW and had authority to sign letters and agreements on behalf of Chrysler/FCA with the UAW. Brown also represented Chrysler and FCA as a Co-Director of the NTC. On May 25, 2018, Brown pled guilty to misprision of a felony, pursuant to 18 U.S.C. § 4, and

was sentenced to one year and one day in prison and a $10,000 fine. At all times relevant to this Complaint, Brown was an agent of Chrysler and/or FCA.

15.     **Dennis D. Williams:** Williams served on the UAW's Executive Board, most recently as the UAW's President (2014 to June 2018) and previously as the UAW's Secretary-Treasurer (2010–2014). Prior to 2010, Williams served on the UAW International Executive Board as the Director of Region 4 (2001 to 2010) during which time he had direct dealings with Sergio Marchionne in connection with Marchionne's role as CEO of CNH Industrial, a maker of farm and construction equipment, which is commonly controlled by Exor NV. On August 27, 2020, the United States Attorney for the Eastern District of Michigan charged Williams with conspiracy to embezzle union funds in violation of 18 U.S.C. § 371 and 29 U.S.C. § 501(c). He is scheduled to admit responsibility and plead guilty on September 30, 2020.

16.     **International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW)**: The UAW is the union that exclusively represents the labor forces for both GM and FCA. From 2009 to 2019, the UAW represented approximately 50,000 GM employees and between 23,000 and 47,000 FCA employees. As such, the UAW has a significant degree of market power to force labor terms on either competitor including not only through the ability to

call strikes but also through the ability to control the day-to-day activities of its work force.

17.     The UAW has an unusual and limited governance structure where only five officers of the UAW—the President, the Secretary-Treasurer, and three Vice Presidents of the International Executive Board—control its central decision-making regarding the negotiation and administration of CBAs. These UAW officers possess particularly strong powers as well, including the power to negotiate CBAs, call special conventions, authorize strikes, and issue and revoke charters, among other powerful tools. While these UAW officers operate in the context of an International Executive Board that includes eleven "Regional Directors," these officers effectively control the overall decision-making, policy, director and officer elections and negotiation and administration of the CBAs. There are minimal checks and balances on the President and the other four officers as they have no oversight board, committee or trustee that exists to oversee and ensure the integrity of the International Executive Board and take action to address malfeasance. In addition, these officers, who had nearly complete control over UAW affairs, are elected only every four years and implemented practices to exercise substantial control over elections to perpetuate their role on the International Executive Board. If any of these officers or directors act corruptly, they have the power and influence to inflict direct harm on any given competitor.

18.    **Sergio Marchionne:** Marchionne (deceased in 2018) served as the CEO of Fiat, and later FCA NV, from 2004 through his death in 2018. Marchionne also served as the Chairman and CEO of FCA from 2014–2018, the Chairman (2011–2014) and CEO (2009–2014) of Chrysler, and the COO of FCA North America (2011–2018). Marchionne also served as the CEO of CNH Industrial (2004-2018), commonly controlled by Exor NV, which directly and indirectly is the largest shareholder of FCA NV.

19.    **NTC:** NTC is a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan. The NTC was formed under the terms of prior CBAs between the UAW and Chrysler, whose obligations were inherited by FCA following Chrysler's bankruptcy. The stated purpose of the NTC is to provide for the education, training, and retraining of UAW members employed by FCA. The governing body of the NTC was known as the Joint Activities Board. The Vice President of Employee Relations of FCA and the Vice President of the UAW's Chrysler Department served as Co-Chairmen of the NTC Joint Activities Board. The remainder of the Joint Activities Board was made up of senior officials from FCA and the UAW.

20.    **CHR:** Non-party CHR is a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan. The CHR was formed under the terms of prior CBAs between UAW and General Motors Corporation ("Old GM").

The CHR's primary purpose is to educate and train GM's represented workforce. The CHR is governed by an eight-director board, four appointed by GM and four by the UAW. As part of the 2019 CBA negotiations, GM and the UAW agreed to dissolve the CHR.

21. **General Holiefield:** Holiefield (deceased in 2015) served as the UAW Vice President for the Chrysler Department from 2006 through 2014. As Vice President, Holiefield had primary responsibility for negotiating with Chrysler/FCA and for administering the CBAs between the UAW and Chrysler/FCA. From 2007 to 2014, Holiefield also served on the UAW International Executive Board. Millions of dollars from Chrysler/FCA were diverted through NTC and charities to pay for Holiefield's personal expenses and to conceal over a million dollars in prohibited payments and things of value from Chrysler/FCA to Holiefield, his girlfriend (and later wife) Monica Morgan, and other UAW officials.

22. **Norwood H. Jewell:** Jewell served on the UAW's International Executive Board from 2011 to 2017, most recently as UAW's Vice President of the FCA Department (2014–2017) and previously as Regional Director (2010–2014). Jewell also served as Co-Chairman of the NTC. On April 2, 2019, Jewell pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371 and was sentenced to fifteen months in prison.

23.     **Virdell King:** King was a senior official in the UAW Chrysler Department from 2008 until she retired in February 2016. In 2011 and 2015, King served on the UAW's committee responsible for negotiating the CBAs between UAW and FCA. On August 29, 2017, King pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to prison and a $5,500 fine.

24.     **Nancy Johnson:** Johnson was the top administrative assistant to Jewell, then the UAW's Vice President for the Chrysler department, from 2014 through 2016. In 2015, Johnson served on the UAW committee responsible for negotiating the CBAs between UAW and FCA. On July 23, 2018, Johnson pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

25.     **Keith Mickens:** Mickens was a senior official in the UAW Chrysler Department from 2010 through 2015. In 2011, Mickens served on the UAW committee responsible for negotiating the CBA between the UAW and FCA. Mickens also served as Co-Director of the NTC and served on the NTC's Joint Activities Board. On April 5, 2018, Mickens pled guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. § 371, and was thereafter sentenced to one year and one day in prison and a $10,000 fine.

26.     **Michael R. Grimes:** Grimes was a senior official at the UAW, serving as the top administrative assistant[2] to Ashton from 2006 to 2014, and then continuing to work in the UAW's GM Department after Ashton retired and joined the GM Board. On September 4, 2019, Grimes pled guilty to conspiracy to commit honest services wire fraud and conspiracy to commit money laundering and was thereafter sentenced to twenty-eight months in prison and forfeited money and real property totaling over $1.5 million.

27.     **Jeffery Pietrzyk:** Pietrzyk was a senior official at the UAW, serving as an administrative assistant to Ashton from 2010 and 2014. Pietrzyk served on the CHR's Board from 2010 to 2014. On September 20, 2019, the government charged Pietrzyk with conspiracy to commit honest services wire fraud and conspiracy to commit money laundering while he was a senior UAW official. Pietrzyk pled guilty on October 22, 2019.

---

2     Administrative assistants play the role of "right hand persons" to Vice Presidents of the UAW for each of the FCA, Ford, and GM Departments. In that capacity, they act as senior leaders of the UAW. They also typically have long tenures in the UAW, playing a staff leader role across various Vice Presidents. "Top" administrative assistants generally have a "chief of staff" role, while other administrative assistants work with the top administrative assistant to perform more specialized functions.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332. Complete diversity exists; Ashton is a resident of New Jersey, and the Plaintiffs are residents of Delaware and Michigan. The amount in controversy is greater than $75,000, as GM seeks to recoup Ashton's compensation for his service on GM's Board, while Ashton was simultaneously violating his fiduciary duties, which compensation totaled hundreds of thousands of dollars. Finally, GM seeks damages for the harm that Ashton imposed on GM, including through increased labor costs, as a result of Ashton's breaches of his fiduciary duties.

