UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| GENERAL MOTORS LLC, and GENERAL MOTORS COMPANY,<br><br>        Plaintiffs,<br><br>  v.<br><br>JOSEPH ASHTON,<br><br>        Defendant. | CASE No.: 20-cv-12659<br>Honorable Robert Kugler<br>District Court Judge<br><br>Honorable Karen Williams<br>Magistrate Judge<br><br><u>Motion Returnable: December 21, 2020</u> |

## **<u>DEFENDANT JOSEPH ASHTON'S BRIEF IN SUPPORT OF HIS MOTION TO DISMISS</u>**

Rodman E. Honecker, Esq.
WINDELS MARX LANE &
MITTENDORF, LLP
120 Albany Street Plaza
New Brunswick, NJ 08901
*Attorneys for Defendant Joseph Ashton*

On the Brief:
    Bradley D. Simon, Esq. (*pro hac vice* admission pending)
    Ben J. Kusmin, Esq. (*pro hac vice* admission pending)

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ............................................................1

ALLEGATIONS OF THE COMPLAINT ...............................................2

  I.   A Pre-2015 Bribery Scheme Orchestrated by Fiat Chrysler Uses
      UAW Official Joseph Ashton to Harm Its Rival GM ....................................2

  II.  The 2015 Bribery Scheme by Fiat Chrysler, Using now-GM Board
      Member Ashton as a Paid Mole, to Manipulate the 2015 Collective
      Bargaining Negotiations to Harm GM and Force it into a Merger ................4

  III.  Ashton's Acknowledged Participation in the Watch Kickback
      Scheme ........................................................................8

  IV.  Ashton's Service on the GM Board of Directors ............................................9

  V.   The Alleged Offshore Accounts ...........................................................10

  VI.  GM's Misleading Allegations ..........................................................11

  VII. GM's Claims in this Lawsuit .............................................................13

PROCEDURAL HISTORY ....................................................................14

  I.   GM's Lawsuit against FCA in the Eastern District of Michigan .................14

  II.  GM's Motion to Alter or Amend Judgment ..................................................16

  III.  GM's New Lawsuit in Michigan ......................................................17

LEGAL STANDARD ...........................................................................19

ARGUMENT .......................................................................................19

  I.   Collateral Estoppel Bars All of GM's Claims ...............................................19

     A.   *The issue is identical.* ..........................................................21

     B.   *The issue was actually litigated in the Michigan Action.* ......................22

     C.   *The Michigan Court issued a final judgment on the merits.* ...................23

     D.   *The determination of the issue was essential to the Michigan
     Action.* ....................................................................................23

     E.   *The parties to be estopped from relitigating the issue here are
     the same as the parties in the Michigan Action.* ..................................24

II.  All of the Claims Fail Because They Depend on GM's Implausible
     Theories of Bribery and Corporate Espionage ...............................................24

     A.   Applicable Law ..................................................................................24

     B.   Implausibility of the Fiat Chrysler Bribery Schemes ............................25

     C.   The Dubious Offshore Account Allegations ........................................29

     D.   Information & Belief Bribery Allegations ...........................................34

III. GM's Fraud Claims Fail for Lack of Causation and Speculative
     Damages ..........................................................................................................37

     A.   Applicable Law ..................................................................................37

     B.   GM's Fraud Claims ............................................................................38

     C.   The Alleged False Statements and Omissions .......................................39

     D.   Proximate Causation ..........................................................................43

     E.   GM's Claimed Damages Are Too Speculative ....................................50

IV.  The Breach of Fiduciary Duty Claim is Time-Barred under Applicable
     Michigan Law ..................................................................................................52

     A.   The Limited Choice of Law Issue .......................................................52

     B.   Under New Jersey Choice of Law Rules, Michigan Law Applies ..........54

     C.   Application of Michigan Law .............................................................59

CONCLUSION ...............................................................................................................60

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*,
   727 F.3d 502 (6th Cir. 2013) ...................................................................30, 37

*Allen v. McCurry*,
   449 U.S. 90 (1980)...................................................................................20, 22

*Allesandra v. Gross*,
   187 N.J. Super. 96, 453 A.2d 904 (App. Div. 1982) .........................................23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................*passim*

*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007).......................................................................2, 25, 27, 29

*Brownell v. Garber*,
   199 Mich. App. 519, 503 N.W.2d 81 (1993)....................................................60

*Caravaggio v. D'Agostini*,
   166 N.J. 237, 765 A.2d 182 (2001) ................................................................54

*Churchill Downs, Inc. v. NLR Entertainment, LLC*,
   2017 U.S. Dist. LEXIS 32352 (D.N.J. Mar. 6, 2017) ...........................38, 49, 51

*In re Consol. Parlodel Litig.*,
   182 F.R.D. 441 (D.N.J. 1998).........................................................................53

*Edelson V., L.P. v. Encore Networks, Inc.*,
   2013 U.S. Dist. LEXIS 66192 (D.N.J. May 9, 2013)..................................43, 54

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
   902 F.3d 132 (2d. Cir. 2018) .........................................................................52

*In re Estate of Dawson*,
   136 N.J. 1, 641 A.2d 1026 (1994) ..................................................................21

*Finderne Mgmt. Co., Inc. v. Barrett*,
   402 N.J. Super. 546, 955 A.2d 940 (App. Div. 2008)..................................50, 51

*Fowler v. UPMC Shadyside*,
  578 F.32 203, 211 (3rd Cir. 2009) ....................................................25

*Frederico v. Home Depot*,
  507 F. 3d 188 (3rd Cir. 2007) ...........................................19, 34, 38

*Gennari v. Weichert Co. Realtors*,
  148 N.J. 582 (1996) ..........................................................19, 38, 43

*In re GEO Specialty Chems., Ltd.*,
  577 B.R. 142 (D.N.J. Bankr. 2017) .................................................23

*Ginsberg v. Quest Diagnostics, Inc.*,
  227 N.J. 7, 147 A.3d 434 (2016) ....................................................53

*GM LLC v. FCA US LLC*,
  2020 U.S. Dist. LEXIS 120736 (E.D. Mich., July 8, 2020) ......................*passim*

*GM LLC v. FCA US LLC*,
  2020 U.S. Dist. LEXIS 146646 (E.D. Mich., Aug. 14, 2020)...................*passim*

*GMA Accessories, Inc. v. Idea Nuova, Inc.*,
  157 F. Supp. 2d 234 (S.D.N.Y. Dec. 18, 2000)...................................44

*Great Western Mining & Mineral Co. v. ADR Options, Inc.*,
  882 F. Supp. 2d 749 (D.N.J. Feb. 8, 2012)........................................20

*Henglein v. Colt Indus.*,
  260 F.3d 201 (3rd Cir. 2001) ..........................................................23

*Karachi Bakery India v. Deccan Foods LLC*,
  2017 U.S. Dist. LEXIS 180404 (D.N.J. October 31, 2017) .......................44, 51

*Klaxon Co. v. Stentor Elec. Mfg. Co*,
  313 U.S. 487 (1941).......................................................................54

*Kuhnel v. CAN Ins. Cos.*,
  322 N.J. Super. 568, 731 A. 2d 564 (App. Div. 1999)......................46

*Levitt v. Riddell Sports (In re MacGregor Sporting Goods)*,
  199 B.R. 502 (D.N.J. Bankr. Nov. 27, 1995) ...................................54

*Li v. Peng*,
  516 B.R. 26 (D.N.J. Aug. 22, 2014) ...........................................................22, 24

*McCabe v. Ernst & Young, LLP*,
  494 F.3d 418 (3rd Cir. 2007) .............................................................38, 47, 48

*McCarrell v. Hoffmann-La Roche, Inc.*,
  227 N.J. 569 (2017) ....................................................................................*passim*

*McConkey v. AON Corp.*,
  354 N.J. Super. 25, 804 A.2d 572 (App. Div. 2002) ........................................50

*MTK Food Services, Inc. v. Sirius America Ins. Co.*,
  455 N.J. Super. 307, 189 A.3d 914 (App. Div. 2018) ......................................58

*MZL Capital Holdings, Inc. v. TD Bank, N.A.*,
  2016 U.S. Dist. LEXIS 103177 (D.N.J. Aug. 5, 2016) ...............................35, 36

*Olivieri v. Y.M.F. Carpet, Inc.*,
  186 N.J. 511 (2006) .......................................................................................24

*Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP*,
  426 N.J. Super. 582, 46 A.3d 586 (App. Div. 2012) ........................................58

*Pittman v. La Fontaine*,
  756 F.Supp. 834 (D.N.J. 1991) .......................................................................22

*Santiago v. Warminster Twp.*,
  629 F.3d 121 (3rd Cir. 2010) ...............................................................19, 25, 27

*Schmidt v. Skolas*,
  770 F.3d 241 (3rd Cir. 2014) ......................................................................20, 53

*Schweikert v. Baxter Healthcare Corp.*,
  2013 U.S. Dist. LEXIS 67355 (D.N.J. May 10, 2013)........................30, 34, 38

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) ...........................................................................35

*Shulton, Inc. v. Optel Corp.*,
  1986 U.S. Dist. LEXIS 19775 (D.N.J. Sep. 29, 1986) ......................................37

*Sports Mgmt. Network v. Busch*,
  2019 U.S. Dist. LEXIS 35663 (E.D.Mich. Mar. 6, 2019) .....................54, 59, 60

*Stanley Co. of America v. Hercules Powder Co.*,
  16 N.J. 295, 108 A. 2d 616 (1954) ....................................................................50

*P.V. ex rel. T.V. v. Camp Jaycee*,
  197 N.J. 132 (2008) ........................................................................53, 55, 57

*Townsend v. Pierre*,
  221 N.J. 36, 110 A.3d 52 (2015) .........................................................44, 45, 49

*Trentadue v. Gorton*,
  479 Mich. 378, 738 N.W.2d 664 (2007)................................................54, 59, 60

*Wiebel v. Morris*,
  2018 N.J. Super. Unpub. LEXIS 2673 (App. Div. Dec. 6, 2018) .....................58

*Zavala v. Wal-Mart Stores, Inc.*,
  393 F. Supp. 2d 295 (D.N.J. 2005) ....................................................................35

**Statutes**

MCL § 600.5805 .................................................................................54, 59

MCL § 600.5827 .................................................................................59, 60

MCL § 600.5829-5838 ...............................................................................59

MCL § 600.5855 .........................................................................................60

N.J.S.A. 2A:14-1 ......................................................................................54

**Other Authorities**

Fed. R. Civ. P. 41(b) ...............................................................................23

Fed. R. Civ. P. 8 ......................................................................................37

Fed. R. Civ. P. 9(b) ...........................................................................*passim*

Fed. R. Civ. P. 12(b)(6)......................................................................*passim*

Fed. R. Civ. P. 59 .............................................................................16, 23

## PRELIMINARY STATEMENT

This case is the latest salvo in GM's scorched-earth litigation campaign to deflect blame for its own bungled handling of collective bargaining negotiations with the UAW in 2011 and 2015, which GM believes cost it billions of dollars in increased labor costs. GM brought suit against Fiat Chrysler ("FCA") and several individuals in Michigan federal court, based on almost identical allegations, in which it was soundly thrashed, and is now pursuing a case almost identical to this one in Michigan state court. Each of the cases, including this one, presses a half-baked theory in which FCA was bribing UAW officials and other auto industry players through offshore bank accounts to help it manipulate the collective bargaining process. The ultimate goal of this plan, which seems straight out of a third-rate spy novel, was to ravage GM so thoroughly that it would yield to FCA's overtures to merge with it and create the world's largest automaker, the pipe dream of FCA's charismatic CEO. Here, GM sets its sights on Joseph Ashton, a retired UAW official who just happened to be on GM's board of directors during the 2015 collective bargaining process. According to GM, Ashton was funneling secret negotiation strategy and other sensitive GM information stolen from board meetings to FCA to give it the upper hand in the 2015 collective bargaining process, in exchange for the offshore lucre. GM alleges all of this on information and belief, which it must because the key facts exist only in the fevered imaginations of its lawyers. The

Amended Complaint should be dismissed, among other reasons, because it is implausible under *Iqbal* and *Twombly*, inadequately pled under Fed. R. Civ. P. 9(b), and collaterally estopped by decisions of the U.S. District Court in Detroit, Michigan.