29.     Venue is proper in this Court as a substantial part of the events or omissions giving rise to the claim occurred in this district. Ashton committed multiple breaches of fiduciary duty, including receiving kickbacks and bribes and committing other acts described herein, while located in New Jersey. In addition, Ashton resides in this district.

30.     This Court has personal jurisdiction over Ashton because he is a resident of New Jersey and has transacted affairs in this district.

## DETAILED ALLEGATIONS

## I.     ASHTON IS APPOINTED TO GM'S BOARD OF DIRECTORS.

31.     Defendant Ashton was a longtime UAW member, eventually rising to the powerful position of Vice President of the UAW's GM Department. Ashton also served on the International Executive Board of the UAW. In his role as Vice

President, Ashton had primary oversight of negotiating and implementing CBAs between the UAW and GM and influencing the terms of the UAW's CBAs with FCA.

32.    Ashton's role as Vice President of the UAW's GM Department provided Ashton with substantial influence over the operations of the CHR, as he served on the CHR's Executive Board. The CHR is a tax-exempt corporation, created by the UAW and GM to develop, deliver, coordinate, and administer joint strategies and programs designed to educate and train UAW-represented GM employees. All funding for the CHR came from GM, as required by GM's CBA with the UAW.

33.    In 2014, after serving on the UAW's International Executive Board for many years, Ashton was tapped to join GM's Board of Directors by the UAW Trust, which had the right to appoint one representative to GM's Board. Ashton served on GM's Board from 2014 to 2017, during which he owed fiduciary duties to GM. GM carefully reviewed Ashton's credentials and fitness for Board service and took appropriate steps to prevent any conflicts of loyalty. Among other steps, GM determined that Ashton would be ineligible to join the Board until he retired from the UAW and Ashton received in-depth training upon joining the Board.

34.    For example, when he joined the Board, Ashton received an orientation on his rights and obligations as a director and signed an agreement to comply with

his fiduciary duties to GM. Ashton repeatedly made numerous misrepresentations to GM. For example, Ashton repeatedly disclaimed in writing that he had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry. Ashton falsely claimed that he had not received or been offered anything of value by a "third party" "in consideration" for his service as a GM director. Ashton falsely warranted that he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM." Ashton falsely claimed there was no "special arrangement or understanding between [him] and any other person pursuant to which" he was nominated to the Board. Ashton further falsely affirmed that he "adhered" to GM's Code of Conduct, which prohibits "bribery" and receiving improper payments, among other pertinent illegal activity. Despite possessing and knowing of his fiduciary duties, including the duty of full disclosure, Ashton never disclosed to anyone at GM any of the past and ongoing schemes that could and did harm GM as described herein.

35.     In July 2017, the federal government unsealed a superseding indictment against Alphons Iacobelli, a then-GM employee who had previously been FCA's highest-ranking labor relations executive and led FCA's labor negotiations for many years. The indictment detailed a years-long pattern of illicit payments to and bribery of union officials by Iacobelli on behalf of FCA and FCA NV. Iacobelli's indictment did not discuss or suggest any wrongdoing occurred while Iacobelli was employed

at GM, or any wrongdoing at the CHR. Iacobelli was terminated from GM once the indictment was made public.

36.    In 2017, after the Iacobelli indictment, GM sought to interview Ashton related to the government's investigation into the CHR. Despite GM policy requiring that Ashton submit to such an interview, Ashton refused and hired criminal counsel. GM advised Ashton that if he did not submit to an interview he would be acting inconsistent with his obligations as a director.  Shortly thereafter, in December 2017, Ashton resigned.

## II.    GM LEARNS OF ASHTON'S WRONGDOING AT THE CHR.

37.    Only in the last year did GM learn of Ashton's criminal scheme involving the CHR, as the federal government unsealed several indictments against Ashton and his co-conspirators. Before this information was revealed in criminal indictments and plea agreements, GM had no knowledge of the kickback scheme or Ashton's involvement. Ashton never disclosed this information to anyone at GM, even while serving as a director owing GM fiduciary duties.

38.    On August 14, 2019, the government charged Grimes with conspiracy to commit wire fraud and money laundering. Grimes' indictment described a scheme involving Grimes and two unnamed co-conspirators, "Union Official 1" and "Union Official 2," to steal from the CHR (and ultimately from GM, which funded the CHR) through inflated vendor contracts and kickbacks. According to the indictment, the

object of the scheme was for Grimes, Union Official 1, and Union Official 2 "to use their positions with the UAW and CHR to personally enrich themselves by deceptively soliciting, influencing, and obtaining contracts for [CHR vendors] . . . to provide clothing and other products to the CHR and to UAW members. In return, Michael Grimes, Union Official 1, and Union Official 2 demanded and accepted from [CHR vendors] hundreds of thousands of dollars in bribes and kickbacks in the form of cash, checks, and other things of value."[3]

39.    For instance, the indictment alleged that Grimes and these two unnamed UAW officials illegally profited from several transactions, including: (1) a 2011 contract for 50,000 "Team UAW-GM" jackets distributed to all plant employees, purchased for $6 million; (2) a 2013 contract for over 50,000 watches purchased for approximately $4 million; and (3) a 2016 contract for approximately 55,000 backpacks purchased for approximately $5.8 million.

40.    On September 4, 2019, Grimes pled guilty and was thereafter sentenced to twenty-eight months in prison and forced to forfeit more than $1.5 million.

41.    On September 20, 2019, the government charged Pietrzyk—"Union Official 2" in Grimes' indictment—with conspiracy to commit wire fraud and money laundering. Like Grimes' indictment, Pietrzyk's indictment described a

---

[3]    *See* Grimes Information at 5.

20

scheme among Grimes, Pietrzyk, and an unnamed co-conspirator, "Union Official 1," to siphon GM funds from the CHR through fraudulent contracts and kickbacks. Again, the object of the scheme was to deceptively obtain contracts for CHR and receive hundreds of thousands of dollars in kickbacks.

42.     On October 22, 2019, Pietrzyk pled guilty. He is awaiting sentencing.

43.     On November 6, 2019, the government identified "Union Official 1" as Ashton, charging him with conspiracy to commit wire fraud and money laundering in connection with the same CHR scheme. Ashton pled guilty on December 4, 2019, admitting that he demanded and accepted hundreds of thousands of dollars in kickbacks and improperly used his position to enrich himself and his co-conspirators.

44.     As described in the indictments and admitted in the plea agreements, Ashton orchestrated a years-long scheme to steal GM funds through inflated vendor contracts and kickbacks. For example, in 2011, Ashton proposed the purchase of 50,000 "Team UAW-GM" jackets for all plant employees. Grimes recommended a specific vendor as the sole source for the contract. That vendor was awarded the contract and Pietrzyk told Grimes that Ashton wanted a cut of the proceeds. Pietrzyk directed Grimes to demand approximately $300,000 in kickbacks for Ashton from the vendor. The vendor agreed to pay it, and Ashton received the $300,000. Ashton paid Pietrzyk approximately $30,000 of that amount.