## ALLEGATIONS OF THE COMPLAINT

To summarize GM's allegations, Fiat Chrysler ("FCA") was engaged, with the assistance of Joseph Ashton, in two diametrically opposed schemes to harm GM. Prior to 2015, FCA conspired with and bribed officials from the United Auto Workers union (the "UAW") to gain advantages for itself, including lowering its costs by increasing its share of Tier Two workers, while ensuring that GM would not get the same advantages.  In 2015, by contrast, FCA conspired with Ashton and others to negotiate a ruinously expensive deal with the UAW, in the hope that GM would be forced to do the same, through the power of "pattern bargaining."  GM claims that this self-contradictory pair of schemes were part of one seamless conspiracy to harm GM.  The Amended Complaint seeks to hold Ashton responsible for the "billions of dollars" in alleged damages under convoluted claims of fraud and breach of fiduciary duty, based on his failure to disclose the alleged schemes while serving as a member of GM's board of directors.

## I.     A Pre-2015 Bribery Scheme Orchestrated by Fiat Chrysler Uses UAW Official Joseph Ashton to Harm Its Rival GM

GM alleges a scheme orchestrated by FCA to pay bribes to UAW officials in the 2009-2014 time frame "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiations, implementation, and administration of the collective bargaining agreements between FCA and the UAW." (AC ¶ 55)(the "Pre-2015 Bribery Scheme").  Much of GM's description of the scheme is drawn from the superseding indictment and plea agreement of a former FCA Vice President of Employee Relations named Alphons Iacobelli. (*Id.* ¶¶ 4, 12, 35, 55, note 10)  The indictment does not mention Ashton.

GM alleges that Ashton "played a central role in" the Pre-2015 Bribery Scheme (AC ¶ 4), and that he was "uniquely situated to further this scheme" by virtue of his role as Vice President of the UAW's GM Department from 2010 to 2014. (*Id.* ¶ 5).  In this role Ashton allegedly had "primary oversight of negotiating and implementing CBAs between the UAW and GM." (¶ 32)  GM pleads "on reasonable belief and inference" that in exchange for bribes from FCA and FCA NV through foreign accounts, "Ashton used his influence to deny GM specific structural labor concessions it should have otherwise received but for [the] bribes." (*Id.* ¶ 5) Specifically, "under Ashton's direction" the UAW provided to FCA and denied to GM certain "structural concessions" or "labor advantages" that included: "genuine support from UAW leaders for GM's worker efficiency program, Global Manufacturing System ("GMS"), manipulation of contractual limits on Tier Two

and temporary employees, support for FCA's "long-term business plan, and other 'side letter' agreements between FCA and the UAW." (*Id.* ¶ 71). GM alleges that FCA and FCA NV "authorized these bribes specifically to harm GM and to advance their long-term goal to force higher costs on GM and assist FCA NV in forcing a merger with GM." (*Id.* ¶ 4)  GM does not allege any facts indicating that Ashton directed, participated in, or knew about the Pre-2015 Bribery Scheme.

## II.   The 2015 Bribery Scheme by Fiat Chrysler, Using now-GM Board Member Ashton as a Paid Mole, to Manipulate the 2015 Collective Bargaining Negotiations to Harm GM and Force it into a Merger

The Amended Complaint alleges that FCA manipulated the 2015 collective bargaining process with the UAW, with assistance from Ashton, to weaken GM with inflated labor costs, which would then pressure GM into agreeing to a merger with FCA (the "CB Bribery Scheme").

Fiat Chrysler CEO Sergio Marchionne had advocated the idea of consolidating Fiat with other large automakers for years leading up to the 2015 collective bargaining negotiations.  (AC ¶¶ 62-63).  He proposed a combination of Fiat, Chrysler, and GM in October 2012, but GM rebuffed this request.  (*Id.* ¶ 63) Fiat and Chrysler merged in 2014, at which point Sergionne began to pursue a merger of the combined FCA with GM.  (*Id.* ¶¶ 68-69)  Marchionne "turned to weaponizing FCA's bribery of the UAW towards GM, in an effort to pressure GM to agree to merge with FCA."  (*Id.* ¶ 70)  GM turned down several more overtures

from FCA, and by 2015 FCA developed a plan to force GM into a merger (dubbed "Operation Cylinder") that involved the bribery of UAW leaders, including Ashton. (*Id.* ¶¶ 74-75)  The crux of the CB Bribery Scheme was to manipulate the 2015 collective bargaining process "to impose asymmetrical costs on GM, with the goal of harming GM by imposing massive labor costs on GM and making it more likely to favorably consider a merger with FCA." (*Id.* ¶ 80)

The UAW uses a practice called "pattern bargaining" in its collective bargaining negotiations with the Big Three automakers, which occur every four years. (AC ¶¶ 80-81)  Before the automakers' CBAs with the UAW are set to expire, and as preliminary negotiations unfold, the UAW selects one of the three automakers to be the "lead" or "target" and the union finalizes a 4-year CBA with that company. (*Id.* ¶¶ 81-82)  That first deal gives the UAW strong leverage to force its terms on the other two companies, (*id.*) and the union uses the threat of a costly nationwide strike to increase its leverage. (*Id.*)  GM does not allege, however, that pattern bargaining is illegal.  As of mid-September 2015, GM had reached a tentative deal with the UAW and believed it would be chosen as the lead, and its deal finalized as the pattern. (*Id.* ¶¶ 86-88)  GM "reasonably believed" that it would be chosen as the lead in the 2015 collective bargaining negotiations, because, among other reasons, FCA was smaller and had the highest percentage of lower-paid workers. (*Id.* ¶ 85)  Defying the expectations of GM (and allegedly of industry analysts), the UAW

announced on September 13, 2015 that it had chosen FCA as the pattern lead. (*Id.* ¶¶ 85, 92)  This choice, GM alleges, was the result of "the years-long bribery scheme" between FCA and the union's leaders. (*Id.* ¶ 92)

Two days after UAW selected FCA as the lead, the parties announced that they had reached a deal. FCA CEO Sergio Marchionne touted the deal as "transformational" and "explained that the 'economics of the deal are almost irrelevant' because the costs 'pale in comparison given the magnitude of the potential synergies and benefits' of a combination." (*Id.* ¶¶ 94-95).  GM believes the "combination" referred to by Marchionne was the hoped-for merger between GM and FCA. (*Id.* ¶ 95)  After an initial rejection of the deal by the UAW rank-and-file, a substantially similar final deal—one that "was specifically tailored to, and in fact ultimately did, disproportionately harm GM"—was ratified on October 22, 2015. (*Id.* ¶¶ 96-98)  UAW President Dennis Williams bragged that the deal reached with FCA was one of the "richest ever negotiated" for the UAW.  (*See* MC ¶ 133, citing Wall Street Journal article on October 22, 2015).[1]

Shortly thereafter, and allegedly under the "coercive economic force of pattern bargaining" and the threat of a strike, GM reached a tentative deal with the UAW "based on the fraudulently tainted FCA-UAW pattern." (*Id.* ¶¶ 82, 99)  A final

---

[1] This fact and the Williams quote were not included in the Amended Complaint.

(and, it turns out, much different)[2] CBA between GM and the UAW was ratified by UAW membership almost a month later, on November 20, 2015, and became effective on November 23, 2015. (*Id.* ¶ 99)   This final CBA caused GM to incur over $1 billion more in incremental labor costs, over the 4-year life of the CBA, than "the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead." (*Id.* ¶ 100)  This billion-dollar difference between the result GM had hoped for, and the result it voluntarily agreed to, is the apparent basis for the "billions of dollars" in damages claimed in this suit. (*Id.* ¶ 5)

Meanwhile, throughout the period encompassing the 2015 collective bargaining negotiations, Joseph Ashton was serving on the board of GM.  (*Id.* ¶¶ 89-90) As a board member, GM alleges, Ashton was able to access, steal, and pass on to FCA "extensive information concerning sensitive topics including . . . negotiation strategy and progress in connection with GM's negotiations with the UAW over the 2015 CBA"; "early information showing what GM viewed as the greatest risks in the coming CBA negotiations"; "much more detailed discussions of risks and opportunities from the coming CBA negotiations"; and discussions about GM's reaction and response to FCA's merger proposal.  (*Id.* ¶ 90)  By blaming Ashton for the "billions of dollars in increased labor costs" it suffered through the allegedly corrupted 2015 collective bargaining process (*id.* ¶¶ 5, 99, 100), GM suggests that

---

[2] *See infra*, pp. 47-48.

by passing such information to FCA, Ashton somehow gave FCA an edge in harming GM through this process, *i.e.*, being selected as the pattern lead and closing a rich deal with the UAW, which could then be forced on GM. (*Id.* ¶¶ 90-91)  GM does not allege what specific information FCA acquired from Ashton, or how FCA used it to gain a negotiating advantage.

### III.    Ashton's Acknowledged Participation in the Watch Kickback Scheme

The Amended Complaint describes several kickback schemes involving a Michigan tax-exempt corporation known as the Center for Human Resources ("CHR"), an entity funded by GM and governed by members appointed by GM and the UAW. (*Id.* ¶¶ 3, 20, 39)  Ashton was involved in <u>one</u> of these schemes, which involved the purchase of 58,000 custom commemorative watches for UAW members. (*Id.* ¶ 47)   Ashton participated in steering the watch contract to an associate, at an allegedly inflated price to the CHR, and demanded a kickback of $250,000.  (*Id.* ¶¶ 46-48)  Ashton received payments of between $5,000 and $30,000 over the time period spanning May 2013 to July 2016, at which time he instructed the associate to stop making any kickback payments. (*Id.* ¶¶ 50, 52)[3]  Ashton did not disclose his participation in the watch scheme to anyone at GM. (*Id.* ¶ 51)  The Amended Complaint describes and alludes to other kickback schemes at the CHR, including one involving "Team UAW-GM" jackets and another involving

---

[3] *See also* E.D. Mich. Index No. 2:19-cr-20738, ECF No. 1 (Ashton Information) at ¶¶ 25-26.

backpacks, (*id.* ¶¶ 39, 44), but Ashton was not charged with participating in any schemes other than the watch scheme.[4] Ashton was criminally charged for his participation in the watch scheme in November 2019 (*id.* ¶ 43); pled guilty on December 4, 2019 (*id.* ¶ 43); and was sentenced on November 17, 2020 to 30 months in prison.

## IV.    **Ashton's Service on the GM Board of Directors**

In 2014, Ashton retired from his position at the UAW and was appointed to the Board of Directors of GM as the representative of the UAW Trust.  (*Id.* ¶ 33)  In April 2014, and at the beginning of each subsequent year of board service, Ashton completed board of director questionnaires; while the questions changed each year, they generally inquired about conflicts of interest and asked for a commitment to maintain the confidentiality of GM information. (*Id.* ¶¶ 34, 119, 128).  GM alleges that certain of the responses were false because they did not disclose Ashton's participation in the watch scheme, or because they were inconsistent with Ashton's alleged receipt of bribes from FCA. (*Id.*)

As a GM board member, Ashton allegedly had access to "extensive information concerning sensitive topics including [] negotiation strategy and progress in connection with GM's negotiations with the UAW over the 2015 CBA, and GM's consideration and response to merger inquiries from FCA NV." (*Id.* ¶ 90.)

---

[4] *See* Ashton Information.