45.     Grimes similarly benefited, having also demanded $525,000 in kickbacks from the vendor so that he could purchase a house in Fenton, Michigan. When the vendor initially refused, Grimes threatened to cancel the contract. The vendor ultimately relented and paid Grimes $530,000 through a check made payable to one of his relatives.[4]

46.     As another example of CHR-related frauds, in 2010, Ashton convinced an associate, Cohen, to loan $250,000 to a construction company. When the construction company stopped paying the loan, Ashton proposed to Cohen that he could recoup the loan money by forming a company to sell watches to the CHR. Cohen agreed and formed USA Countrywide for this purpose in August or September 2012.

47.     In late 2012 or early 2013, Cohen located a subcontractor to manufacture 58,000 custom watches. Ashton actively participated in the design, production, and pricing of the watches. Ashton also negotiated and approved for USA Countrywide/Cohen to purchase the watches from the manufacturer for approximately $2.3 million. Ashton then directed USA Countrywide/Cohen to submit a bid for the watches to Pietrzyk listing a higher price of almost $4 million.

---

[4]   *See* Grimes Information at 8–9.

Both Pietrzyk and Ashton then successfully used their positions of power in the CHR and UAW to make sure that USA Countrywide was awarded the contract.

48.    In May 2013, Ashton demanded $250,000 from USA Countrywide/Cohen as a kickback for the contract. Cohen agreed, and began to deliver the kickback in installments. Ashton also directed USA Countrywide/Cohen to pay kickbacks to Pietrzyk, fraudulently described as "antique furniture" or "furniture" in the memo line of the checks to conceal the criminal kickbacks.[5]

49.    The CHR received the 58,000 watches from USA Countrywide/Cohen in January 2014, but Ashton advocated that it was not an appropriate time to hand them out. Thus, the watches were held at the CHR.[6]

50.    Ashton's illegal conduct continued even after he joined GM's Board of Directors. In particular, Cohen personally delivered cash to Ashton at Ashton's home, delivering between $5,000–$30,000 several times from May 2013 through early 2015, *i.e.*, after Ashton joined the Board. In 2016, while Ashton was serving on the Board, he continued to receive these payments in the form of checks from Cohen. Ashton received at least $30,000 in such payments in 2016.[7]

---

[5]    *See* Ashton Information at 9.

[6]    *See* Ashton Information at 9.

[7]    *See* Ashton Information at 7-9.

51.     Even though Ashton was receiving these kickbacks while serving on the Board of GM, and knowing that such payments directly harmed GM by causing GM to unwittingly fund over-priced expenses at the CHR, Ashton never disclosed this kickback scheme, or the rampant kickbacks occurring at the CHR generally, to anyone at GM.

52.     Following the news of a federal investigation into the UAW and FCA and FCA NV in the fall of 2016, Ashton met with USA Countrywide/Cohen to stop the payments due to the investigation.[8]

53.     In sum, Ashton, Grimes, and Pietrzyk conspired to inflate contracts between CHR and vendors and then accept kickbacks from those vendors totaling over $2 million. This defrauded GM, which funds the CHR under the terms of its CBA with the UAW. Ashton, Grimes, and Pietrzyk hid from GM the manner in which the contracts were actually awarded and implemented involving bribes and kickbacks, including while Ashton was serving as a director on GM's Board.

## III.   GM LEARNS OF ASHTON'S INVOLVEMENT IN FCA AND FCA NV'S BRIBERY SCHEME.

54.     In addition to Ashton's involvement in the fraud at the CHR, GM recently discovered Ashton's role in advancing FCA and FCA NV's bribery scheme to harm GM and force it to merge with FCA NV.

---

[8]   *See* Grimes Information at 13.

55.    On January 22, 2018, Iacobelli pled guilty in connection with the bribery scheme. Iacobelli's guilty plea revealed for the first time that FCA's illegal payments to certain UAW officials were made "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiations, implementation, and administration of the collective bargaining agreements between FCA and the UAW."[9] At this time, Ashton was not openly identified as being a participant in the scheme.

56.    After thorough investigation, including witness interviews, review of publicly available information regarding criminal developments, close monitoring of the criminal proceedings against Defendants and their co-conspirators, review and analysis of internal GM documents and communications, the engagement of consulting experts, and an in-depth analysis of collective bargaining negotiations and related agreements among GM, FCA, and the UAW, GM brought suit in November 2019 against FCA, FCA NV, and certain individual defendants in the United States District Court for the Eastern District of Michigan. Ashton was not a defendant in that suit.

---

[9]    7/13/18 Iacobelli Plea Agreement at 7. (Iacobelli pled guilty on January 22, 2018, and his plea agreement was filed the next day. Due to a scrivener's error, a corrected version was filed on July 13, 2018.)

57.    GM was denied formal discovery in that action. Only very recently, after several months of additional investigation, did GM come to learn of certain foreign financial accounts in the Cayman Islands (Cayman National Bank) and Japan (Shinsei Bank) held in the name of Ashton and/or Ashton's charity. These accounts held or currently hold substantial funds that, upon information, belief, and clear and reasonable inference, were ultimately provided to Ashton by FCA NV. Before this information came to light, GM had no way to know of Ashton's involvement in FCA and FCA NV's bribery scheme. This information could not have been discovered earlier despite due diligence, including because the co-conspirators actively concealed the misconduct and by its very nature the information is self-concealing.

58.    Ashton was not alone in receiving such funds. FCA and FCA NV bought the control of other UAW leaders to ensure that their bribery scheme achieved its goal of targeting and harming GM. For example, upon information, belief, and clear and reasonable inference, as part of the conspiracy with Ashton, FCA NV directed illicit bribes to at least Ashton (UAW Vice President 2010-2014), General Holiefield (UAW Vice President 2008-2012), and past UAW Presidents including Dennis Williams (UAW Officer 2010-2018), by granting those individuals control or a beneficial interest over undisclosed foreign financial accounts with substantial funds. For Williams, such accounts exist in Switzerland (LGT Bank) and Liechtenstein (Mason Private Bank) in his name and in the name of a business entity

he controls. Upon information, belief, and clear and reasonable inference, FCA and FCA NV enabled, funded, and provided control to these individuals' above-identified accounts.

59.    FCA and FCA NV's funding of these offshore accounts is further supported by their proven and admitted pattern of bribing UAW officials, FCA NV's (through predecessor Fiat S.p.A.) admitted use of offshore accounts to bribe Italian politicians in the past, and the commercial power and influence these entities possess to cause such banks and other facilitators to open and maintain these foreign accounts for third parties as identified herein. Further, the only reasonable explanation that this closely connected group of individuals would have such foreign accounts in countries and financial institutions known for money laundering is that they were facilitated and funded by FCA and FCA NV. The notion that a closely tied group of FCA and UAW executives would possess undisclosed foreign bank accounts unrelated to their admitted participation in a multi-year bribery scheme is simply not plausible.

60.    In addition, upon information, belief and clear inference, other FCA and UAW officials connected to the Ashton-FCA conspiracy as described herein received FCA/FCA NV bribes through foreign accounts.

61.     It was only through discovering the existence of these foreign accounts, including those held by Ashton, that GM learned the true extent of FCA and FCA NV's scheme, described below, and Ashton's involvement in it.