GM alleges that Ashton passed this confidential information on to corrupt UAW leaders and FCA executives in furtherance of the scheme to impose higher labor costs on GM and force GM to merge with FCA. (*Id.* ¶¶ 5, 90-91)

After Iacobelli's indictment was unsealed in July 2017, "GM sought to interview Ashton related to the government's investigation into the CHR. Despite GM policy requiring that Ashton submit to such an interview, Ashton refused and hired criminal counsel. GM advised Ashton that if he did not submit to an interview he would be acting inconsistent with his obligation as a director." (*Id.* ¶¶ 35-36) Ashton resigned from the GM board shortly after this confrontation, in December 2017. (*Id.* ¶ 36)

## V.    The Alleged Offshore Accounts

GM alleges the existence of two foreign bank accounts allegedly linked to Ashton and claims, without any factual support, that the accounts were somehow used by FCA or FCA NV to bribe Ashton in furtherance of its scheme to harm GM. The accounts are located in the Cayman Islands and Japan, and are "held in the name of Ashton and/or Ashton's charity." (*Id.* ¶ 57) GM alleges "upon information, belief, and clear and reasonable inference" that the funds in the accounts "were ultimately provided to Ashton by FCA NV." (*Id.*)   Specifically, "in return for secret compensation from FCA and FCA NV through foreign accounts, Ashton had agreed to pass and was passing GM's confidential information to UAW and/or FCA leaders

[while on GM's board]." (*Id.* ¶ 120)   While alleging that the accounts "held or currently hold substantial funds" (*id.*), GM does not allege how much either account holds (or held); or when; or how they were "provided" to Ashton; or when or how Ashton accessed the funds.   Yet GM alleges that it was only through the discovery of these foreign accounts "that GM learned the true extent of FCA and FCA NV's scheme and Ashton's involvement in it." (*Id.* ¶ 61)

## VI.   GM's Misleading Allegations

A close reading of GM's Amended Complaint reveals GM's willingness to distort the facts in order to present a compelling narrative, even when it means presenting affirmatively misleading allegations.   Perhaps in recognition of the weakness of its case against Joseph Ashton, GM repeatedly and shamelessly smears Ashton by conflating his acknowledged wrongdoing with the crimes of a dozen other UAW and FCA officials.   And it is no accident.   GM knows better than anyone that Ashton was not involved in the illegal activity described in these misleading allegations, by virtue of its own "thorough investigation" undertaken prior to filing the Michigan Action, which according to GM included:

> witness interviews, review of publicly available information regarding criminal developments, close monitoring of the criminal proceedings against Defendants and their co-conspirators, review and analysis of internal GM documents and communications, [and] the engagement of consulting experts.

(AC ¶ 56). Nor can it be chalked up to sloppy drafting—GM spent two years developing its case before filing the Michigan Action, and has now filed at least five additional complaints in various actions alleging the same underlying facts.

One disturbing example of GM's deceptive pleading occurs in Paragraph 4 of the Amended Complaint, which alleges that FCA "paid millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees [in return for] benefits, concessions, and advantages for FCA . . ." Here, GM is quoting without citation the plea agreement of Alphons Iacobelli (*Id.* ¶ 11), the rogue FCA employee and admitted ringleader of the pre-2015 bribery scheme. While certain as-yet-unnamed co-conspirators are named in this paragraph (and throughout the plea agreement), GM knows full well based on subsequent disclosures that none of these co-conspirators is Joseph Ashton. Yet GM introduces this paragraph with the claim that "Ashton also played a central role" in this scheme. GM clearly seeks to taint him with "guilt by association."

In Paragraph 44, GM alleges that "[a]s described in the indictments and admitted in the plea agreements" Ashton orchestrated a kickback scheme involving 50,000 jackets with the "Team UAW-GM" logo, and alleges that Ashton demanded and received approximately $300,000 in kickbacks from the jacket scheme. But, as GM doubtless knows because it "diligently monitored the criminal proceedings and other sources of available information" (*id.* ¶ 108), Ashton was never charged with

any involvement in the jacket scheme, nor did he plead guilty to participating in any such scheme.  Indeed, both Ashton's information and his plea agreement speak only of the commemorative watch scheme. GM compounds this misleading narrative in Paragraph 53, where it conflates the watch scheme with other kickback schemes not involving Ashton to allege that Ashton and two other officials conspired to rig contracts to accept kickbacks of over $2 million.   GM's willingness to twist the facts to fit its narrative is evident throughout the Amended Complaint.[5]

These examples, and others discussed below, are relevant because they demonstrate that GM's pleadings cannot be taken at face value.   Throughout the Amended Complaint, when GM asks the Court to draw an inference based on its allegations, that request must be met with a healthy dose of skepticism.

## VII.   GM's Claims in this Lawsuit

Based on these allegations, GM asserts causes of action sounding in breach of fiduciary duty, common law fraud, and common law fraud by omission. GM claims that Ashton owed a fiduciary duty to GM as a board member, and that he breached the duty by failing to disclose the alleged CB Bribery Scheme, disclosing GM confidential information to the UAW and FCA in furtherance of the alleged CB Bribery Scheme, and failing to disclose his participation in the watch scheme.

---

[5] *See* AC ¶ 107(b) - ¶ 107(i), describing alleged acts of fraudulent concealment by other actors.

The fraud claims ostensibly connect alleged misstatements or omissions by Ashton to the alleged harm to GM through the following elaborate daisy chain of events:

> ➢ Ashton's representations on the director questionnaires were false, and his failures to disclose the alleged bribery scheme and the kickback scheme were fraudulent omissions (*id.* ¶¶ 119, 128);
> ➢ which hid the alleged CB Bribery Scheme from GM (*id.* ¶ 120);
> ➢ which induced GM to permit Ashton to join the board and maintain his position on the board (*id.* ¶¶ 121-122);
> ➢ which allowed Ashton to continue to pass GM confidential information to FCA in furtherance of the CB Bribery Scheme (*id.* ¶¶ 90-91, 123);
> ➢ which enabled FCA to reach a generous CBA with the UAW in 2015 (*id.* ¶¶ 94-98);
> ➢ which allowed the UAW to extract similar concessions in its 2015 CBA with GM (*id.* ¶¶ 99-100),
> ➢ causing GM to incur $1 billion in damages.  *Id.* ¶¶ 5-6, 100.

Rube Goldberg would surely doff his cap at this elaborate construct.

## PROCEDURAL HISTORY

This lawsuit was not brought in a vacuum. Rather, GM's allegations here must be viewed in light of an aggressive and misguided litigation campaign it has been waging—so far unsuccessfully—based on the very same underlying facts that it alleges here.  This campaign has already previously targeted Ashton, and has already unsuccessfully argued the very same theories that it presses here.

## I.    GM's lawsuit against FCA in the Eastern District of Michigan

In November 2019 the Plaintiffs herein filed a complaint in the U.S. District Court for the Eastern District of Michigan alleging violations of the Racketeer

Influenced and Corrupt Organizations Act ("RICO") against FCA US LLC, its parent company Fiat Chrysler Automobiles N.V. (collectively "FCA"), and three former FCA employees and UAW officials named Alphons Iacobelli, Jerome Durden, and Michael Brown. *See* Index No. 2:19-cv-13429 (the "Michigan Action"). GM alleged the Pre-2015 Bribery Scheme and the CB Bribery Scheme as its theories of RICO injury to GM, albeit without the allegations that Ashton and others received bribes from FCA through offshore accounts in furtherance of the schemes. *See generally* No. 2:19-cv-13429 ECF No. 1 (the "Michigan Complaint" or "MC"). All defendants brought (or joined) motions to dismiss under Fed. R. Civ. P. 12(b)(6). *See* ECF No. 41 (FCA US LLC); ECF No. 42 (FCA NV); ECF No. 50 (Iacobelli).

The Honorable Judge Paul Borman, in an Opinion and Order dated July 8, 2020, granted the defendants' motions, dismissing GM's complaint with prejudice. *GM LLC v. FCA US LLC*, 2020 U.S. Dist. LEXIS 120736 (E.D. Mich., July 8, 2020)(ECF No. 82). Although the various defendants argued a number of different grounds for dismissal, Judge Borman resolved the motions "on only one of those grounds": namely, "because it finds that GM's alleged injuries were not proximately caused by Defendants' alleged violations of the RICO Act." *Id.* 2-3. The RICO violations alleged by GM were the very same schemes that it alleges here, *i.e.*, the Pre-2015 Bribery Scheme and the CB Bribery Scheme, though it had not yet alleged

that FCA had bribed Ashton and others through offshore accounts pursuant to the schemes. The specific findings are discussed in more detail below.

## II.   GM's Motion to Alter or Amend Judgment

Less than a month after GM's complaint was dismissed, GM brought a motion pursuant to Fed. R. Civ. P. 59(e) seeking to alter or amend that judgment. (ECF No. 84).  Based in part on what it claimed was newly discovered evidence, GM sought to have the Court amend its judgment to be without prejudice, and allow it to file an amended complaint. *See GM LLC v. FCA US LLC*, 2020 U.S. Dist. LEXIS 146646 (E.D. Mich., Aug. 14, 2020) (ECF No. 92) at *3.  In a declaration filed by GM's lead attorney, the attorney claimed that the new evidence was "reliable information indicating the existence of foreign [bank] accounts potentially connected to the scheme alleged in GM's Complaint." ECF No. 84-3 ("Karis Dec.")(Aug. 3, 2020) at ¶ 8.  GM attached a proposed Amended Complaint to its motion which contained new allegations about the alleged ownership and use of the foreign bank accounts by FCA to bribe Ashton and others in furtherance of the Pre-2015 Bribery Scheme and the CB Bribery Scheme. *See generally* ECF No. 84-1 ("PAC").

The alleged foreign bank accounts described in GM's motion, the attorney declaration, and the proposed amended complaint in the Michigan are the same accounts that GM alleges in this lawsuit. The allegations made in the PAC about FCA's alleged use of the accounts to bribe Ashton are nearly identical to those in

the Amended Complaint.  *Compare* PAC ¶¶ 9, 43, 63, 88, 100, 176, 230 *with* AC ¶¶ 4-5, 57-60, 107-108.

Judge Borman denied the motion, because "GM's newly discovered evidence is too speculative to warrant reopening this case."  *GM LLC,* 2020 U.S. Dist. LEXIS 146646, at *2.  He elaborated as follows:

> The affidavits offered by GM in support of their theory—that Defendants used "a broad network of foreign bank accounts containing millions of dollars" to facilitate a bribery scheme that included two "paid mole[s]" inside GM—do very little to corroborate this theory.  *Id.* at *12.

> Even if the affidavits establish that these foreign bank accounts exist, that fact does not rise to the inference advanced by GM, that FCA was more-than-likely using the bank accounts to bribe UAW officials. GM argues, for instance, that because former UAW Vice President Joseph Ashton maintained a bank account in the Cayman Islands "at the same time that Defendants were making unlawful payments to try to grease the skids with the UAW," he "operated as a paid mole inside GM's Boardroom during 2015 collective bargaining negotiations." . . . The existence of foreign bank accounts, and an almost-thirty-year-old scandal do not, however, move GM's claims over the line from speculative or conceivable to plausible. *Id.* at *13-*14.

> GM's newly discovered evidence does not create a reasonable inference that FCA was bribing individuals to infiltrate GM as part of a scheme to directly harm GM. and, therefore, does not change the Court's conclusion that GM's alleged injuries were not proximately caused by FCA's alleged RICO violations. *Id.* at *15.

GM filed a notice of appeal on August 17, 2020 (*see* ECF No. 93).