**A.      Marchionne Prepares on Behalf of FCA and FCA NV to Force a Takeover of GM by Merger**

62.     Sergio Marchionne held a longstanding view that the U.S. automotive market required consolidation to remain competitive. As he told *Automotive News* in 2008:  "You need at least 5.5 million to 6 million cars (a year) to have a chance of making money. . . . Fiat is not even halfway there. And we are not alone in this. So we need to aggregate, one way or another."[10]

63.     The central purpose of the bribery scheme Marchionne, FCA, and FCA NV enacted was to harm GM in an effort to induce it to merge with FCA to achieve synergies and a higher return on capital. With the scheme well underway and having its desired effect, in October 2012, when Fiat owned a significant portion of Chrysler (approximately 59 percent) and the UAW Trust owned the remainder, Marchionne wrote to GM's CEO on behalf of FCA NV proposing a "comprehensive" combination between Fiat, Chrysler, and GM. GM rebuffed this attempt at a

---

[10]  Gilles Castonguay, *Fiat Can't Survive Alone; Needs Partner: CEO*, Reuters (Dec. 8, 2008), https://www.reuters.com/article/us-rb-fiat-ceo/fiat-cant-survive-alone-needs-partner-ceo-idUSTRE4B738Z20081208.

combination. But Marchionne remained resolute in his quest to force an FCA NV-GM combination.

64.     By 2013, Chrysler had only two shareholders:  (1) Fiat, which owned a controlling 58.5 percent stake; and (2) the UAW Trust, which owned the remaining 41.5 percent.

65.     In July 2012, Fiat elected to exercise its option to purchase a portion of the UAW Trust's stake in Chrysler, offering $139.7 million for 3.3 percent. Fiat and the UAW Trust apparently disagreed over the price, and Fiat sued in Delaware Chancery Court. In October 2013, press reports indicated that "Fiat plan[ned] to urge the UAW to help it convince [the UAW Trust] to unload its [entire] 41.5% stake in Chrysler."[11]

66.     On January 1, 2014, Fiat announced an agreement to acquire the UAW Trust's entire stake in Chrysler for $4.35 billion. The transaction closed on January 21, 2014. Nearly half that amount, $1.9 billion, was financed through a special distribution by Chrysler with Chrysler agreeing to pay the UAW Trust another $700 million over four years.

---

[11]   Clark Schultz, *Fiat Leans on the UAW for Chrysler Sale,* SEEKING ALPHA (Oct. 17, 2013), https://seekingalpha.com/news/1334672-fiat-leans-on-the-uaw-for-chrysler-sale.

67.     Although not a party to the foregoing transaction, the UAW itself entered into an "enforceable" Memorandum of Understanding with FCA promising to "actively assist in the achievement of FCA US's long-term business plan." In short, this agreement was an attempt by FCA and its co-conspirators to paper over— and provide an appearance of legitimacy to—what had previously been agreed to in their long-running bribery scheme. From FCA's Annual Report:

> FCA US and UAW executed and delivered a contractually binding and legally enforceable Memorandum of Understanding ("MOU") to **supplement** FCA US's existing collective bargaining agreement. Under the MOU, the UAW committed to (i) **use the best efforts to cooperate in the continued roll-out of FCA US's World Class Manufacturing ("WCM") programs**, (ii) to actively participate in benchmarking efforts associated with implementation of WCM programs across all FCA's manufacturing sites to ensure objective competitive assessments of operational performance and provide a framework for the proper application of WCM principles, and (iii) **to actively assist in the achievement of FCA US's long-term business plan**. (Emphasis added.)[12]

68.     Fiat and Chrysler merged into FCA on October 12, 2014, with Marchionne at the helm of the combined entity.

69.     After taking full control of Chrysler, Marchionne set his sights on forcing a merger with another one of the "Big Three" North American automakers.

---

[12] FCA, 2014 ANNUAL REPORT, at 178, https://www.fcagroup.com/en-US/investors/financial_regulatory/financial_reports/files/FCA_2014_Annual_Report.pdf.

Given the ownership structure of Ford, with the substantial share of voting power held by the Ford family, Ford would never be a logical target for Marchionne's merger ambitions. GM was the only viable target, and thus Marchionne had long focused his efforts on GM.

**B.      Defendant Ashton and President Williams Are Key Players in the Takeover Conspiracy**

70.     In 2013 and 2014, as FCA consolidated its control of Chrysler, Marchionne turned to weaponizing FCA's bribery of the UAW towards GM, in an effort to pressure GM to agree to merge with FCA.

71.     By this time, upon information and belief, FCA and FCA NV had been bribing Ashton and UAW Secretary-Treasurer and President Dennis Williams (among others) and turned to them for assistance. As the Vice President for the GM Department of the UAW, Ashton could directly influence and control the labor relations between GM and the UAW. Ashton was thus important to the scheme to ensure that GM did not receive the same labor advantages as FCA in the form of structural concessions granted to FCA. For example, under Ashton's direction, FCA was provided and GM was denied certain structural programs, including genuine support from UAW leaders for GM's worker efficiency program, Global Manufacturing System ("GMS"), manipulation of contractual limits on Tier Two and temporary employees, support for FCA's "longer term business plan," and other "side letter" agreements between FCA and the UAW.

72.   By 2014, FCA and FCA NV found an even more valuable use for Ashton. Through Williams, Ashton was chosen to be the UAW Trust's designee on GM's Board.

73.   Marchionne and FCA also received support from new UAW President and longtime friend, Dennis Williams. Williams cooperated with the goals and plans of FCA and FCA NV and took concrete actions to support those goals as his cooperation had been purchased many times over. Marchionne and Williams had known each other since the 2000s, when Williams negotiated contracts at a Fiat-affiliated truck and tractor company. Williams has affirmed that he tries "not to second-guess Sergio," and that the pair have a "very good relationship," which was secured through bribery of Williams.

**C.   FCA Initiates Operation Cylinder**

74.   By 2014, GM had rejected multiple overtures from FCA NV regarding a merger. But in early 2015, having successfully consolidated control over Chrysler and positioned FCA NV for merger, Marchionne, FCA, and FCA NV believed it was in a much stronger position to force a GM merger.

75.   With Marchionne as the lead, FCA schemed that it could effectively take over GM through a merger (code-named "Operation Cylinder"), have Marchionne remain CEO of the combined companies, and oversee the largest auto

company in the world.[13]  In part for this very reason, Marchionne, on behalf of FCA and FCA NV, had authorized the bribery of UAW leaders, including Ashton. The support of those UAW leaders was essential to the success of Operation Cylinder because, among other reasons, the UAW could effectively block a merger under certain terms in the CBA. Marchionne and Williams were well aware that the UAW wielded this veto power over any potential merger.

76.    FCA NV initiated its takeover plans in March 2015, when Marchionne wrote to GM's Board and management, formally proposing the merger between GM and FCA NV.

77.    GM vetted the proposal with management, its advisors, and its Board, and ultimately rejected the offer on April 14, 2015. Crucially, at this point, Ashton was no longer a UAW officer—instead, he was much better positioned as a GM director to receive and pass on to the UAW (and ultimately FCA and FCA NV) relevant information. As a GM director at the time, Ashton was included in the Board's confidential discussions surrounding the merger and was privy to GM's detailed analysis of and response to the FCA NV's most recent merger invitation.

---

[13]  Tommaso Ebhardt, *The Crisis Fiat Faced As It Lost an Indispensable Leader*, BLOOMBERG BUSINESSWEEK (Apr. 23, 2019), https://www.bloomberg.com/news/articles/2019-04-23/the-crisis-fiat-faced-as-it-lost-an-indispensable-leader.

Ashton passed this information to the UAW and FCA, in violation of his fiduciary duties to GM and the confidentiality provisions he signed annually.