## III.   GM's New Lawsuit in Michigan

On September 15, 2020, GM filed a lawsuit against Alphons Iacobelli in Michigan state court making largely the same allegations it makes here, and asserting claims for breach of fiduciary duty, fraud, and fraud by omission, as it does here, as well as civil conspiracy claims. *See* 3:20-cv-12668, ECF No. 1-3. The state court complaint includes, in sum and substance, the same allegations against Ashton that are made in the Amended Complaint. *See e.g.*, *id.* at ¶ 15 (Ashton served on and then "abruptly resigned" from the GM board), ¶ 43 (Ashton participated in pre-2015 scheme to deny advantages to GM), ¶ 67 (Ashton took bribes from FCA through foreign accounts in exchange for GM confidential information), ¶ 113 (Ashton and others "hold millions of dollars in illicit funds in foreign bank accounts"), ¶¶ 119, 137, 139 (Ashton's allegedly false director questionnaire responses), ¶ 140 ("Ashton specifically joined GM to further the scheme from inside GM's boardroom"); ¶ 141 (GM relied on fraudulent misrepresentations and/or omissions of Ashton in hiring him).  After filing, and then voluntarily dismissing, a separate action against the Fiat Chrysler entities, on September 22, 2020 GM amended its complaint against Iacobelli to add FCA US, FCA NV, and another individual named Jerome Durden, as defendants. *See* 3:20-cv-12668, ECF No. 1, ¶¶ 4-7. FCA removed that action to the U.S. District Court for the Eastern District of Michigan on September 30, 2020. *See* 3:20-cv-12668, ECF No. 1. GM moved for remand, *id.,* ECF No. 4, and on November 3, 2020 the action was remanded back to state court. *See* ECF No. 22.

## LEGAL STANDARD

To withstand dismissal under Fed. R. Civ. P. 12(b)(6), GM must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[6]  The Court must disregard "naked assertions devoid of further factual enhancement and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Santiago v. Warminster Twp.*, 629 F.3d 121, 131 (3rd Cir. 2010)(*quoting Iqbal* at 678).   In order to satisfy the stringent pleading standard of Fed. R. Civ. P. 9(b), "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F. 3d 188, 200 (3rd Cir. 2007).  The complaint, moreover, "must inject precision or some measure of substantiation into a fraud allegation." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582 (1996).   In deciding a motion to dismiss, the Court may consider the allegations of the complaint, exhibits attached to the complaint, matters of public record, and documents "integral to or explicitly relied upon in the complaint," without converting the motion into one for summary judgment. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3rd Cir. 2014).

## ARGUMENT

### I.   Collateral Estoppel Bars All of GM's Claims

---

[6] Unless otherwise noted, throughout this brief, citations and quotations are omitted from citations, and any emphasis is added.

GM's claims against Ashton should be dismissed on the ground of collateral estoppel, also called issue preclusion.  The purpose of the doctrine is "to promote judicial consistency, encourage reliance on court decisions, and protect defendants from being forced to repeatedly relitigate the same issues in multiple lawsuits." *Great Western Mining & Mineral Co. v. ADR Options, Inc.*, 882 F. Supp. 2d 749, 760 (D.N.J. Feb. 8, 2012) (*citing Allen v. McCurry*, 449 U.S. 90, 94)(1980).  All of GM's claims in this lawsuit depend on the alleged existence of bribery and corporate espionage schemes which have already been ruled implausible by the Michigan court, based on virtually identical factual allegations. *See GM LLC,* 2020 U.S. Dist. LEXIS 146646. Judge Borman also found specifically that Ashton's involvement, based on alleged offshore accounts, was also implausible.  *Id.* at *14-*15.  Although GM brings different causes of action here, its success depends on a finding by this Court that is entirely repugnant to the Michigan decisions.

Under New Jersey law, for the doctrine of collateral estoppel to apply to foreclose the relitigation of an issue, the party asserting the bar must show that:

(1) the issue to be precluded is identical to the issue decided in the prior proceeding;

(2) the issue was actually litigated in the prior proceeding;

(3) the court in the prior proceeding issued a final judgment on the merits;

(4) the determination of the issue was essential to the prior judgment; and

(5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

*In re Estate of Dawson*, 136 N.J. 1, 20-21, 641 A.2d 1026, 1034-1035 (1994). All five prongs of the test are easily met here.

**A.**     ***The issue is identical.***  Here, collateral estoppel applies to a narrow but central issue: whether GM has plausibly alleged that it suffered an injury proximately harmed by a corporate espionage scheme orchestrated by Fiat Chrysler against GM, and using offshore accounts to bribe Joseph Ashton in furtherance of that scheme. The corporate espionage scheme was the centerpiece of GM's theory of liability in the Michigan Action.  In this case, the same corporate espionage scheme is the link between Ashton's alleged misstatements and omissions and the same alleged GM injury. (AC ¶¶ 5, 89-91, 100).  Just as Judge Borman had to rule on the plausibility of this theory in deciding FCA's motion to dismiss (and GM's motion to alter or amend the judgment), this Court will have to undertake the same analysis to determine Ashton's motion to dismiss.

The fact that Judge Borman analyzed GM's causation theories in the context of RICO claims, while this Court would analyze them under common law tort theories, does not counsel a different result.  "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen*, 449 U.S., at 94.  *See also Li v. Peng*, 516 B.R. 26, 34 (D.N.J. Aug. 22, 2014) (the finding in a New Jersey attorney disbarment proceeding

that attorney had knowingly misappropriated funds had collateral estoppel effect in a bankruptcy dischargeability determination).

**B.**   ***The issue was actually litigated in the Michigan Action.***   This element requires that "the litigant against whom issue preclusion is invoked must have had a full and fair opportunity to litigate the issue in the previous tribunal." *Pittman v. La Fontaine*, 756 F.Supp. 834, 841 (D.N.J. 1991). Through the briefing and oral argument of three separate motions to dismiss, and the thorough briefing of its motion to alter or amend the judgment, GM had a full and fair opportunity to argue the plausibility of its bribery and corporate espionage theories. *GM LLC,* 2020 U.S. Dist. LEXIS 146646. Also, "the burden of proof in the earlier action must be commensurate with the standard in the present action." *Pittman*, 756 F.Supp. at 841. This requirement is also satisfied, because in both actions the Court decides whether GM's allegations plausibly state a cause of action sufficient to withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

An issue need not go to trial in order to be considered "actually litigated" for purposes of collateral estoppel. Rather, an issue is "actually litigated" when it is "properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." *Allesandra v. Gross*, 187 N.J. Super. 96, 105-106, 453 A.2d 904, 909 (App. Div. 1982) (*quoting Restatement (Second) Judgments*, comment d to §

27).  The issue "may be submitted and determined *on a motion to dismiss for failure to state a claim.*" *Id.*

**C.**   ***The Michigan Court issued a final judgment on the merits.***  A decision on a motion to dismiss "can be sufficiently 'final' for purposes of issue preclusion." *In re GEO Specialty Chems., Ltd.*, 577 B.R. 142, 187 (D.N.J. Bankr. 2017).  In the context of collateral estoppel, the concept of finality need not be "unduly rigid"; rather, it "may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Henglein v. Colt Indus.*, 260 F.3d 201, 209-210 (3rd Cir. 2001).  The Michigan Court dismissed GM's action with prejudice, *GM LLC*, 2020 U.S. Dist. LEXIS 120736, and denied GM's Fed. R. Civ. P. 59 motion. *GM LLC,* 2020 U.S. Dist. LEXIS 146646.  In denying GM's Fed. R. Civ. P. 59 motion, the Court noted that "an order of dismissal for failure to state a claim upon which relief can be granted is an adjudication on the merits, which means that the dismissal has prejudicial effect." *Id.* at *7 (*citing* Fed. R. Civ. P. 41(b)).

**D. *The determination of the issue was essential to the Michigan Action.***

Although the various defendants argued a number of different grounds for dismissal of GM's claims in the Michigan Action, Judge Borman resolved the motions "on only one of those grounds," *i.e.*, "GM's alleged injuries were not proximately caused by Defendants' alleged violations of the RICO Act." *Id.* at *2.

This finding was the basis for its holding that GM had not stated a claim under Rule 12(b)(6), making it "essential" for collateral estoppel purposes. "Under the generally accepted meaning of the term, a fact may be deemed *essential* to a judgment where, without that fact, the judgment would lack factual support sufficient to sustain it." *Li*, 516 B.R., at 47 (emphasis in original).

### E. *The parties to be estopped from relitigating the issue here are the same as the parties in the Michigan Action.*

There is no dispute that Plaintiffs in the Michigan Action are identical to the Plaintiffs here, and are the "parties to be estopped" from relitigating the plausibility of their bribery and corporate espionage theories.

All the benefits of the collateral estoppel doctrine—*i.e.*, "finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness," *Olivieri v. Y.M.F. Carpet, Inc.*, 186 N.J. 511, 522 (2006)— would be fairly reaped by the application of the doctrine here.

## II.    All of the Claims Fail Because They Depend on GM's Implausible Theories of Bribery and Corporate Espionage

### A.    Applicable Law

In reviewing a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a Court must evaluate the sufficiency of the complaint under the new pleading standard enunciated by the Supreme Court in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007)

and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  *See also Santiago v. Warminster Twp.*, 629 F.3d 121, 129-30 (3rd Cir. 2010).  Under this standard, the Court must "identify allegations that 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* at 130 (*quoting Iqbal, supra*, at 679).  If any well-pleaded allegations remain, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.*  Moreover, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal, supra*, 556 U.S. at 678. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.32 203, 211 (3rd Cir. 2009)(*quoting Iqbal* at 679).   In this analysis, the Court is to disregard "naked assertions devoid of further factual enhancement and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements. *Santiago, supra*, 629 F.3d at 131 (*quoting Iqbal* at 678).

**B.     Implausibility of the Fiat Chrysler Bribery Schemes**

Both the Pre-2015 Bribery Scheme and the 2015 CB Bribery Scheme alleged by GM are implausible under the *Iqbal* standard.

With respect to the Pre-2015 Bribery Scheme, Judge Borman found that GM had failed to adequately allege (in other than conclusory fashion) that the UAW had withheld concessions from GM as a result of FCA's bribery.

> [T]he facts alleged indicate that the UAW would not give most of the concessions at issue to any company that was not bribing its officials. So, GM would never have had access to the same "unique competitive advantages" unless it also bribed the UAW. Accordingly, GM's labor costs were not higher than they would have been absent FCA's bribes, FCA's labor costs were just lower than they would have been. In other words, FCA's UAW workers were the direct victims of the bribes because they were paid less, and GM suffered only an indirect harm.

*GM LLC*, 2020 U.S. Dist. LEXIS 120736 at *29-*30.  Regarding the most important of the alleged concessions, the Court concluded that "any labor costs that GM paid as a result of adhering to the terms of its [2011] CBA with the UAW regarding temporary workers, the grievance process, and the anticipated Tier Two cap, cannot be described as harm proximately caused by Defendants' bribes." *Id.* 26.  The more correct inference to be drawn from GM's allegations was that "Defendants' intent was to lower FCA's labor costs by inducing UAW officials to act against the interests of workers, not the inference that Defendants wanted to increase GM's labor costs by asking the UAW to deny GM concessions that it otherwise would have given." (*Id.* 27)  GM's theory of pre-2015 bribery is, if anything, even less plausible with respect to Ashton, because the claims here depend on connecting Ashton's alleged misrepresentations on board of director questionnaires with the earlier bribery scheme.  GM alleges no plausible theory connecting the two.

The plausibility of GM's 2015 CB Bribery Scheme merits more discussion. *Twombly* teaches that courts should not accept a plaintiff's implausible conspiracy theory when there is an "obvious alternative explanation" for the defendant's conduct. *Twombly*, 550 U.S. at 567. In *Twombly*, the Supreme Court rejected as implausible plaintiff's theory that telephone companies "declined to enter each other's service territories in any significant way" pursuant to an anticompetitive conspiracy. *Id.* The obvious alternative explanation for the companies' behavior was that "the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* at 567-68. *See also Santiago*, 629 F.3d at 133 (rejecting plaintiffs allegation that excessive use of force against residents was planned, in light of the obvious alternative explanation that officers "simply used their own discretion in determining how to treat each occupant.").