78.    On June 18, 2015, GM CEO Mary Barra, GM President Daniel Ammann, GM CFO Chuck Stevens, and GM's lead labor negotiator Cathy Clegg attended a meeting with UAW President Williams and Vice President Cindy Estrada, Ashton's successor, who relayed and championed Marchionne's merger proposition. Working at Marchionne's behest as a result of the bribery scheme, Williams used his position to press for GM to consider the proposed merger. GM made clear to Williams that it was not interested in merging with FCA NV.

79.    The next day, the GM Board, including Ashton, was informed of the Williams meeting. They were informed that Marchionne had been in direct talks with Williams about a merger and apparently had tapped Williams as FCA NV's messenger. They were also told that the day before, Williams relayed that Marchionne had told him the GM Board had not seriously considered the FCA NV merger proposal—an untrue statement.

### D.    2015 CBA Negotiations

80.    A key to Marchionne's Operation Cylinder scheme was the longstanding practice in the automotive industry known as pattern bargaining, a strategy in which unionized workers across an industry attempt to bargain uniform terms in their contracts. The UAW describes pattern bargaining as "a core part of

[its] bargaining strategy"[14] and a "powerful strategic tool."[15]  Pattern bargaining is a potent force multiplier:  through it, Marchionne needed only certain corrupt UAW leaders' support to impose anti-competitive conditions aimed at GM. As part of his and Marchionne's criminal scheme, Williams weaponized pattern bargaining, not to protect the interests of the UAW's members, but to advance FCA interests by promoting Marchionne's merger to the detriment of GM. FCA and FCA NV sought to leverage pattern bargaining to impose asymmetrical costs on GM, with the goal of harming GM by imposing massive labor costs on GM and making it more likely to favorably consider a merger with FCA given the synergies touted by Marchionne.

81.    Approximately every four years, each Detroit-based automaker negotiates a CBA with the UAW. To increase its leverage in the industry, the UAW has ensured that each CBA expires at the same time, resulting in simultaneous negotiation. The UAW begins negotiations with each automaker through subcommittees in July.

82.    Months later, and shortly before contract expiration, the UAW selects one of the automakers as a "lead" or "target" company, with which the UAW negotiates a CBA. Then, the UAW exerts pressure on the other two companies to

---

[14]   UAW, *Pattern Bargaining* (Oct. 25, 2015), https://uaw.org/pattern-bargaining/.

[15]   Letter from Rory Gamble, Vice President, UAW, to UAW National Ford Department, Negotiations Update (Oct. 18, 2019).

use the first agreement as a "pattern" for negotiations. The UAW has particularly strong leverage to do so, *i.e.*, the threat of a costly nationwide strike.

83.    Williams has publicly admitted to forcing automakers into a pattern: "We believe in pattern bargaining. The companies ought to compete on a product, quality, engineering and process and not on the backs of workers. That philosophy has been embedded for us since Walter Reuther and is embedded with Dennis Williams."[16]

84.    In the 2011 negotiations, GM was the "lead" or "target" company and negotiated the first tentative agreement with the UAW. But FCA and FCA NV had already been bribing the UAW thus corrupting the collective bargaining process.

85.    In 2015 bargaining, based on past practices and having conducted a detailed analysis of the negotiation dynamics, GM reasonably believed that it would be the target. Industry analysts also did not believe that FCA was a viable target. FCA was "the smallest of the three companies, with the lowest profit margins and the highest percentage of lower-paid entry-level workers seeking higher wages," which would "make it more difficult for the UAW to win big pay raises for its workers and big signing bonuses."[17]

---

[16]  *UAW President Dennis Williams Roundtable* (June 18, 2015), available at https://www.youtube.com/watch?v=bfS3EzxDXqI.

[17]  Alisa Priddle & Brent Snavely, *Fiat Chrysler Is Surprise Lead Company in UAW Talks*, DETROIT FREE PRESS (Sept. 13, 2015),

86.     Between July and mid-September 2015, prior to the "lead" being named, GM bargained with the UAW through its subcommittees. The GM Board gave its negotiators authority to negotiate within a particular range.

87.     During these negotiations, Williams gave his list of "Presidential Demands" to GM. Based on GM's calculations, Williams's "Presidential Demands" reflected a CBA with a total cost increase of just under a billion dollars over the 2011 CBA.

88.     Prior to September 13, 2015 and before selecting the target for pattern bargaining, both the UAW and GM had made various concessions in their negotiations. Those concessions decreased the total incremental costs for the new potential deal by more than 20 percent compared to the UAW's initial demand of nearly $1 billion. The UAW's principal negotiators represented to GM that they could "sell it"—that is, the deal that was on the table—to the UAW's members.

89.     Unbeknownst to GM, while serving on GM's Board, Ashton was playing a key role in advancing FCA and FCA NV's scheme to harm GM through the 2015 negotiations.

90.     Through his membership on the GM Board and his close relationship with the UAW, Ashton was able to provide the UAW, FCA, and FCA NV with

---

https://www.freep.com/story/money/cars/general-motors/2015/09/13/fiat-chrysler-lead-company-uaw-contract-talks/72091592/.

unparalleled access to information on both sides of the ongoing UAW-GM CBA negotiations. For example, Ashton had access to extensive information concerning sensitive topics including, as most relevant here, negotiation strategy and progress in connection with GM's negotiations with the UAW over the 2015 CBA, and GM's consideration of and response to merger inquiries from FCA NV. In 2015, a key period both for CBA negotiations and GM's response to FCA's merger request, Ashton received information showing detailed information on GM's actual performance and goals for 2015; early information showing what GM viewed as the greatest risks in the coming CBA negotiations (specifically identifying the two-tiered wage structure); much more detailed discussions of risks and opportunities from the coming CBA negotiations, including specific discussions around the tier-two wage structure; and specific discussions of FCA's merger proposal, including GM's detailed strategies for defending against what it viewed as an unattractive proposal. Passing this confidential information to the UAW and/or failing to disclose the ongoing schemes involving FCA and the UAW, in which Ashton was a longstanding participant, was a clear breach of Ashton's fiduciary duties to GM.

91.     Ashton, a sitting member of GM's Board, owed the highest duties of loyalty, care, confidentiality, and disclosure to GM—and no duties whatsoever to the corrupt UAW leaders who had appointed him or FCA and FCA NV leaders who had bought his loyalty. However, while serving on GM's Board as a fiduciary, not

only did Ashton fail to disclose the ongoing scheme between FCA and FCA NV and the UAW to directly harm GM, Ashton proceeded to pass confidential GM information to the corrupt UAW leaders and FCA and FCA NV executives. This confidential information included GM's strategies and internal positions in connection with the 2015 CBA negotiations.

92.    On September 13, 2015, the UAW unexpectedly announced that it had chosen FCA as the "target," a position secured through the years-long bribery scheme between FCA, FCA NV, and UAW leaders.

93.    Williams had near complete control over the selection of the lead. Williams chose FCA as the lead, at Marchionne's bidding, in order to use the FCA pattern agreement to harm GM and seek to force a merger with GM.

94.    On September 15, 2015, just two days after FCA was selected as lead, FCA and the UAW reported that an agreement had been reached that, in Marchionne's words, was a "transformational deal."[18]

95.    Marchionne explained that the "economics of the deal are almost irrelevant" because the costs "pale in comparison given the magnitude of the potential synergies and benefits" of a combination, and cemented a "philosophical

---

[18] Alisa Priddle, *Marchionne: Deal Can Bring Workers 'Significant Benefits*,' DETROIT FREE PRESS (Sept. 16, 2015), https://www.freep.com/story/money/cars/chrysler/2015/09/16/marchionne-health-care-2-tier-wages-part-uaw-pact/32501757/.

approach that [FCA] wants to use going forward." The facts indicate that Marchionne was referring to using the collective bargaining process to pressure a merger between FCA and GM.[19]

96.     On September 30, 2015 and despite the richness of the tentative agreement, the UAW's FCA workforce rejected the tentative agreement negotiated by the FCA and UAW leaders.[20] Various press reports attributed the rejection to distrust of the union's leadership by its members.