Here, too, there are obvious alternative explanations for the 2015 collective bargaining behavior of the UAW and FCA that GM chalks up to a grand conspiracy involving bribery and corporate espionage. For example, FCA likely made generous concessions to the UAW not because it wanted to harm GM through the coercive power of pattern bargaining to force a merger, (AC ¶¶ 80, 93, 99), but because, as GM alleged in its Michigan complaint, both parties knew that they were under investigation by the government (MC ¶ 134), and therefore, "both sides had

incentives to prove to the government that they were engaging in good faith negotiations." *GM LLC*, 2020 U.S. Dist. LEXIS 120736 at \*34-\*35.

Another telltale sign of implausible allegations is that the well-pled facts imply only "the mere possibility of misconduct." *Iqbal* at 679. Based on the alleged existence of offshore accounts and Ashton's position on the GM board—the only facts GM has—GM asks the Court to infer that Ashton stole confidential information he had access to as a board member and passed it to FCA in furtherance of the alleged scheme to manipulate the 2015 collective bargaining process. This melodramatic scenario is at best a mere possibility; the inference GM asks the Court to make is shot through with logical holes, and lacks any factual support. For example, GM alleges that Ashton was "privy to detailed highly confidential information concerning GM's view of and strategic response to FCA and FCA NV's ongoing merger inquiries" (AC ¶ 5), which he then allegedly passed to FCA. But there was never any mystery about GM's view of FCA's merger inquiries: as FCA's allegations make plain, GM was not interested in the merger and rejected FCA's invitations to merge. (*Id.* ¶ 74) At any rate, GM does not explain what information Ashton could have provided to FCA that could have given it a strategic advantage.

In a similar vein, GM alleges that Ashton passed on confidential information concerning "GM's approach and expectations for collective bargaining negotiations." (*Id.* ¶ 5) According to GM, the confidential information obtained by

bribing Ashton was used by FCA to further its scheme to induce the UAW to select it as the pattern target. (*Id.* ¶¶ 5, 92)   But FCA does not plausibly explain what GM confidential information it needed and obtained through Ashton to make this scheme possible.   Surely, it required no sophisticated corporate espionage to induce the UAW to agree to such a "rich deal." (MC ¶ 133). The inference GM asks the Court to make is simply implausible.

GM betrayed the fatal deficiency of its corporate espionage theory in its motion to amend in the Michigan Action, where it acknowledged that the existence of the offshore accounts, along with Ashton's GM board service, are "*consistent with a scheme* intended [] to harm GM." ECF No. 84 at 6.   But, as the Supreme Court explained in *Iqbal*, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (2009)(*quoting Twombly*, 550 U.S. at 557).

## C.   The Dubious Offshore Account Allegations

GM's allegations about offshore accounts controlled by Ashton are central to its corporate espionage theories.   As crucial parts of the "what" and the "how" of the alleged fraud, these facts must be pled with particularity under Fed. R. Civ. P. 9(b). *Schweikert v. Baxter Healthcare Corp.*, 2013 U.S. Dist. LEXIS 67355, at *5 (D.N.J. May 10, 2013).   But GM's allegations about the existence and use of these accounts

are just the type of "naked assertions devoid of factual enhancement" that *Iqbal* has instructed courts to ignore. *See 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013).

As a threshold matter, GM is cagey about whether it alleges the existence of the accounts as fact (¶¶ 4, 5, 60, 107), or upon information and belief. (¶¶ 5, 57, 58). As reflected in filings in the Michigan action, explained below, the very existence of these accounts is in doubt, and GM should not allege their existence as fact without applying the "information and belief" label.  GM alleges:

- "GM learned that FCA and FCA NV established and used offshore bank accounts to further their scheme [and that] *Ashton was the recipient of* one or more of these funded accounts" (*Id.* ¶ 4);
- Based on reasonable belief and inference, in return for secret compensation from FCA and FCA NV through foreign accounts, Ashton [denied concessions to GM]" (*Id.* ¶ 5);
- "Again in return for secret compensation from FCA and FCA NV through foreign accounts [] Ashton passed confidential GM information to the UAW and FCA and FCA NV." (*Id.* ¶ 5);
- "Only very recently, after several months of additional investigation, did GM come to learn of certain foreign financial accounts in the Cayman Islands (Cayman National Bank) and Japan (Shinsei Bank) *held in the name of Ashton and/or Ashton's charity*. These accounts held or currently hold substantial funds that, upon information, belief, and clear and reasonable inference, were ultimately provided to Ashton by FCA NV." (*Id.* ¶ 57);
- [U]pon information, belief, and clear and reasonable inference, as part of the conspiracy with Ashton, FCA NV directed illicit bribes to [] Ashton (UAW Vice President 2010-2014) [and others] by granting those individuals *control or a beneficial interest over* undisclosed foreign financial accounts with substantial funds." (*Id.* ¶ 58);

- "Upon information, belief, and clear and reasonable inference, FCA and FCA NV enabled, funded, and provided control to these individuals' above identified accounts." (*Id.* ¶ 58);
- The foreign accounts were "held by Ashton." (*Id.* ¶ 60)
- "Ashton and other FCA and UAW executives held millions of dollars in illicit funds in foreign bank accounts in countries such as Switzerland, Luxembourg, Liechtenstein, Panama, the Cayman Islands, and others." (*Id.* ¶ 107(a))
- GM learned "very recently" "of the substantial accounts Ashton had been provided by FCA NV in multiple foreign financial institutions." (*Id.* ¶ 108)

It is difficult to discern from these allegations what GM really "knows" about the foreign accounts. GM acknowledged in the Michigan Action, just weeks before filing this action, that the existence of these accounts is not a fact at all, but merely something that GM's attorneys "reasonably believe" based on an extensive, but ostensibly privileged, investigation that they bankrolled.

In GM's motion to alter or amend, GM explained that it "**has come to reasonably believe and has alleged as fact** that Ashton maintained at least one account in the Cayman Islands at the same time that Defendants were making unlawful payments to try to grease the skids with the UAW." (ECF No. 84 at 6)  In a declaration accompanying the brief, GM's lead attorney described activities begun in April 2020 in which:

> GM, through outside counsel, retained and began working with third party investigators to assist in GM's investigation. Certain of these third parties, all of whom have significant credentials supporting their investigative expertise, recently discovered reliable information

> *indicating the existence of* foreign accounts *potentially connected to* the scheme alleged in GM's Complaint [].

Karis Dec. ¶ 8.  Through these activities, and within the 10 days preceding the August 3rd filing, GM allegedly "obtain[ed] sufficiently reliable information concerning the existence of foreign bank accounts by various individuals [including Ashton] to allege in a public filing [] the scope and significance of the foreign accounts." *Id.* ¶ 10. The declaration gives no further information about the investigation that revealed the alleged offshore accounts, such as the identity of the investigators or what they did to find the accounts, or identify the "reliable information indicating the existence of" the accounts. Nor does the declaration (or any other pleading in the Michigan Action, or this one) describe the allegedly suspicious activity in the accounts.  Rather, Attorney Karis pronounces that "GM has invoked and will continue to invoke the work product doctrine, attorney client privilege, and other applicable protections as to all aspects of its counsel's work on this matter, including as to all investigators, agents and consultants." *Id.* ¶ 4

    With the benefit of these admissions, it is clear that GM's ostensible "knowledge" about the offshore accounts that allegedly tie Defendant Ashton to the alleged bribery scheme are based <u>entirely</u> on information and belief—*i.e.*, the overactive imaginations of GM's attorneys.  GM fails to adequately allege the most fundamental facts about the accounts, the "what" of its fraud claims and the linchpin of its entire case against Ashton:

- GM is not sure whether the accounts are "held in the name of" Ashton (¶ 57), or if Ashton merely had "a control or a beneficial interest over" them. (¶ 58)

- GM cannot decide if the bribes to Ashton were achieved using a single offshore account in the Cayman Islands (ECF No. 84 at 7, PAC ¶ 6, AC ¶¶ 107(a)); or through one account each in the Cayman Islands and Japan (AC ¶¶ 57); or through accounts at "multiple foreign financial institutions." (*Id.* ¶ 108)

- GM does not know for sure if the accounts were established and used by the Dutch company FCA NV alone (*id.* ¶¶ 11, 57, 58), or by both the Dutch company *and* the Michigan company FCA US LLP. (*Id.* ¶¶ 4, 5, 10, 58, 59)

- GM cannot allege how much money was in, or flowed through, any of the accounts. Although it claims that the accounts hold "substantial funds" (*id.* ¶¶ 57-58), it does not make any attempt to quantify the amounts.  GM manages to allege that the accounts it links to Ashton, *along with* those of a half dozen accounts in other countries belonging to "co-conspirators," collectively contained "millions of dollars" (*id.* ¶ 107(a)), but it inexplicably cannot allege how much was in the Ashton-linked account(s)—the only account(s) relevant to the claims here.

- For that matter, GM does not allege <u>when</u> the accounts linked to Ashton were created and funded, and used to bribe Ashton—only that the accounts "*held or currently hold* substantial funds" (*Id.* ¶ 57).  Critically, GM fails to allege whether

the accounts were funded and abused *before, during, or after* the 2015 collective

bargaining process, when GM's "billions of dollars in increased labor costs" (*id.*

¶ 5) allegedly occurred because of Ashton's conduct.

GM's lead attorney claims that counsel's private investigators found "reliable

information *indicating the existence of* foreign accounts *potentially connected to* the

scheme alleged in GM's Complaint." (Karis Dec. ¶ 8) How reliable can it be if it

does not answer these basic questions so critical to GM's claims? In order to satisfy

the Rule 9(b) standard, the plaintiff must "inject precision or some measure of

substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200. The allegations

relating to the offshore accounts lack the crucial "what, when, where, and how"

required by New Jersey law and Federal Rule 9(b) to make out a claim for fraud.

*Schweikert*, 2013 U.S. Dist. LEXIS 67355 at *5. Clearly, GM fails to allege these

basic and critical facts because it does not really "know" these details, or whether

the accounts exist at all. These threadbare allegations cannot form the basis of a

plausibly pled cause of action under either *Iqbal* or Fed. R. Civ. P. 9(b).

## D.    Information & Belief Bribery Allegations

GM further alleges that the funds in the foreign accounts were used by FCA

and/or FCA NV to direct illicit bribes to Ashton in furtherance of the conspiracy to

force a merger with GM—but it does so clearly *on information and belief. Id.* ¶¶ 58,

59, 60. These bribery allegations, in turn, form the basis of GM's fraud causes of

action. *See* AC ¶¶ 119-120, 122 (Second Cause of Action); ¶¶ 127-128, 130 (Third Cause of Action).   GM's allegations about the bribery perpetrated through the accounts fail to pass muster under Rule 9(b), because they are made upon information and belief, without any factual support.

"Fed. R. Civ. P. 9(b) applies even when the fraud relates to matters within the knowledge of the defendant and [] allegations based on information and belief do not satisfy Fed. R. Civ. P. 9(b) unless the complaint sets forth the facts upon which the belief is founded." *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 313, *41 (D.N.J. 2005).   Moreover, "even under a more relaxed application of Rule 9(b), plaintiffs must accompany such an allegation with a statement of facts upon which their allegation is based."   *MZL Capital Holdings, Inc. v. TD Bank, N.A.*, 2016 U.S. Dist. LEXIS 103177, *15-16 (D.N.J. Aug. 5, 2016)(*citing Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 285 (3d Cir. 1992)).   While it alleges on information and belief that FCA NV directed bribes to Ashton using the foreign accounts, AC ¶¶ 5, 57-58, GM does not set forth the factual basis for this belief.   For example, GM does not allege any transactions in and out of the accounts which suggest bribery, or allege any circumstantial evidence suggesting that Ashton was receiving bribes from FCA through the accounts. GM does not even allege the dates that the accounts were open or active, or the dates on which control over the accounts was transferred to Ashton.