97.     On October 8, 2015, FCA and the UAW announced a new tentative agreement, which was similar to the initial tentative agreement in terms of structure and total cost to FCA.[21] The deal was specifically tailored to, and in fact ultimately did, disproportionately harm GM.

---

[19]  *2015 UAW FCA Agreement Announcement* (Sept. 15, 2015), available at https://www.youtube.com/watch?v=YX8wWGi28rs.

[20]  During bargaining, the UAW negotiates "tentative" agreements with each automaker. These tentative agreements are then proposed to UAW members, who vote to approve ("ratify") or reject the deal. Agreements are not legally effective until ratification by UAW membership. If a majority of UAW members vote to reject a tentative agreement, another agreement must then be negotiated and proposed to UAW membership for ratification. In voting to reject a tentative agreement, members do not provide a reason for the rejection.

[21]  As demonstrated by their actions with respect to the second tentative agreement, the UAW leadership recognized that the failure of the first tentative agreement was caused by the UAW's failure in messaging and process more than issues with the substance of the agreement.  *See* Tracy Samilton, "UAW hopes second time's the   charm   for   new   contract   with   FCA"   (October   9,   2015)

98.    On October 22, 2015, UAW members ratified the new FCA deal with 77 percent approval.

99.    On October 25, 2015, GM, selected as the next target, reached a tentative deal with the UAW based on the fraudulently tainted FCA-UAW pattern. Although GM tried to resist the use of the FCA agreement as a pattern, the threatened risk of a strike proved too great. As had been intended by the various conspirators, the coercive economic force of pattern bargaining and threat of strike forced GM to largely concede FCA's agreement as a pattern. The 2015 GM-UAW CBA was ratified by UAW membership on November 20, 2015 and was effective as of November 23, 2015.

100.    Ultimately, the final CBA between GM and the UAW caused GM to incur approximately $1.9 billion in incremental labor costs over four years—over $1 billion more than the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead.

101.    Through his work to further FCA and FCA NV's scheme while serving on the GM Board, Ashton inflicted substantial harm on GM, in violation of his fiduciary duties.

---

https://www.michiganradio.org/post/uaw-hopes-second-times-charm-new-contract-fca.

## IV.   ASHTON AND THE OTHER CO-CONSPIRATORS TOOK STEPS TO FRAUDULENTLY CONCEAL THEIR WRONGDOING AND RESULTING DAMAGE.

102.   As recounted above, GM had no way to know of the ongoing CHR scheme perpetrated by Ashton. It was not until the summer of 2019, with the indictment of Grimes, that GM first learned of the existence and scope of wrongdoing at the CHR by Ashton. Prior to that time, GM did not know and could not reasonably have discovered the shakedown and kickback scheme that Grimes, Pietrzyk, and Ashton committed with certain vendors of the CHR or that Ashton had been involved in and directed the fraud, including while serving on GM's Board.

103.   Ashton and his co-conspirators affirmatively concealed their wrongdoing and GM's resulting injury. For example, Ashton admitted that he, along with Grimes and Pietrzyk, "concealed and did not disclose the manner in which certain contracts between CHR and [USA Countrywide]. . . was obtained or the fact that [he, Grimes, and Pietrzyk] accepted bribes and kickbacks from [USA Countrywide]."[22] Grimes and Pietrzyk similarly admitted that they, along with Ashton, "concealed and did not disclose" the scheme, including the improperly inflated contracts and the bribes and kickbacks they received.[23]

---

[22]   Ashton Plea Agreement at 6.

[23]   Grimes Plea Agreement at 6.

104.   The lengths Ashton and others went to conceal their scheme from GM are detailed in the government's charges. To conceal his kickbacks received from a CHR vendor, Impressions, Grimes directed Impressions to make out checks payable to his wife or to "KKG Consulting," a sham company created by Grimes' wife for the purpose of concealing the bribes. Likewise, Ashton, Grimes, and Pietrzyk conspired with Cohen to set up a sham vendor, USA Countrywide, and then conceal bribes from that vendor with checks purportedly for "antique furniture" or "furniture." Then, once Ashton learned that the government was investigating the NTC, Ashton met with Cohen and instructed him not to send further payments to avoid detection from the government investigation.

105.   Meanwhile, although Ashton was a member of GM's Board of Directors from 2014 to 2017 and owed a fiduciary duty to GM to disclose any self-dealing or misuse of GM funds, Ashton concealed that over the same time period he was receiving regular cash payments and checks from Cohen and USA Countrywide of between $5,000 and $30,000 as bribes and kickbacks for causing CHR to enter an inflated contract with USA Countrywide for the purchase of 58,000 custom watches. Ashton furthered this concealment by refusing even to meet with or speak to GM in 2017 when GM first learned of a possible investigation into CHR.

106.   Similarly, GM had no way to know of the existence or Ashton's involvement in the scheme directed by FCA and FCA NV to bribe key UAW officials to ensure FCA received illicit competitive advantages to GM's harm.

107.  In addition, Ashton and the other conspirators also adopted extraordinary measures to conceal FCA's bribery scheme. As described herein and as admitted in the criminal plea agreements, the co-conspirators took numerous active steps to evade suspicion and prevent inquiry into their illegal scheme, including through misstatements, false testimony, tax fraud, and other contrivances designed to suppress evidence of wrongdoing. As demonstrated by the length, complexity and sophistication of the scheme, these efforts successfully concealed the scheme and precluded suspicion of Ashton's or the other conspirators' conduct. For example:

(a)   Ashton and other FCA and UAW executives hold millions of dollars in illicit funds in foreign bank accounts in countries such as Switzerland, Luxembourg, Liechtenstein, Panama, the Cayman Islands, and others.

(b)   FCA officials "used the credit card accounts and the bank accounts of the NTC to conceal over $1.5 million in prohibited

payments and things of value paid to officers and employees of the UAW";[24]

(c)     Iacobelli, Durden, Morgan, and their co-conspirators used the charities to "conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield";[25]

(d)     Iacobelli (on March 19, 2015), Durden (in February 2011, November 2011, and May 2012–15), and Morgan (on November 3, 2014) filed false tax returns that failed to disclose hundreds of thousands of dollars in illegal payments;

(e)     Between July 2009 and 2015, Durden agreed and conspired with Iacobelli, Holiefield, Morgan, Mickens, the NTC, and other individuals and entities "to impede, impair, obstruct, and defeat the Internal Revenue Service from ascertaining, computing, assessing, and collecting taxes," thereby "conceal[ing] hundreds of thousands of dollars in illegal payments made by and on behalf of FCA to UAW officers and representatives";[26]

---

[24]   5/25/18 Brown Plea Agreement, at 3.

[25]   7/26/17 Iacobelli Indictment, at 9.

[26]   6/13/17 Durden Information, at 6.