Without these basic facts, GM has not carried its burden to support this "information and belief" allegation.

The "facts" GM alleges to support the logical leap from the existence of the foreign accounts to Fiat Chrysler's use of the accounts to bribe Ashton are meager. GM cites: 1) "FCA NV's (through predecessor Fiat S.p.A.) admitted use of offshore accounts to bribe Italian politicians in the past" (*id.* ¶ 59); and 2) Fiat Chrysler's "proven and admitted pattern of bribing UAW officials." (*Id.*)   The first is an apparent reference to a Fiat scheme from the 1990's called Kickback City that GM unsuccessfully argued in the Michigan Action.  *See* Michigan PAC ¶ 186.   The second is a reference to the bribery scheme orchestrated by rogue Fiat Chrysler employees led by their admitted ringleader Alphons Iacobelli. (AC ¶¶ 35, 55, 107).[7] Even in a non-fraud context, and considering essentially the same allegations, Judge Borman did not find it reasonable to infer that the foreign accounts were a vehicle to direct bribes to Ashton. *GM LLC,* 2020 U.S. Dist. LEXIS 146646, at *14.  Courts in this district "cannot accept such serious allegations of fraud based solely on the "information and belief" of the plaintiff alone, without any elaboration as to the basis of that belief." *Shulton, Inc. v. Optel Corp.*, 1986 U.S. Dist. LEXIS 19775, *53

---

[7] FCA denies that it either directed or approved the alleged prohibited payments.  E.D. Mich. No. 3:20-cv-12668, ECF No. 16 at 1. (FCA Brief Opposing Remand)(Oct. 16, 2020).

(D.N.J. 1986).   GM provides no factual basis for its "information and belief" allegations, which should be ignored.  *See 16630 Southfield,* 727 F.3d at 506.

Finally, GM acknowledges the inadequacy of its pleading when it alleges that it "seeks to determine the full extent to which Ashton breached his fiduciary duties to GM and the full extent of the resulting damages caused to GM" (AC ¶ 6).  As the Supreme Court has put it wryly, "Fed. R. Civ. P. 8 is a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-679. *See also 16630 Southfield*, 727 F.3d at 504 (Rule 8(a)(2) "prevents plaintiffs from launching a case into discovery when there is no reasonable likelihood that they can construct a claim from [] the complaint.").

### III. GM's Fraud Claims Fail for Lack of Causation and Speculative Damages

GM's fraud claims fail for the additional independent reason that GM has not plausibly alleged that Ashton's statements and omissions were in fact false, or that, if false, they caused any measurable harm to GM.

### A.      Applicable Law

There are five elements of common-law fraud under New Jersey law: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.

*Gennari*, 148 N.J. at 610.  The stringent pleading standard of Fed. R. Civ. P. 9(b) applies to such a fraud claim. *Frederico*, 507 F. 3d at 200. In order to satisfy Fed. R. Civ. P. 9(b), "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Id.*  New Jersey courts have held that when the plaintiff does not specify the "who, what, where, and how" of the fraudulent conduct, the allegations are vague and conclusory. *See Schweikert,* 2013 U.S. Dist. LEXIS 67355 at *5.  The plaintiff must establish that it suffered "actual damages," *Churchill Downs, Inc. v. NLR Entertainment, LLC,* 2017 U.S. Dist. LEXIS 32352, at *12 (D.N.J. Mar. 6, 2017), and that "the defendant's conduct was a substantial contributing factor in causing a loss." *Id.* (*quoting McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 439 (3rd Cir. 2007).  GM's fraud allegations do not come close to satisfying these standards.

## B.   GM's Fraud Claims

GM alleges a labyrinthine chain of causation to connect Ashton's alleged misstatements to the harm GM allegedly suffered by voluntarily entering a CBA with the UAW that was more expensive than it had hoped it would be.  The theory works as follows:

1. Ashton's representations on certain board of director questionnaires were false, and his failures to disclose the alleged bribery scheme and the kickback scheme were fraudulent omissions (AC ¶¶ 119, 128);

2. These misrepresentations hid the alleged CB Bribery Scheme from GM (*id.* ¶ 120);

3. And induced GM to permit Ashton to join the board and maintain his position on the board (*id.* ¶¶ 110, 121-122);

4. Which allowed Ashton to pass, and in subsequent years continue to pass, GM confidential information to FCA in furtherance of the CB Bribery Scheme (*id.* ¶¶ 90-91, 123);

5. This information enabled FCA to reach a generous CBA with the UAW in 2015 (*id.* ¶¶ 94-98);

6. The UAW's rich deal with FCA empowered it to extract similar concessions from GM in those parties' 2015 collective bargaining negotiations, through the power of pattern bargaining (*id.* ¶¶ 99-100);

7. Causing GM "to incur billions of dollars in increased labor costs." (*Id.* ¶¶ 5-6, 100).

Reciting the steps of a causal chain with only half this many links (*viz.*, #5 to #7, in the Michigan Action) caused Judge Borman to remark that "[t]o state the theory is to show that the injury alleged is far beyond the first step in the causal chain." *GM LLC*, 2020 U.S. Dist. LEXIS 120736 at *34. Our analysis of these claims, which also finds a lack of proximate cause, begins by evaluating the allegedly false statements.

## C.   The Alleged False Statements and Omissions

GM itemizes responses to various board of director questionnaires by Ashton that allegedly constitute fraudulent misrepresentations, in support of its fraud and fraud by omission causes of action, respectively. (AC ¶¶ 119, 128)  With respect to each and every one of these alleged false statements, GM fails to plausibly allege

that the statement is actually false and/or that GM's detrimental reliance on the statement could have caused the alleged injuries.

1.   On the December 2015 and January 2017 questionnaires, Ashton represented that "he had no business or financial interests or relationships with a company selling goods to the vehicle manufacturing industry." AC ¶ 119(a), 128(a), and that "there was no special arrangement or understanding between [himself] and any other person pursuant to which he was nominated to the Board." *Id.* 119(d), 128(d).  GM alleges that both these statements are false because they do not disclose Ashton's receipt of bribes from FCA in exchange for corrupting the collective bargaining process. *Id.* ¶ 128(a), (d).  But these statements occurred *after* the consummation of the 2015 collective bargaining agreement which injured GM—the CBA was ratified by UAW membership on November 20, 2015, and became effective on November 23, 2015. *Id.* ¶ 99. Clearly, at the time Ashton responded to these two questionnaires (on December 1, 2015 and January 10, 2017, respectively)(AC ¶¶ 119, 128) the 2015 collective bargaining process was long over. GM does not allege that the bribery payments continued <u>beyond</u> the 2015 collective bargaining process, nor any reason for them to do so.  Nor does GM explain how it could have entered into the ruinous 2015 CBA in reliance on either of these <u>later</u> statements.

2.   In January 2015, December 2015, and January 2017, Ashton represented that "he had not received anything of value by a third party in consideration for his

service as a GM director. *Id.* ¶¶ 119(b), 128(b).  GM alleges that this statement is false for the same reason, because it does not disclose Ashton's receipt of bribes from FCA in exchange for corrupting the collective bargaining process. *Id.* ¶ 128(b). The December 2015 and January 2017 statements are unavailing for the reason explained above, namely that they came after the conclusion of the 2015 collective bargaining process. The January 2015 statement is addressed below.

3.   In two questionnaires responses from April 2014 and January 2015, respectively, Ashton represented that he would "maintain the confidentiality of information provided to him in his capacity as a director of GM." *Id.* ¶¶ 119(e), 128(e).  GM also casts this representation as false, because Ashton was allegedly passing confidential information to FCA as part of the CB Bribery scheme.  *Id.* 128(e).  While these statements, and the January 2015 statement denying any third-party payments for his board service, were made before the 2015 collective bargaining negotiations, they fail for a more devastating reason:  GM has not plausibly pled the existence of the underlying CB Bribery Scheme. GM's corporate espionage theory, and Ashton's alleged role in it, is manufactured from the threadbare allegation of Ashton's control of offshore bank accounts, and not entitled to a presumption of truth.  As Judge Borman held in dismissing GM's complaint in the Michigan Action, "GM's alleged injuries were not proximately caused by Defendants' [conduct]" *GM LLC*, 2020 U.S. Dist. LEXIS 120736 at *3.   The proffered "newly discovered evidence" about

offshore accounts linked to Ashton did not change this conclusion: "GM's newly discovered evidence [of Ashton's foreign bank accounts] does not create a reasonable inference that FCA was bribing individuals to infiltrate GM as part of a scheme to directly harm GM, and, therefore, does not change the Court's conclusion that GM's alleged injuries were not proximately caused by FCA's alleged RICO violations." *GM LLC,* 2020 U.S. Dist. LEXIS 146646, at *15. In fact, the falsity of most of the alleged misrepresentations depends on the existence of the FCA CB Bribery Scheme. Since those schemes, and Ashton's participation in them, are not plausible, Ashton's statements disavowing them are not plausibly pled false statements.

4.   GM alleges a single false statement that is based on something other than the alleged CB Bribery Scheme. In January 2017, Ashton represented on the board of director questionnaire that he would "adhere to GM's Code of Conduct, which prohibits bribery and receiving improper payments, among other pertinent illegal activity." (AC ¶¶ 119(c), 128(c)) GM alleges that this representation is false because of the CB Bribery Scheme, and also because Ashton "received kickbacks through inflated contracts at the CHR funded by GM." *Id.* 128(c). In other words, Ashton's promise to adhere to the GM Code of Conduct was a lie, because he was receiving kickbacks from the commemorative watch scheme. This, too, falls short: As GM itself acknowledges, Ashton took affirmative steps to stop receiving kickback

payments prior to this statement, in the fall of 2016. (AC ¶ 52)   GM does not allege, and Ashton's criminal information likewise does not reflect, that Ashton received any kickback payments beyond July 2016.[8]   GM has not established that Ashton's promise, made in January 2017, was anything but objectively true.   The first prong of New Jersey common law fraud is "a material misrepresentation of <u>a presently existing or past fact</u>," *Gennari, supra*, 148 N.J. at 610.   *See also Edelson V., L.P. v. Encore Networks, Inc.*, 2013 U.S. Dist. LEXIS 66192 *30 (D.N.J. May 9, 2013)("Statements as to future or contingent events . . . or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong"). Ashton's promise not to receive kickback payments was not false—especially since he kept it.

## D.   Proximate Causation

<u>Even if</u> GM could plausibly allege 1) that FCA was bribing Ashton through offshore accounts to steal GM confidential information; and 2) that Ashton's representations in his board of director questionnaires were therefore false when made; and 3) that GM reasonably relied on them in accepting him onto the board of directors and granting him access to confidential information, GM <u>still</u> could not make out the elements of its fraud claims.   That is because it does not adequately allege that the theft of that information and FCA's use of it proximately caused any

---

[8] *See* 2:19-cr-20738, ECF No. 1 (Ashton Information) at 8-9.

damage to GM.  Fed. R. Civ. P. 9(b)'s particularity requirements apply to each element of a fraud claim, including proximate cause.  *Karachi Bakery India v. Deccan Foods LLC*, 2017 U.S. Dist. LEXIS 180404, *23 (D.N.J. October 31, 2017)(*citing GMA Accessories, Inc. v. Idea Nuova, Inc.*, 157 F. Supp. 2d 234, 243 (S.D.N.Y. Dec. 18, 2000).

Under New Jersey law, proximate cause "consists of any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." *Townsend v. Pierre*, 221 N.J. 36, 51, 110 A.3d 52, 61 (2015).  By this standard, GM would have to allege that its consummation of the costly 2015 CBA with the UAW was a direct product of Ashton's alleged misstatements on the director questionnaires, or his failure to own up to the watch scheme. Given the extended daisy chain of events linking Ashton's statements to the collective bargaining outcome, it simply strains credulity to claim that the terms of the 2015 GM-UAW CBA "would not have occurred" without the alleged misstatements, as *Townsend* requires.  The *Townsend* Court further counseled that "when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, [the court must] direct a verdict for the defendant." *Id.* at 60-61.