(f)     In February 2010, Marchionne concealed his gift of a custom-made Terra Cielo Mare watch to Holiefield by "declar[ing] the goods at less than fifty bucks."[27] Marchionne then falsely denied the gift when questioned about it by federal investigators;

(g)     "In May of 2011, [Iacobelli] sent an email to [Durden] cautioning Durden not to put the details of certain expenditures made for the benefit of [Holiefield] in writing";[28]

(h)     On December 16, 2015, Brown "provided misleading and incomplete [grand jury] testimony in a deliberate effort to conceal the conspiracy to violate the Labor Management Relations Act by FCA, FCA executives acting in the interest of FCA, the UAW and UAW officials.";[29]

(i)     From 2014 to 2016, Jewell "knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA . . . knowing that the prohibited payments of things of value, which were delivered through and concealed by the [NTC], were willfully made with the intent to benefit" Jewell

---

[27]   7/13/18 Iacobelli Plea Agreement, at 8.

[28]   7/26/17 Iacobelli Indictment, at 20.

[29]   5/25/18 Brown Plea Agreement, at 5.

and other officials.[30] Further, Jewell entered into a "'culture of corruption' that existed between Alphons Iacobelli and other FCA officials and former UAW Vice President General Holiefield and other members of his staff," involving "corruption [that] was ongoing and intentionally concealed . . . ."[31]

108.   After the U.S. Attorney's investigation began bringing this scheme to light, GM diligently monitored the criminal proceedings and other sources of available information, but GM did not have sufficient information to identify Ashton's involvement in this scheme or his breach of fiduciary duty with respect to the scheme until very recently, when GM first learned of the substantial accounts Ashton had been provided by FCA NV in multiple foreign financial institutions.

109.   In 2017 and 2018, in a series of letters and public statements, FCA, Marchionne, and Williams (all of whom were co-conspirators with Ashton) warranted that their illegal scheme had "nothing whatsoever to do with the collective bargaining process," but rather involved other "bad actors." As has now been revealed, these statements were false, and were designed to evade suspicion and prevent inquiry into their illegal conduct:

---

[30]   4/2/19 Jewell Plea Agreement, at 3–4.

[31]   *Id.* at 13.

(a)  On July 26, 2017, the same day that Iacobelli and Morgan were indicted, Williams published a letter to UAW members stating: "The current UAW leadership had absolutely no knowledge of the alleged fraudulent activities detailed by this indictment until they were brought to our attention by the government. . . . *[T]he allegations in the indictment in no way call into question the collective bargaining contracts negotiated by our union during this period*."[32]  In fact, Williams himself was directly involved in the corruption scheme, which was designed to and did corrupt the collective bargaining process.

(b)  On July 26, 2017, FCA published a statement claiming that it was a "victim[] of malfeasance by certain of [its] employees that held roles at the [NTC], an independent entity. These egregious acts were neither known to nor sanctioned by FCA."[33]  In fact, FCA was aware of the illegal payments made by its executives, who were implementing FCA's "corporate policy" of bribing

---

[32]  Dennis Williams, *Letter Regarding DOJ Investigation* (July 26, 2017), https://uaw.org/letter-regarding-doj-investigation/.

[33]  FCA, *Statement in Response to Department of Justice Investigation* (July 26, 2017), https://media.fcanorthamerica.com/newsrelease.do?id=18478&mid=.

key officials in order to corrupt the collective bargaining process. A federal court has found that FCA acted as an active co-conspirator with the NTC and others in this bribery scheme.

(c)     Following a day later in what appears to be coordinated statements, Marchionne published a letter that piggy-backed on Williams' false statements: "I join Dennis Williams, the UAW President, in expressing my disgust at the conduct alleged in the indictment which constitutes the most egregious breach of trust by the individuals involved. I also join Dennis in confirming that **this conduct had nothing whatsoever to do with the collective bargaining process, but rather involved two bad actors** . . . ."[34] Marchionne claimed that the wrongdoing was "neither known nor sanctioned by FCA." In reality, Marchionne and Williams themselves participated in and directed the scheme to corrupt the collective bargaining process.

(d)     On August 1, 2017, Williams published a letter to UAW members stating: "You should also know that no matter what

---

[34] Michael Martinez, *Marchionne Expresses 'Disgust' Over FCA-UAW Executive Conspiracy,* AUTOMOTIVE NEWS (July 27, 2017), https://www.autonews.com/article/20170727/OEM02/170729763/marchionne-expresses-disgust-over-fca-uaw-executive-conspiracy.

anyone says, ***it was NOT possible for General Holiefield to compromise or otherwise affect the national negotiations that resulted in new collective bargaining agreements***, including the 2011 collective bargaining agreement between the UAW and Chrysler."[35]

(e)   On January 26, 2018, days after Iacobelli pled guilty, Williams published a letter to UAW members stating:  "***[T]here is simply no truth to the claim that this misconduct compromised the negotiation of our collective bargaining agreement or had any impact on union funds. . . . [T]he fact is [Iacobelli's and corrupted UAW officials'] misdeeds did not affect your collective bargaining agreement and no union funds were stolen or lost.***"[36]

(f)   On May 24, 2018, during a Press Roundtable discussion, Williams sought to distance himself and UAW leaders from the

---

[35]   *Letter to UAW Members from UAW President Dennis Williams* (Aug. 1, 2017), https://uaw.org/letter-to-uaw-members/ (emphasis added).

[36]   *Letter from UAW President Dennis Williams to Members Regarding DOJ Case* (Jan. 26, 2018), https://uaw.org/letter-uaw-president-dennis-williams-members-regarding-doj-case/ (emphasis added).

criminal investigation, stating that "a few people in the UAW is not reflective of the leadership."[37]

(g)   On August 27, 2018, FCA released a statement that it "firmly restates that it is a victim of illegal conduct by Al Iacobelli and certain other rogue individuals who formerly held leadership roles at the [NTC] . . . *the conduct of these individuals . . . had no impact on the collective bargaining process.*"[38]

110.   These FCA bribery and CHR kickback schemes, and Ashton's role in those schemes, were inherently self-concealing, as secrecy was essential to perpetuate the schemes. Had either been exposed, Ashton would have been immediately removed from GM's Board, the perpetrators would have been investigated and prosecuted criminally, and the scheme would have been brought to an end.

111.   As alleged herein, GM could not have discovered these schemes or Ashton's role therein any earlier despite reasonable diligence.

---

[37] *UAW President Dennis Williams Roundtable* (May 24, 2018), https://uaw.org/final-media-roundtable-uaw-president-dennis-williams/.

[38] *See* Tresa Baldas, *Ex-Fiat Chrysler Exec Alphons Iacobelli Gets 5 1/2 Years in UAW Scandal,* DETROIT FREE PRESS (Aug. 27, 2018), https://www.freep.com/story/money/cars/chrysler/2018/08/27/fca-alphons-iacobelli-uaw-sentencing/1108849002/ (emphasis added).

## CAUSES OF ACTION

### First Cause of Action

Breach of Fiduciary Duty

112.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

113.   From 2014 to 2017, Ashton served on the Board of Directors of GM. In that role, Ashton owed GM fiduciary duties of loyalty, care, confidentiality, and disclosure. When he joined the Board, Ashton received an orientation on his rights and obligations as a director and signed an agreement to comply with his fiduciary duties to GM. As described above, Ashton repeatedly disclaimed any conflicts of loyalty and agreed to adhere GM's Code of Conduct, which prohibits "bribery," among other pertinent illegal activity.

114.   Ashton breached his fiduciary duties by, among other things, failing to disclose to GM the bribery scheme between FCA and UAW to harm GM and force a merger between GM and FCA and disclosing GM confidential information to UAW and/or FCA leaders while serving on the Board of Directors of GM.