Several of the specific steps in the causal chain are suspect. For example, GM suggests that, if Ashton had answered the questionnaires truthfully, "GM would not

have permitted Ashton to join and maintain a position on the board." (*Id.* ¶¶ 121, 122, 129, 130) It further alleges that if either the watch scheme <u>or</u> the CB Bribery Scheme had been exposed (*i.e.*, through disclosures by Ashton), then "Ashton would have been immediately removed from GM's Board, the perpetrators would have been investigated and prosecuted criminally, and the scheme would have been brought to an end." (*Id.* ¶ 110).   But GM does not explain how removing Ashton would necessarily have ended Fiat Chrysler's corporate espionage campaign.  For example, GM alleges that UAW President Dennis Williams, who served as UAW's President from 2014 to 2018 (and throughout the 2015 collective bargaining negotiations)(*id.* ¶ 15) was also in the pocket of FCA and actively participating in the CB Bribery Scheme. (*Id.* ¶ 71)  GM even suggests that it was Williams who appointed Ashton to the GM Board of Directors in 2014, at the behest of FCA, to further the scheme. (*Id.* ¶ 72). Williams was a "longtime friend" of FCA and its CEO Marchionne, and "cooperated with the goals and plans of FCA and FCA NV." (*Id.* ¶ 73)  And, because "his cooperation had been purchased many times over" Williams "took concrete actions to support those goals." (*Id.* ¶ 73)  If all this is true, it is implausible that the CB Bribery Scheme would have fallen apart in the event that Ashton had confessed his participation in the watch kickback scheme, as GM claims.  Ashton would likely have been fired from the board, but the CB Bribery Scheme would still be a secret, and Williams could have found another "mole" to get FCA the information it needed.

This possibility undermines GM's claim that it relied on Ashton's misrepresentations to its detriment. *See Kuhnel v. CAN Ins. Cos.*, 322 N.J. Super. 568, 731 A. 2d 564 (App. Div. 1999) (affirming dismissal of fraud claim for lack of detrimental reliance).

Perhaps even more importantly, GM does not allege that, in the absence of a corporate espionage scheme, the 2015 collective bargaining process would not have developed in the exact same fashion, where FCA was selected as the target, UAW accepted a sweetheart deal from FCA, and GM ultimately agreed to a similarly rich deal with the complained-of increased labor costs. As GM acknowledged in the Michigan Action, at the time Fiat Chrysler and the UAW agreed to their deal in 2015,

> [both parties] knew the federal government was actively investigating past FCA-UAW [collective bargaining agreements] and labor agreements, and potentially other embezzlement of union funds [and] [t]hrough this "rich" FCA-UAW labor contract, [the UAW was] able to claim to the public, UAW members, and government investigators that IAW leadership had obtained significant FCA concessions that could then be used in pattern negotiation.

MC ¶ 134. Judge Borman concluded that, under these circumstances, "both sides had incentives to prove to the government that they were engaging in good faith negotiations." *GM LLC*, 2020 U.S. Dist. LEXIS 120736, at *34. This constitutes

one of the "holes in [GM's] logic" that FCA was motivated by a desire to harm GM.[9]
*Id.*

Judge Borman identified another reason for Fiat Chrysler to make generous concessions to the UAW in the absence of a scheme to harm GM, namely "the fact that FCA's UAW workforce rejected the first tentative deal struck between FCA and UAW negotiators." (*Id.* *35; *see* AC ¶ 96)   This circumstance "add[ed] to the pressure on FCA to make concessions to the UAW." (*Id.*)  Thus, FCA's alleged manipulation of the collective bargaining process may not have been "a substantial contributing factor in causing [the] loss" that GM complains of. *McCabe,* 494 F.3d at 439.

There is yet another gap in GM's chain of causation, this one between the alleged "coercive economic force of pattern bargaining" (*id.* ¶ 99) and GM's voluntary decision to enter the 2015 CBA.   The Amended Complaint is uncharacteristically silent about the events transpiring between the "tentative deal" reached between GM and the UAW on October 25, 2015 (*id.* ¶ 99) and the ratification of the final deal almost a month later, on November 20, 2015. (*Id.*)  In its Michigan complaint GM filled in this gap, expanding on its allegation that it was forced to "*largely* concede" to FCA's rich deal with the UAW as a pattern (AC ¶ 99;

---

[9] Likely realizing that this allegation had backfired, GM excised it before filing the Amended Complaint in this action; the relevant allegations are otherwise almost identical to those in the Michigan Complaint. *Compare* MC ¶¶ 133-135 with AC ¶¶ 98-99.

MC ¶ 135). There, GM described an additional, quite successful round of negotiation, in which GM "[u]ltimately . . . was able to reduce the immediate cost impact of the FCA pattern by about $400 million." MC ¶ 137. Judge Borman zeroed in on this bombshell fact, observing that

> GM admits, in the Complaint, that it "was able to reduce the immediate cost impact of the FCA pattern by about $400 million," which shows that the economic force of pattern bargaining was not so strong that GM was unable to deviate, at least to some degree, from the pattern CBA.

(*Id.* (citing ¶ 137 of the Michigan Complaint)).[10]  There, as here, this further undermines the alleged power of pattern bargaining, and with it GM's claim of proximate cause.  *See GM LLC*, 2020 U.S. Dist. LEXIS 120736, *35.   In this analysis, the mere possibility of causation is not enough, "and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Townsend,* 221 N.J. at 60-61.

Likewise, with respect to the commemorative watch scheme, GM has not adequately alleged that Ashton's false statements or omissions proximately caused any injury to it. New Jersey courts have held that actual damages and proximate causation are elements of the cause of action in fraud. *Churchill Downs,* 2017 U.S.

---

[10] Once again, GM's method of coping with an inconvenient fact is to suppress it.  The crucial information in ¶ 137 of the Michigan Complaint does not appear anywhere in the Amended Complaint. If GM believes that knocking $400 million off the cost of its CBA is not worth mentioning, just imagine the precision it will bring to calculating damages in this case.

Dist. LEXIS 32352 at *12.  GM alleges that, by virtue of Ashton's misstatements, "GM continued to unknowingly fund inflated vendor contracts at the CHR that lined the pockets of Ashton and his co-conspirators." (*Id.* ¶ 123)  This is beside the point: GM is not claiming damages for the $250,000 by which it allegedly overfunded the CHR because of the kickback scheme. [11]   Rather, GM claims that Ashton's failure to confess the kickback scheme ultimately led to GM's damages in the 2015 collective bargaining process.  (AC ¶¶ 100-101).  The requirement of proximate causation presents an unsurmountable hurdle to this claim as well. As noted above, "[p]roximate cause consists of any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred." *Townsend, supra*, 221 N.J. at 51.  Accordingly, GM would have to allege that Ashton's failure to confess his ongoing receipt of kickback payments while serving on GM's board of directors led directly to GM's consummation of the 2015 CBA with the UAW. GM has not plausibly alleged this. For many of the reasons already discussed, including that Fiat Chrysler might well have obtained the information it allegedly needed from another source within GM, and that both automakers likely would have

---

[11] If GM does claim these damages, Defendant will respond to GM's arguments on reply.

struck similar deals with the UAW in the absence of the corporate espionage, GM

has not adequately pled proximate cause in its fraud causes of action.[12]

## E.   GM's Claimed Damages Are Too Speculative

In New Jersey tort cases, "profits which are remote, speculative or uncertain

are neither an element of damages nor evidence of damages." *Stanley Co. of America*

*v. Hercules Powder Co.*, 16 N.J. 295, 314, 108 A. 2d 616, 626 (1954).  Defining the

appropriate measure of damages in a fraud case is "a perplexing problem,"

*McConkey v. AON Corp.,* 354 N.J. Super. 25, 52, 804 A.2d 572, 588 (App. Div.

2002), and a court will award damages only when they can be "established by the

proofs with sufficient certainty." *Id.*  And while "New Jersey recognizes benefit-of-

the-bargain damages in fraud cases," "[t]he requirement of establishing the amount

claimed with sufficient certainty is essential." *Finderne Mgmt. Co., Inc. v. Barrett*,

402 N.J. Super. 546, 574, 955 A.2d 940, 957 (App. Div. 2008).  Actual damages are

an element of the fraud cause of action, and "a plaintiff must also show that the

defendant's conduct was a substantial factor in causing a loss." *Churchill Downs,*

2017 U.S. Dist. LEXIS 32352 at *12.  Of course, the particularity requirements of

---

[12] It is unclear whether GM seeks damages associated with the 2011 collective bargaining negotiation, when GM claims that Ashton "used his influence to deny GM specific structural labor concessions it should have otherwise received but for FCA and FCA NV's bribes." (AC ¶ 5)  With respect to any such damages, GM has not plausibly alleged that misrepresentations Ashton made on board of director questionnaires starting in 2014, or any other misstatements or omissions, had any causal nexus with those damages, which would also be patently barred by the statute of limitations.

Rule 9(b) apply to every element of a fraud claim, including damages. *Karachi Bakery,* 2017 U.S. Dist. LEXIS 180404 at \*23.

The issue of determining what damages GM suffered from the alleged breaches by Joseph Ashton is indeed a perplexing one.    GM apparently deemed itself entitled to a certain set of terms and conditions negotiated in a "potential deal" with the UAW prior to the conclusion of the 2015 collective bargaining negotiations (AC ¶¶ 86-88), but because of Ashton's conduct it voluntarily entered into a different deal costing it "over \$1 billion more than the deal GM believed it had reached with the UAW before the UAW's selection of FCA as the lead." (*Id.* ¶¶ 99-100).  Indeed, the damages caused by Ashton may not be only one billion dollars, but billions! — "In part due to Ashton's disloyalty and breaches of confidence, GM was forced to incur billions of dollars in increased labor costs."  (*Id.* ¶ 5).  Suffice it to say that the "sufficient certainty" required under New Jersey law for calculating damages, *Finderne, supra*, 955 A.2d at 957, is lacking here.

In his decision dismissing GM's claims in the Michigan Action, Judge Borman similarly observed that the difficulty of calculating GM's damages pursuant to the 2015 CB Bribery Scheme meant that GM could not meet the RICO proximate cause requirement articulated by the Supreme Court in *Holmes v. Sec. Investor Prot. Corp*. *GM LLC*, 2020 U.S. Dist. LEXIS 120736 at \*35-\*36.  Even if FCA were responsible for some of the increased labor costs to GM, the Court reasoned, "the

difficulty of calculating the difference between the labor costs GM had to pay under its ultimate 2015 CBA and the costs it would have had to pay in the counterfactual world where it was selected as the lead is exactly the difficulty that animated the *Holmes* Court's announcement of the direct-injury rule." (*Id.* \*34-\*35 (*citing Holmes*, 503 U.S. at 269)).  The fact that the damages here allegedly arose from fraud, or a breach of fiduciary duty, as opposed to acts characterized as RICO predicate offenses, does not make those damages any easier to calculate.

As for GM's alleged damages arising from the Pre-2015 Scheme, the Court would have to quantify the damages associated with the UAW's failure to afford "efficiencies" to GM that it afforded to FCA (due to the fraudulent activity of Joe Ashton, of course).  Like the process needed to calculate the 2015 damages, this would be "speculative in the extreme," *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 143 (2d. Cir. 2018).  All of GM's claims can be dismissed on the grounds that its claimed damages are speculative, inadequately pled under Rule 9(b), and impossible to calculate with sufficient certainty.