115.   Separately, Ashton further breached his fiduciary duty by failing to disclose to GM the kickback scheme involving CHR and continuing to solicit and accept bribes from vendors to the CHR, knowing that such kickbacks directly harmed GM as the funding source of the CHR.

116.   As a direct result of these breaches of Ashton's fiduciary duty, GM was damaged.

117.   Ashton is accordingly liable to GM for this harm and, in addition, must forfeit any amounts paid to him by GM as a result of his service on the Board, which amounts total in the hundreds of thousands of dollars.

## **Second Cause of Action**

### Fraud

118.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

119.   As described above, Ashton intentionally or recklessly made numerous material misrepresentations to GM. For example, in written director questionnaires that Ashton completed each year from 2014 through 2017, Ashton repeatedly represented in writing:

    (a)   That he had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry;

    (b)   That he had not received or been offered anything of value by a third party "in consideration" for his service as a GM director;

(c)     That he "adhered" to GM's Code of Conduct, which prohibits "bribery" and receiving improper payments, among other pertinent illegal activity;

(d)     That there was no "special arrangement or understanding between [him] and any other person pursuant to which" he was nominated to the Board; and

(e)     That he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM."

120.    These representations were false. At the time Ashton made these representations, he knew that he had received and continued to receive kickbacks from CHR vendors under inflated contracts ultimately funded by GM. Further, at the time Ashton made these representations, he knew that, in return for secret compensation from FCA and FCA NV through foreign accounts, Ashton had agreed to pass and was passing GM's confidential information to UAW and/or FCA leaders.

121.    These fraudulent misrepresentations were intended to and did induce reliance by GM. For example, had GM known of the criminal kickback scheme involving the CHR and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

122.   Further, had GM known of FCA and FCA NV's bribery scheme and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

123.   Ashton's fraudulent misrepresentations were intended to and did cause harm to GM. For example, as a result of Ashton's fraudulent misrepresentations and omissions, Ashton was nominated to GM's Board and GM paid him compensation. GM continued to unknowingly fund inflated vendor contracts at the CHR that lined the pockets of Ashton and his co-conspirators. Once on the Board, Ashton betrayed GM's trust by funneling GM's confidential information to UAW and/or FCA leaders.

## Third Cause of Action

### Fraud by Omission

124.   Plaintiffs hereby incorporate the above allegations by reference as if fully set forth herein.

125.   Ashton owed GM a duty of disclosure. First, as a director on GM's Board, Ashton owed GM a duty of disclosure. Second, as described above, Ashton actively participated in meetings and discussions concerning strategy decisions involving the UAW and FCA. Having participated and provided input in these discussions, Ashton had a duty to make complete disclosures of facts where his partial disclosures would and did convey false impressions and mislead GM.

126.   By the time Ashton joined GM's Board, he had actively participated for years in a criminal kickback scheme involving the CHR, which was funded by GM. Ashton continued receiving these kickbacks after joining GM's Board. Ashton has pled guilty to his participation in this scheme. Despite knowing of and participating in this scheme, Ashton never disclosed the scheme to anyone at GM.

127.   Further, by the time Ashton joined GM's Board, he had actively participated in FCA and FCA NV's criminal scheme to corrupt the bargaining process to benefit FCA and harm GM. Ashton never disclosed this scheme to anyone at GM. Indeed, as described above, once on GM's Board, Ashton furthered this scheme by passing GM's confidential information to UAW and/or FCA leaders.

128.   In addition, as described above, Ashton failed to disclose numerous additional material facts of which he was aware, the non-disclosure of which created a false impression for GM. For example, in written director questionnaires that Ashton completed each year from 2014 through 2017, Ashton repeatedly represented in writing:

> (a)   That he had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry. Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process. Ashton was

aware of this undisclosed material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

(b)     That he had not received or been offered anything of value by a third party "in consideration" for his service as a GM director. Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process. Ashton was aware of this undisclosed material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

(c)     That he "adhered" to GM's Code of Conduct, which prohibits "bribery" and receiving improper payments, among other pertinent illegal activity. Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process, as well as the material fact that he received kickbacks through inflated contracts at the CHR funded by GM. Ashton was aware of these undisclosed material facts, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

(d)    That there was no "special arrangement or understanding between [him] and any other person pursuant to which" he was nominated to the Board. Ashton failed to disclose the material fact that he received secret compensation from FCA and FCA NV to further their scheme to corrupt the bargaining process. Ashton was aware of this undisclosed material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

(e)    That he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM." Ashton failed to disclose the material fact that he passed GM's confidential information to FCA, FCA NV, and the UAW. Ashton was aware of this undisclosed material fact, and sought to induce GM's reliance in obtaining and maintaining a seat on GM's Board.

129.   These fraudulent omissions were intended to and did induce reliance by GM. For example, had GM known of the criminal kickback scheme involving the CHR and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

130.   Further, had GM known of FCA and FCA NV's bribery scheme and Ashton's role in the scheme, GM would not have permitted Ashton to join and maintain a position on GM's Board.

131.   Ashton's fraudulent omissions were intended to and did cause harm to GM. For example, as a result of Ashton's fraudulent misrepresentations and omissions, Ashton was nominated to GM's Board and GM paid him compensation. GM continued to unknowingly fund inflated vendor contracts at the CHR that lined the pockets of Ashton and his co-conspirators. Once on the Board, Ashton betrayed GM's trust by funneling GM's confidential information to UAW and/or FCA leaders.

## REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.   Damages, in an amount to be determined at trial, including but not limited to, the recoupment of monies paid by GM to Ashton for service as a director on GM's Board and further damage GM suffered as a result of Ashton's breaches of fiduciary duty, fraudulent statements and omissions, and other unlawful acts;

B.   An award of punitive and/or exemplary damages as Ashton has acted with malice and willful disregard for GM's rights;

C.   An award of costs and fees incurred in pursuing this litigation, including attorney's fees, costs, and the fees and costs of experts;

D.      Equitable relief, including restitution; and

E.      Any other relief the Court deems just, fair, necessary, or equitable.

## **JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: September 14, 2020              Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: s/James E. Marina
James E. Marina (N.J. Bar No. 050791996)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
jmarina@kirkland.com

Hariklia Karis, P.C. (*pro hac vice pending*)
Jeffrey Willian, P.C. (*pro hac vice pending*)
Casey McGushin  (*pro hac vice pending*)
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
casey.mcgushin@kirkland.com

Austin Norris  (*pro hac vice pending*)
2049 Century Park East
Los Angeles, CA 90067
Telephone:  (310) 552-4200
austin.norris@kirkland.com

Maisie Allison  (*pro hac vice pending*)
555 South Flower Street
Los Angeles, CA 90071
Telephone:  (213) 680-8400
maisie.allison@kirkland.com

*Attorneys for Plaintiffs General Motors LLC
and General Motors Company*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I hereby certify to the best of my knowledge pursuant to Local Civil Rule 11.2 that this matter in controversy is not the subject of any other action pending in any court, arbitration, or administrative proceeding.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of September, 2020.

s/James E. Marina

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

I hereby certify to the best of my knowledge pursuant to Local Civil Rule 201.1 that the matter in controversy is not subject to arbitration because the damages recoverable by Plaintiffs exceed the sum of $150,000 exclusive of interest and costs and any claim for punitive damages.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of September, 2020.

s/James E. Marina