## IV.     The Breach of Fiduciary Duty Claim is Time-Barred under Applicable Michigan Law

### A. The Limited Choice of Law Issue

The Third Circuit permits a defendant to raise the statute of limitations in a motion to dismiss under Fed. R. Civ. P. 12(b)(6) if "the time alleged in the statement

of a claim shows that the cause of action has not been brought within the statute of limitations." *Schmidt*, 770 F.3d at 249-250.   Defendant believes that under New Jersey's choice-of-law rules Michigan law should apply to GM's breach of fiduciary duty claim, which is plainly untimely under Michigan's statute of limitations.

The New Jersey Supreme Court has "long recognized that it is appropriate to analyze choice-of-law questions issue-by-issue, even if that approach complicates the trial." *Ginsberg v. Quest Diagnostics, Inc.*, 227 N.J. 7, 19, 147 A.3d 434, 442 (2016)(citing *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008)). Accordingly, "the laws of different states may apply in the same case to different issues in the case." *In re Consol. Parlodel Litig.*, 182 F.R.D. 441, 447 (D.N.J. 1998). For the balance of the issues raised in this Motion, where there is no outcome-determinative conflict between the laws of New Jersey and those of Michigan, the Court may apply New Jersey law.

The statute of limitations argument raises a choice-of-law issue, because New Jersey law differs from Michigan law in two key respects.   First, New Jersey law provides a six-year statute of limitations for a breach of fiduciary duty claim, *Levitt v. Riddell Sports (In re MacGregor Sporting Goods)*, 199 B.R. 502, 512 (D.N.J. Bankr. Nov. 27, 1995)(citing N.J.S.A. 2A:14-1), while Michigan law provides a three-year statute of limitations.   *Sports Mgmt. Network v. Busch,* 2019 U.S. Dist. LEXIS 35663, *21 (E.D.Mich. Mar. 6, 2019) (citing MCL § 600.5805).   Second,

New Jersey law applies the common law discovery rule, which can toll the applicable statute of limitations, *Caravaggio v. D'Agostini*, 166 N.J. 237, 245, 765 A.2d 182, 186 (2001), while Michigan law does not. *Trentadue v. Gorton*, 479 Mich. 378, 738 N.W.2d 664, 669-670 (2007).   Rather, Michigan applies only statutory tolling mechanisms, which are shorter than the otherwise applicable statutes of limitation.  *Sports Mgmt.*, 2019 U.S. Dist. LEXIS 35663 at *22.   Because statutes of limitation are outcome determinative, there is a real conflict which must be resolved. *McCarrell v. Hoffmann-La Roche, Inc.*, 227 N.J. 569, 591 (2017)("Going forward, to avoid any confusion, we are establishing a bright-line rule: a conflict of law is present whenever the selection of one statute of limitations over another is outcome dispositive.").

## B.  Under New Jersey Choice of Law Rules, Michigan Law Applies

A federal court sitting in diversity ordinarily applies the choice-of-law rules of the state in which the court sits to determine which state's law applies.  *Edelson V., L.P.* 2013 U.S. Dist. LEXIS 66192 at *40 (*citing Klaxon Co. v. Stentor Elec. Mfg. Co,*, 313 U.S. 487, 496, (1941)). The New Jersey Supreme Court's recent decision in *McCarrell* provides the framework for determining which state's law provides the statute of limitations for a given claim.  227 N.J. at 591.

In *McCarrell*, the New Jersey Supreme Court adopted the Restatement (Second) of Conflict of Laws § 142 to analyze choice of law with respect to the

statute of limitations issue. The Court explained that it had previously adopted the Second Restatement's "most significant relationship test" in deciding choice of law questions on substantive law issues, *see Camp Jaycee*, 197 N.J. 132 (2008); *Restatement* §§ 145, 146, 6, and that "[i]ncorporating section 142 into our choice-of-law analysis for tort purposes completes the conversion from the governmental-interest standard to the Second Restatement begun in *Camp Jaycee*." *McCarrell*, 227 N.J. at 592. Indeed, the official comment to Section 142 confirms that the American Law Institute intended that section to apply the most-significant-relationship test to statutes of limitations as well. *See Restatement*, § 142, cmt. e (revised 1988).  As the *McCarrell* Court recognized, "[t]he essential purpose of substantive tort law is to provide a remedy to a party who has been wronged, whereas the essential purpose of a statute of limitations is to encourage litigants to file timely claims and to bar the litigation of stale claims.

Restatement Section 142 begins with a presumption in favor of the forum state—here, New Jersey. Then, Section 142 instructs that:

> In general, unless the exceptional circumstances of the case make such a result unreasonable:
>
> (1) The forum will apply <u>its own statute of limitations barring the claim</u> [or]
>
> (2) The forum will apply <u>its own statute of limitations permitting the claim</u> unless:
>
> > (a) maintenance of the claim would serve no substantial interest of the forum; and

> (b) the claim would be barred under the statute of limitations of a state having a more significant relationship to the parties and the occurrence.

*McCarrell, supra*, 227 N.J. at 592, quoting *Restatement (Second)* § 142.   Under

Section 142(2), a court considers whether maintenance of the claim would serve "no

substantial interest" of New Jersey when the action—as here—would be timely

under the New Jersey statute of limitations, but is barred by the statute of limitations

of another state having a significant relationship to the parties and the occurrence.

*See id.; see also McCarrell*, 227 N.J. at 599. In *McCarrell*, the action was timely

under New Jersey's statute of limitations, but would have been barred under

Alabama's statute of limitations, and thus, Restatement Section 142(2) applied. The

same analysis is necessary here, because GM's breach of fiduciary claim would be

timely under New Jersey's statute of limitations, but would be barred under

Michigan's—the critical question is whether New Jersey has any substantial interest

in the maintenance of GM's breach of fiduciary claim, to establish the most

significant relationship.

Under the most significant relationship standard, the law of the state of the

injury is applicable unless another state has a more significant relationship to the

parties and issues. *Camp Jaycee*, 197 N.J. at 143.   The following factors are also

relevant to the analysis:  (i) the place where the conduct causing the injury occurred,

(ii) the domicile, residence, nationality, place of incorporation and place of business

of the parties, and (iii) the place where the relationship, if any, between the parties is centered. *Id.* at 458 (*quoting Restatement (Second)* § 145(2)(a)-(d)).

The allegations of the Amended Complaint make abundantly clear that Michigan is the only state with substantial interests in this claim.  Each of the Plaintiffs, General Motors LLC and General Motors Company, is a citizen of Delaware and Michigan, with its principal place of business in Michigan. (AC ¶¶ 7-8) The breach of fiduciary duty claim arises out of acts and omissions allegedly committed by Mr. Ashton while he was a board member of General Motors in Michigan. (*Id.* ¶¶ 2, 5, 34).   Those breaches include an alleged failure to disclose an alleged bribery scheme orchestrated by FCA, a Michigan company, (*id.* ¶¶ 10, 114), and a kickback scheme that occurred in Michigan and defrauded the CHR, a Michigan tax-exempt corporation. (*Id.* ¶¶ 20, 37-53, 114). As a result of these breaches, which allegedly enabled the 2015 collective bargaining process to be corrupted, *id.* ¶¶ 4-5, "GM was forced to incur billions of dollars in increased labor costs," *id.* ¶ 5, which were paid to UAW-represented GM employees in Michigan.

The fact that Ashton is a New Jersey resident does not counsel a different result.  In *Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP*, 426 N.J. Super. 582, 46 A.3d 586 (App. Div. 2012), New York was found to have the most significant relationship to a claim of abuse of process filed by a New Jersey resident against a New York law firm, which arose out of allegedly improper activities in

New York. Thus, even when applying New Jersey law would *help* the New Jersey resident defendant, that alone is not enough to constitute a substantial interest in applying New Jersey's statute of limitations. A recent Appellate Division case applying *McCarrell* reaches a similar result. *MTK Food Services, Inc. v. Sirius America Ins. Co.*, 455 N.J. Super. 307, 189 A.3d 914 (App. Div. 2018), involved a legal malpractice action filed more than two years after the claim arose against an attorney licensed in both Pennsylvania and New Jersey, and who represented a client in a Pennsylvania lawsuit involving a fire at the plaintiff's restaurant. *Id.* at 313. Pennsylvania's statute of limitations is two years while New Jersey's is six years. *Id.* Applying Section 142(2), the Court noted that the representation and litigation took place in Pennsylvania, and the only connection to the forum was that the attorney held a New Jersey license. *Id.* at 314. As in *Pitcock*, the court held that New Jersey did not have a substantial interest in the action, and applied the shorter Pennsylvania statute of limitations. *Id. See also Wiebel v. Morris*, 2018 N.J. Super. Unpub. LEXIS 2673, *20-22 (App. Div. 2018)(applying shorter SOL to bar claim under *McCarrell*).   The *McCarrell* Court emphasized that, "when the forum state has *no interest* in the litigation and the claim is barred by another state's [shorter] statute of limitations, the forum state generally should not entertain the claim" in order to discourage "egregious examples of forum shopping."   *Id.* 596 (*citing*

*Restatement (Second)* § 142, comment g.).  It follows that Michigan's three-year statute of limitations for breach of fiduciary duty should be applied here.

## C. Application of Michigan Law

Michigan has a three-year statute of limitations for breach of fiduciary duty. *Sports Mgmt.,* 2019 U.S. Dist. LEXIS 35663 at *21 (citing MCL § 600.5805).  The calculation of the statute of limitations is governed by MCL § 600.5827, which provides that, "the claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results."[13] Under Michigan law, a plaintiff cannot invoke the common law discovery rule to claim that his cause of action first accrues when he knew or should have known of the breach because "[t]he Michigan Supreme Court did away with the common law discovery rule in [*Trentadue*]." *Id.* at *22.  The Court in *Trentadue* found that the statutory scheme is "exclusive and thus precludes the common law practice of tolling accrual based on discovery in cases where none of the statutory tolling provisions apply." [14] *Trentadue*, 738 N.W.2d at 670.

Applying the above principles, because GM filed its original complaint in this action on September 14, 2020, ECF No. 1, its claim for breach of fiduciary duty will

---

[13] MCL § 600.5829-5838 provides exceptions not applicable here.

[14] In the event that GM invokes the tolling statute MCL § 600.5855, relating to fraudulent concealment, Defendant will address GM's arguments in its reply brief. The burden of proving fraudulent concealment is on the plaintiff.  *Sports Mgmt.*, 2019 U.S. Dist. LEXIS 35663 at *23 (*citing Brownell v. Garber*, 199 Mich. App. 519, 527, 503 N.W.2d 81 (1993)).

be barred by the Michigan statute of limitations if its claim accrued more than three years earlier, *i.e.*, before September 14, 2017.

GM's claim for breach of fiduciary presumptively accrued "at the time of the wrong upon which the claim is based," MCL § 600.5827, *i.e.*, when FCA wrongly forced GM into an unfair CBA with the help of Joseph Ashton. (AC ¶¶ 99-100). As alleged by GM, it reached a tentative deal with the UAW on October 25, 2015; the deal was ratified by UAW membership on November 20, 2015, and it became effective on November 23, 2015. *Id.* ¶ 99. GM knew at the time it entered into the deal that it was patterned after "the richest deal ever negotiated by the UAW" (MC ¶ 133) and would cost GM "over $1 billion more than the deal GM believed it had reached with the UAW." (AC ¶ 100)  Even calculating the accrual in GM's favor, GM's cause of action for breach of fiduciary duty accrued as of the CBA effective date of November 23, 2015.  In the absence of tolling GM had, at the latest, until November 23, 2018 to bring this claim.  GM's claim for breach of fiduciary duty is therefore untimely.

## CONCLUSION

The Court should dismiss the Amended Complaint with prejudice.

November 23, 2020

Respectfully submitted,

/s/  Rodman E. Honecker
Rodman E. Honecker, Esq.
WINDELS MARX LANE &
MITTENDORF, LLP
120 Albany Street Plaza
New Brunswick, NJ 08901
rhonecker@windelsmarx.com

*Attorneys for Defendant Joseph*
*Ashton*