# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

**James E. Marina (N.J. Bar No. 050791996)**
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

| | |
|---|---|
| GENERAL MOTORS LLC, GENERAL MOTORS COMPANY,<br><br>Plaintiffs,<br><br>against<br><br>JOSEPH ASHTON,<br><br>Defendant. | CASE NO. 1:20-cv-12659-RBK-KMB<br><br>The Honorable Robert B. Kugler<br><br><br>PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS |

## TABLE OF CONTENTS

INTRODUCTION...................................................................................1

GM'S ALLEGATIONS..........................................................................4

    A.    Ashton's UAW Role and Service on GM's Board. ..............................5

    B.    Ashton Pleads Guilty to Embezzling GM Funds While Serving as a Director on GM's Board. .................................................7

    C.    In Exchange for Bribes, Ashton Denies GM Structural Benefits and Funnels GM's Confidential Information to FCA.........................9

PROCEDURAL BACKGROUND ......................................................12

ARGUMENT .......................................................................................16

I.    Collateral Estoppel Does Not Bar GM's Claims. .....................20

II.    GM's Claims Easily Clear The "Plausibility" And "Particularity" Bars. ...............................................................25

    A.    GM Plausibly Alleges That Ashton Accepted Kickbacks and Disclosed Proprietary Information to a Competitor............................26

    B.    GM's Foreign Account Allegations Satisfy Rule 9(b)........................31

III.    GM Has Stated Actionable Fraud Claims Against Ashton. ....35

    A.    GM's Fraud Claims Against Ashton Are Straightforward. ................35

    B.    GM Sufficiently Alleged that Ashton Made Fraudulent Misrepresentations and Omissions.......................................................36

    C.    GM Adequately Alleges that Ashton's Fraudulent Conduct Caused GM's Injuries.........................................................................40

    D.    GM's Fraud Damages are not Speculative..........................................42

IV.    GM's Breach of Fiduciary Duty Claims are Timely. ...............44

    A.    Ashton Ignores, and Thus Has Waived any Challenge to, GM's Extensive Fraudulent Concealment Allegations. ................................45

B.    The 1AC Sufficiently Alleges Fraudulent Concealment. ...................46

**CONCLUSION.....................................................................................................49**

# TABLE OF AUTHORITIES

## CASES

*Aiellos v. Zisa*,
2009 WL 3486301 (D.N.J. Oct. 20, 2009)............................................45

*Am. Sanitary Sales Co. v. State, Dep't of Treasury, Div. of Purchase & Prop.*,
429 A.2d 403 (N.J. App. Div. 1981).....................................................47

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................... 23, 29

*Bagic v. Univ. of Pittsburgh*,
773 F. App'x 84 (3d Cir. 2019) ............................................................5

*Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring & Searchlight Minerals Corp.*,
441 F. Supp. 3d 23 (D.N.J. 2020) .............................................. passim

*Christidis v. First Pa. Mortg. Tr.*,
717 F.2d 96 (3d Cir. 1983)...................................................................36

*Churchill Downs v. NLR Entm't, LLC*,
No. CV143342KMMAH, 2017 WL 899927 (D.N.J. Mar. 6, 2017) ..................46

*City of Millville v. Rock*,
683 F. Supp. 2d 319 (D.N.J. 2010) .....................................................38

*Cobra Enters., LLC v. All Phase Servs., Inc.*,
2020 WL 2849892 (D.N.J. June 1, 2020)............................................50

*David v. Wells Fargo Fin. Inc.*,
2008 WL 11510645 (D.N.J. Dec. 18, 2008).........................................22

*Deborah Heart & Lung Ctr. v. Penn Presbyterian Med. Ctr.*,
2011 WL 6935276 (D.N.J. Dec. 30, 2011)...........................................32

*Doe v. Hesketh*,
828 F.3d 159 (3d Cir. 2016)................................................................20

*Doe v. Univ. of Scis.*,
961 F.3d 203 (3d Cir. 2020)........................................................ 5, 29

*Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*,
841 F. Supp. 212 (E.D. Mich. 1993)...................................................52

*Finderne Mgmt. Co. v. Barrett*,
955 A.2d 940 (N.J. App. Div. 2008)....................................................46

*Hunt Const. Grp., Inc. v. Farina*,
   No. CIV. 11-4933 FSH PS, 2012 WL 72286 (D.N.J. Jan. 10, 2012) .................34

*In re Chung-Hwan Kim*,
   2018 WL 671467 (Bankr. D.N.J. Jan. 31, 2018) .................................21

*In re Doctoroff*,
   133 F.3d 210 (3d Cir. 1997) ...............................................21

*In re Fruehauf Trailer Corp.*,
   250 B.R. 168 (D. Del. 2000) ...............................................33

*In re Hawkins*,
   231 B.R. 222 (D.N.J. 1999) ................................................22

*In re MacGregor Sporting Goods, Inc.*,
   199 B.R. 502 (Bankr. D.N.J. 1995) .........................................53

*In re Mercedes-Benz Anti-Tr. Litig.*,
   157 F. Supp. 2d 355 (D.N.J. 2001) .........................................51

*Kauffman v. Moss*,
   420 F.2d 1270 (3d Cir. 1970) ..............................................26

*Khosla Ventures, LLC v. Rolls-Royce Canada Ltd.*,
   2012 WL 1344822 (D.N.J. Apr. 16, 2012) ....................................49

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006) ............................................ 25, 26

*McConkey v. AON Corp.*,
   804 A.2d 572 (N.J. App. Div. 2002) ........................................47

*McDermott v. Clondalkin Grp., Inc.*,
   649 F. App'x 263 (3d Cir. 2016) ...........................................37

*Morris Assocs., Inc. v. DiStefano*,
   2012 WL 2019083 (Mich. App. June 5, 2012) .................................40

*N. Am. Commun., Inc. v. InfoPrint Sols. Co., LLC*,
   817 F. Supp. 2d 642 (W.D. Pa. 2011) .......................................53

*Nat'l Med. Imaging, LLC v. U.S. Bank, N.A.*,
   2019 WL 4076768 (E.D. Pa. Aug. 28, 2019) ..................................22

*Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*,
   967 F.3d 218 (3d Cir. 2020) ............................................ 5, 32

*Santiago v. Warminster Twp.*,
   629 F.3d 121 (3rd Cir. 2010) ..............................................29

iv

*Schechter v. Hyundai Motor Am.*,
   2019 WL 3416902 (D.N.J. July 29, 2019), *reconsideration denied*,
   2020 WL 1528038 (D.N.J. Mar. 31, 2020)...........................................................38

*Stanley Co. of America v. Hercules Powder Co.*,
   108 A.2d 616 (N.J. 1954).................................................................................46

*State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*,
   107 F. Supp. 3d 772 (E.D. Mich. 2015)............................................................51

*Townsend v. Pierre*,
   110 A.3d 52 (N.J. 2015)...................................................................................43

*Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*,
   2009 WL 1387115 (Del. Ch. May 18, 2009), *aff'd*,
   988 A.2d 938 (Del. 2010) ...............................................................................40

*United States v. Kensington Hosp.*,
   760 F. Supp. 1120 (E.D. Pa. 1991) ..................................................................34

*Zemel v. Korchmar*,
   2020 WL 6391193 (D.N.J. Oct. 30, 2020).........................................................50

## STATUTES

18 U.S.C. § 1962(b)-(d) .........................................................................................13

Mich. Civ. Law § 600.5855 ............................................................................. 45, 46

## INTRODUCTION

This case involves straightforward claims for breach of fiduciary duty and fraud.  Defendant Joseph Ashton was a long-time official at the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), former head of the UAW's GM Department, and former director on GM's Board.  In a criminal plea agreement, Ashton admitted that while serving on GM's Board, he engineered a years-long scheme to embezzle money from the GM-funded UAW-GM Center for Human Resources ("CHR").  That plea agreement and a recently discovered bribery scheme perpetuated by GM's competitor, FCA US LLC ("FCA") and Fiat Chrysler Automobiles N.V. ("FCA NV") form the basis of this lawsuit, in which GM seeks to recover the damages that Ashton wrought upon it. GM's First Amended Complaint (Dkt. 7, the "1AC") readily clears the low bar for adequately stating claims of fraud and breach of fiduciary duty.  Ashton's motion to dismiss contends otherwise only by repeatedly ignoring large portions of the 1AC and mischaracterizing GM's claims and related litigation.

Ashton and two co-conspirators, Michael Grimes and Jeffery Pietrzyk, served on the CHR's board.  As each has admitted in criminal plea agreements, they abused their positions by, among other things, inflating contracts and demanding hundreds of thousands of dollars in kickbacks from vendors.  The CHR funds should have been used to educate and train GM's employees.  Instead, Ashton and his co-

conspirators used the inflated vendor payments to line their own pockets.  Ashton continued to receive these illegal kickbacks after he joined GM's Board in 2014, with the bribes continuing until at least 2016.

Despite knowing of his years-long scheme to embezzle funds contributed by GM, and despite intentionally causing GM to unwittingly provide over-priced payments at the CHR while serving as a director on GM's Board, Ashton never disclosed the kickback scheme to anyone at GM.  Instead, he both lied about and concealed the scheme, ensuring that GM continued to fund the fraudulent CHR budgetary requests while paying Ashton hundreds of thousands of dollars in compensation.  It is difficult to conceive of a more clear-cut case of breach of fiduciary duty and fraud than concealing from your employer a criminal scheme to embezzle money from it and collecting kickbacks while serving on its Board of Directors.  That is especially true given that these facts are just that—facts—not merely GM's allegations.  Ashton and his co-conspirators have pled guilty and admitted to their participation in that scheme.  As a result, Ashton will serve nearly three years in prison for committing these crimes.

Yet, Ashton's wrongdoing went beyond the facts he admitted in his plea agreement.  GM recently uncovered his role in another scheme to harm GM.  The United States Attorney for the Eastern District of Michigan has been conducting a wide-ranging investigation into corruption by and between FCA and FCA NV on

the one hand and certain former UAW leaders on the other.  As has been repeatedly admitted, starting no later than July 2009, FCA and FCA NV paid millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" to gain labor advantages.  FCA and FCA NV authorized these bribes specifically to harm GM and advance their long-term goal of forcing higher costs and a merger on GM.  GM had no way to know of Ashton's involvement in FCA and FCA NV's bribery scheme until very recently when GM, through investigation of its counsel, discovered that FCA and FCA NV had likely compensated Ashton through accounts in the Cayman Islands and Japan.  In exchange for those illicit payments, Ashton abused his position as Vice President of the UAW's GM Department and as a director on GM's Board.  First, as Vice President of the UAW's GM Department, Ashton denied GM specific structural labor concessions it should have otherwise received through pattern bargaining but for FCA and FCA NV's bribes.  Second, as a director on GM's board, Ashton accessed and funneled GM's highly confidential information to the UAW, FCA, and FCA NV.  Ashton never disclosed and in fact concealed this criminal scheme and his role in it from GM.

Having discovered that Ashton actively participated in two criminal schemes to harm GM while serving on its Board, GM brought suit alleging breach of fiduciary duty and fraud.  Ashton's response to those allegations is remarkable.  Just eleven months after ***pleading guilty*** to a scheme to embezzle money funded by GM and

take kickbacks while on GM's Board, Ashton describes GM's allegations as "half-baked" and based on "facts [that] exist only in the fevered imaginations of its lawyers."  (Dkt. 17-1, Ashton's Brief in Support of Motion to Dismiss ("Br.") at 1.)  In reality, GM's detailed and well-founded allegations are largely based on Ashton and his co-conspirators' criminal plea agreements.  And Ashton's claim that "GM's pleadings cannot be taken at face value" (Br. 13) contradicts the bedrock rule that "accepting at face value the allegations within the complaint is precisely what a court is required to do at the motion-to-dismiss stage."  *Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring & Searchlight Minerals Corp.*, 441 F. Supp. 3d 23, 37 n.5 (D.N.J. 2020).  Ashton's motion to dismiss relies on mischaracterizations of GM's allegations and tries to distract from the undeniable fact that Ashton's admitted criminal wrongdoing harmed GM.  The motion should be denied in its entirety.

## GM'S ALLEGATIONS

Ashton's Motion downplays his criminal conduct.  Much as Ashton may like this Court to believe that his wrongdoing was limited to the "watch kickback scheme" to which he pled guilty to federal charges, GM's allegations in the 1AC implicate Ashton in multiple criminal schemes dating to at least 2009.  And on a motion to dismiss, the Court must "accept as true all factual allegations in the complaint and view those facts in the light most favorable to the [plaintiff]."  *Doe v.*

*Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020).  Ashton's claims that he was not involved in some of the schemes thus must be left for summary judgment and/or trial, and his repeated efforts to draw inferences ***against*** GM get the pleading standard exactly backward.  "[E]ven assuming a different inference is also plausible, at the motion to dismiss stage, [the Court] must view the allegations in the light most favorable to the [plaintiff] and draw all reasonable inferences in the [plaintiff's] favor."  *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 233 (3d Cir. 2020); *accord Bagic v. Univ. of Pittsburgh*, 773 F. App'x 84, 88-89 (3d Cir. 2019) ("When considering a motion to dismiss, a district court cannot weigh competing inferences and forgo drawing a reasonable one in the plaintiff's favor.").  Applying those settled principles, the 1AC readily clears the low bar of plausibly pleading that Ashton defrauded, and breached his duty of loyalty to, GM.

> **A.    Ashton's UAW Role and Service on GM's Board.**

Ashton was a longtime UAW member who eventually became Vice President of the UAW's GM Department, a position he occupied from 2010 to 2014, when he joined GM's Board.  (1AC ¶ 58.)  As a UAW Vice President, Ashton had primary oversight for negotiating and implementing collective bargaining agreements ("CBAs") between the UAW and GM and influencing the terms of the UAW's CBAs with FCA.  (*Id.* ¶ 31.)

In 2014, Ashton was tapped to join GM's Board of Directors by the UAW Trust[1] (at the direction of UAW President Dennis Williams), which had the right to appoint one representative to GM's Board.  (*Id.* ¶ 33.)  Ashton served on GM's Board from 2014 to December 2017.  (*Id.*)  When he joined the Board, Ashton received an orientation on his rights and obligations as a director and signed an agreement to comply with his fiduciary duties to GM.  (*Id.* ¶ 34.)  In written director questionnaires that Ashton completed each year from 2014 to 2017, Ashton repeatedly represented in writing that:

- He had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry;

- He had not received or been offered anything of value in consideration for his Board service;

- He would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM";

- There was no "special arrangement or understanding between [him] and any other person pursuant to which" he was nominated to the Board; and

- He adhered to GM's Code of Conduct, which, among other things, prohibits bribery and receiving improper payments.

(*Id.* ¶¶ 34, 119, 128.)

---

[1]   The UAW Trust was established as a result of the 2007 CBAs between the UAW, FCA, GM, and Ford, which assigned retiree health care liabilities to an independent Voluntary Employee Beneficiary Association.  Pursuant to the restructuring following the 2008 financial crisis, the UAW Trust obtained the right to appoint a director to GM's Board.  (1AC at ¶ 9 n.2.)

**B.     Ashton Pleads Guilty to Embezzling GM Funds While Serving as a Director on GM's Board.**

The CHR's primary purpose is to educate and train GM's domestic union workforce.  (*Id.* ¶ 20.)  It is governed by an eight-director board, with four members appointed by GM and four by the UAW.  (*Id.*)  Under the terms of its CBA with the UAW, GM funds the CHR.  (*Id.* ¶ 53.)  GM is the sole source of funding for the CHR.  (*Id.* ¶ 3.)

Ashton served on the CHR's Executive Board, where he wielded substantial influence over the CHR's operations.  (*Id.* ¶ 32.)  In 2019, the federal government unsealed several indictments against Ashton and his co-conspirators.  On August 14, 2019, Grimes, who served with Ashton at the UAW and on the CHR Board, was charged with conspiracy to commit wire fraud and money laundering.  (*Id.* ¶ 38.)  Charges followed against Pietrzyk, Ashton's top aide at the UAW and CHR, the next month, and against Ashton two months after that.  (*Id.* ¶¶ 41, 43.)  All three have pled guilty and admitted their participation in the scheme.  (*Id.* ¶¶ 9, 40, 42.)  Through those indictments and plea agreements, GM learned that Ashton hatched and executed a criminal scheme involving the CHR.  (*Id.* ¶ 37.)  Before the indictments were unsealed, GM had no previous knowledge of the kickback scheme or Ashton's involvement.  (*Id.*)

Through the CHR scheme, Ashton and his co-conspirators abused their positions at the CHR to get rich.  They deceptively solicited, influenced, and

obtained contracts for CHR vendors to provide clothing and other items to UAW members.  (*Id.* ¶ 38.)  In return, they "demanded and accepted from [CHR vendors] hundreds of thousands of dollars in bribes and kickbacks in the form of cash, checks, and other things of value."  (*Id.*)

For example, in 2011, Ashton proposed that the CHR purchase 50,000 "Team UAW-GM" jackets for all plant employees.  (*Id.* ¶ 44.)  Grimes recommended a specific vendor as the sole source for the contract.  (*Id.*)  After the vendor won the contract, Pietrzyk directed Grimes to demand approximately $300,000 in kickbacks from the vendor for Ashton.  (*Id.*)  The vendor agreed to pay it, and Ashton received the $300,000; he paid Pietrzyk approximately $30,000 of that amount.  (*Id.*)

In 2010, Ashton convinced an associate to loan $250,000 to a construction company.  (*Id.* ¶ 46.)  When the company stopped paying the loan, Ashton proposed that his associate could recoup the loan money by forming a company to sell watches to the CHR.  (*Id.*)  The associate took Ashton's advice, formed a company (USA Countrywide), and located a subcontractor to manufacture 58,000 watches.  (*Id.* ¶ 47.)  Ashton negotiated and approved USA Countrywide's purchase of the watches from the subcontractor for approximately $2.3 million.  He then directed USA Countrywide to submit an inflated bid to the CHR of almost $4 million and used his position at the CHR to ensure that it (using funding from GM) awarded the contract to USA Countrywide.  (*Id.*)  Then, in May 2013, Ashton demanded $250,000 as a

kickback for the contract.  (*Id.* ¶ 48.)  Ashton also directed USA Countrywide to pay kickbacks to Pietrzyk, fraudulently described as "antique furniture" or "furniture" in the memo line to conceal the criminal kickbacks.  (*Id.*)

Kickbacks were personally delivered in cash to Ashton's New Jersey home from May 2013 through early 2015—after Ashton joined GM's Board.  (*Id.* ¶ 50.) Ashton continued receiving kickbacks in the form of checks through 2016, while serving on GM's Board.  (*Id.*)

Ashton never disclosed the kickback scheme to anyone at GM.  (*Id.* ¶ 51.) Ashton and his co-conspirators affirmatively concealed the scheme through fraudulent checks, sham vendors, and other fraudulent means.  (*Id.* ¶¶ 102-05.)

### C.   In Exchange for Bribes, Ashton Denies GM Structural Benefits and Funnels GM's Confidential Information to FCA.

Beginning in 2009, FCA and FCA NV gave millions of dollars to UAW officials to obtain advantages for FCA and secure disadvantages for GM in negotiating and implementing CBAs.  (*Id.* ¶¶ 4, 55, 75-99.)  More than a dozen criminal plea agreements reveal that network of bribery.  The scheme targeted GM in two ways.  First, in return for its bribes, FCA obtained labor cost advantages while ensuring such advantages were denied to GM that GM otherwise would have obtained through pattern bargaining.  (*Id.* ¶ 73.)  Second, in 2015, FCA and its CEO, Sergio Marchionne, leveraged their bribery scheme to harm GM and assist FCA NV in trying to force a merger with GM.  (*Id.* ¶¶ 75, 99-100.)  As part of their scheme,

FCA and FCA NV induced the UAW to select FCA as the "target" company during 2015 CBA negotiations.  (*Id.* ¶ 92.)  Then, weaponizing the UAW's longstanding practice of pattern bargaining, FCA negotiated a CBA that was designed to and did impose (through the economic power of pattern bargaining) enormous costs on GM.  (*Id.* ¶¶ 99-100.)  The final CBA cost GM about $1 billion more than the deal GM believed it had reached with the UAW before the UAW corruptly selected FCA as the lead.  (*Id.* ¶ 100.)

GM very recently learned additional information regarding Ashton's participation in FCA and FCA NV's bribery scheme.  Ashton and/or his "charity" hold accounts in the Cayman Islands (Cayman National Bank) and Japan (Shinsei Bank).[2]  (*Id.* ¶ 57.)  FCA NV compensated a broad network of FCA and UAW executives through foreign bank accounts including past UAW President Dennis Williams (UAW Officer 2010-2018), (*id.* ¶ 58), who was a key participant in FCA's bribery scheme.  The fact that Ashton, too, holds foreign accounts shows how FCA and Ashton were able to conceal his involvement in FCA's scheme.

Ashton's role in the scheme was twofold.  First, as Vice President of the UAW's GM Department, Ashton could directly influence and control the labor relations between GM and the UAW.  (*Id.* ¶ 71.)  Ashton thus ensured that GM did

---

[2]   Numerous former UAW officers used charities as a vehicle to conceal prohibited payments from FCA and FCA NV.  (1AC at ¶¶ 21, 107(c).)

not receive the same labor advantages as FCA. (*Id.*) Under Ashton's direction, FCA was provided and GM was denied certain structural programs, including genuine support from UAW leaders for GM's manufacturing efficiency program, Global Manufacturing System ("GMS"); manipulation of contractual limits on Tier Two and temporary employees; support for FCA's "long-term business plan"; and other "side letter" agreements between FCA and the UAW. (*Id.*)

Second, Ashton acted clandestinely on FCA's behalf from inside GM's Boardroom. (*Id.* ¶¶ 33-34; 90.) Through his membership on the GM Board and his close relationship with the UAW, Ashton provided the UAW, FCA, and FCA NV with unparalleled access on both sides of GM's CBA negotiations. (*Id.* ¶ 90.) In 2015, for example, Ashton had access to extensive information concerning, among other things, negotiation strategy and progress in connection with GM's labor negotiations and GM's consideration of and response to merger inquiries from FCA NV. (*Id.*) He received detailed information on GM's actual performance and goals for 2015, as well as early information concerning what GM viewed as the greatest risks in upcoming CBA negotiations, and he was privy to specific discussions concerning FCA's merger proposal, including detailed defense strategies. (*Id.*) Ashton passed GM's confidential information to corrupt UAW leaders and FCA and FCA NV executives, including confidential information concerning FCA's merger

11

proposal as well as GM's strategies and positions regarding 2015 CBA negotiations. (*Id.* ¶¶ 77, 91.)

In 2017, after an unsealed indictment against corrupt FCA executive Alphons Iacobelli revealed FCA and FCA NV's years-long pattern of bribing UAW officials, GM sought to interview Ashton. (*Id.* ¶¶ 35-36.) GM policy required Ashton to submit to the interview, but he refused and hired criminal counsel. (*Id.* ¶ 36.) Shortly thereafter, in December 2017, Ashton resigned from GM's Board. (*Id.*)

## PROCEDURAL BACKGROUND

In July 2017, the federal government began unsealing indictments, starting with Iacobelli's, that revealed the years-long pattern of corruption and racketeering activity conducted by FCA and certain UAW leaders. (*Id.* ¶ 35.) To date, more than a dozen FCA and UAW officials have been criminally charged, and every one of them has pleaded guilty. Officials have admitted to numerous racketeering acts, including millions of dollars in bribes designed to corrupt the negotiation, implementation, and administration of the collective bargaining process. (*Id.* ¶¶ 2, 4.)

In November 2019, GM sued FCA, FCA NV, and certain individual defendants in the United States District Court for the Eastern District of Michigan related to their bribery scheme (*General Motors LLC v. FCA*, Case No. 19-cv-13429 (E.D. Mich.), the "RICO Action"). (*Id.* ¶ 56.) The RICO Action alleged five causes

of action, including violations of the RICO Act, *see* 18 U.S.C. § 1962(b)-(d), and claims of unfair competition and civil conspiracy under Michigan law.  Ashton was not a defendant in that suit.  (*Id*.)

The RICO Action was assigned to the Honorable Paul D. Borman, who denied GM discovery and declined to exercise supplemental jurisdiction over GM's state law claims.  Judge Borman also publicly described GM's lawsuit as a "waste of time and resources" and a "huge legal distraction," and ordered the parties' CEOs to personally meet without counsel and settle the case within one week's time—an order the Sixth Circuit vacated shortly thereafter through a writ of mandamus. Within days of the mandamus, Judge Borman then dismissed GM's RICO claims with prejudice on the sole ground that GM had failed to plead sufficient facts to show Defendants' RICO violations proximately caused GM's injuries.

GM timely moved to alter or amend the judgment, seeking, *inter alia*, to amend its complaint based on newly discovered evidence that supported its claim that defendants' racketeering scheme was directly and intentionally designed to, and did, harm GM.  In particular, ongoing investigations had revealed a network of hidden offshore accounts used to funnel millions of dollars in bribes—including accounts for Ashton as well as Iacobelli, who succeeded in infiltrating GM shortly after he abruptly resigned from FCA, and former UAW President Williams, who had hand selected (on the UAW Trusts' behalf) Ashton for service on GM's Board as

13

the UAW Trust's designee.  Judge Borman denied the motion, concluding that "GM's newly discovered evidence does not create a reasonable inference that FCA was bribing individuals to infiltrate GM as part of a scheme to directly harm GM, and, therefore, does not change the conclusion that GM's alleged injuries were not proximately caused by FCA's alleged RICO violations."  GM has appealed Judge Borman's order dismissing its RICO claims and his refusal to grant leave to amend the complaint even once.  That appeal is currently pending before the Sixth Circuit.

After Judge Borman declined to exercise supplemental jurisdiction over GM's state law claims, GM filed new lawsuits asserting state law claims against FCA, FCA NV, Iacobelli, and Durden in Michigan state court, asserting claims for fraud, breach of fiduciary duty, and unfair competition (the "Michigan Action").[3]  GM also filed this lawsuit asserting state law claims against Ashton, who resides in New Jersey. The Michigan Action asserts that Iacobelli defrauded GM and breached his fiduciary duty to GM by obtaining employment with GM and passing its confidential information to FCA and FCA NV in exchange for bribes held in foreign accounts.

FCA sought to remove the Michigan Action to federal court, asserting, *inter alia*, that GM's claims against Iacobelli and Durden were fraudulently joined and

---

[3]  To avoid confusion between the state and federal cases in Michigan, this Response refers to decisions in the RICO Action as being made by Judge Borman or the "RICO Court."

should be dismissed.  In so doing, FCA and Iacobelli asserted many of the same arguments Ashton asserts here, including that GM's foreign-account allegations were implausible and foreclosed by Judge Borman's decision, GM's allegations were improperly based upon "information and belief," and GM's state law claims against Iacobelli were baseless.  (*General Motors LLC v. Iacobelli, et al.*, Case No. 20-cv-12668 (E.D. Mich.) at Dkt. Nos. 16 and 18.)

Judge Robert H. Cleland, who presided over the removal proceedings, emphatically rejected these arguments.  (*Id*. at Dkt. No. 22 ("Remand Order").)  For example, Judge Cleland rejected FCA's argument that GM had "not adequately pled that Defendant Iacobelli advanced his position in a bribery scheme with Defendant FCA by committing corporate espionage."  (Remand Order 9-10.)  Given GM's "detailed description of the alleged conspiracy provided in the complaint," including allegations that Iacobelli had been compensated with millions of dollars held in foreign accounts, Judge Cleland found FCA's argument that GM failed to adequately plead its claims "rather remarkable."  (*Id.* at 10.)  Judge Cleland also concluded that GM's "information and belief" allegations were not only proper but served an important legal purpose.  As he explained, "[p]leading on information and belief is important and useful where the proof of allegations is within the possession of others," and "[d]etailed and intricate financial information" about the foreign accounts, "which Defendants allegedly took great efforts to conceal, is not

presumably in the possession of Plaintiff." (*Id.* at 11-13.)   Regarding GM's allegations that Iacobelli had joined GM in order to pass confidential information to FCA (like the instant claim against Ashton), Judge Cleland found that "it is hard to imagine a more clear-cut case for breach of fiduciary duties." (*Id.* at 9.)   GM's allegations that "Iacobelli allegedly continued to receive payments through foreign bank accounts from one of Plaintiffs' primary competitors to advance the competitor's business interests and corrupt labor relations to the disadvantage of Plaintiffs . . . plainly alleges actions taken for Defendant Iacobelli's personal interests contrary to the best interests of Plaintiffs." (*Id.*)   Accordingly, the court granted GM's motion to remand the case to Michigan state court and made clear that GM's foreign account bribery allegations, central to the complaint against Ashton, were adequately stated.

## ARGUMENT

Ashton's motion to dismiss has little basis in law and even less basis in the allegations actually pled in GM's Complaint.  The motion focuses myopically on GM's allegations concerning Ashton's involvement in an FCA-led bribery scheme, in a transparent effort to get some benefit out of the RICO Court's dismissal of the RICO Action.  But virtually every one of Ashton's arguments suffers from a fatal defect: he largely ignores the allegations that he was ***admittedly*** involved in a separate kickback scheme involving GM's funds that he never revealed to GM

during the course of his service as a member of GM's Board. The Complaint thus sets forth exceedingly straightforward theories of fraud and breach of fiduciary duty: GM would not have accepted and compensated Ashton as a member of its Board had he not affirmatively concealed the fact that he was disloyal to GM and engaged in illegal conduct. The RICO Action has no bearing whatsoever on the adequacy of those allegations, for the simple reason that they were never made in that Action.

That alone dooms the majority of Ashton's arguments, for his naked assertions that GM is not really challenging or seeking to recover for that obvious disloyalty are squarely refuted by the 1AC. And in all events, his challenges to GM's allegations about the FCA-led bribery scheme are just thinly disguised efforts to resist the bedrock rule that all well-pled factual allegations must be taken as true, and all reasonable inferences must be drawn in GM's favor, at the motion to dismiss stage. Under a proper application of those settled rules, the motion should be denied in its entirety.

First, collateral estoppel has no application here. *No issue* in this case was "actually litigated" or "actually decided" in the RICO Action. The RICO Court ruled only that GM's RICO complaint did not satisfy the specific proximate cause standard applicable to RICO claims. A holding about whether a complaint alleging different claims against different defendants based on different allegations suffices to state RICO claims is completely irrelevant to whether GM's complaint in *this* case states

fraud and breach of fiduciary duty claims against Ashton.  The RICO Action did not involve any allegations concerning Ashton's admitted involvement in a kickback scheme.  That alone defeats any suggestion that the RICO Court's ruling on the adequacy of a different complaint against others has any collateral estoppel effect here.

Second, there is nothing "implausible" about GM's claims.  Ashton ignores the fact that GM's claims are supported by his *admitted* involvement in a years-long criminal kickback scheme while serving on GM's Board.  There is nothing complex or far-fetched about GM's allegations that Ashton breached his duties by serving on GM's Board of Directors while failing to reveal that scheme.  And while Ashton takes repeated issue with GM's *additional* allegations that he participated in FCA's admitted scheme to bribe UAW leaders, his arguments ignore the bedrock rule that well-pled factual allegations must be taken as true.  Ashton's attempts to complicate GM's straightforward claims and advance competing explanations for his conduct provide no basis for dismissal under Rule 12(b)(6).

Third, GM has sufficiently stated fraud claims based on Ashton's *admitted* conduct in orchestrating the CHR kickback scheme while serving as a GM director. In particular, Ashton embezzled money from the GM-funded CHR, concealed it, and then stood silently by as GM relied on Ashton's misrepresentations and omissions by continuing to fund the CHR year after year.  Once again, Ashton's argument

simply fails to address these allegations.  Instead, he argues that GM's fraud claims are insufficient because GM failed to allege a precise connection between Ashton's fraudulent conduct and the harm GM suffered as a result of the 2015 collective bargaining negotiations.  This assertion is incorrect given the allegations in the 1AC that Ashton used his role on GM's Board to pass confidential information related to the 2015 negotiations to the UAW and, ultimately, FCA.  (1AC ¶ 90.)  And Ashton does nothing to rebut GM's straightforward claims of fraud, injury, and damages based on Ashton's admitted role in stealing funding for the CHR from GM through his scheme.  Whether GM can prove ***additional*** theories of injury and harm are questions to be resolved after full discovery.

Fourth, GM's fiduciary duty claims against Ashton are not time-barred.  Even if Michigan's three-year limitations period applies, GM has alleged in detail that fraudulent concealment tolled the statute of limitations.  Ashton's intentional and strategic decision to not address GM's fraudulent concealment allegations in his opening brief renders any counter-argument waived.  In all events, the allegations in the 1AC are more than sufficient to raise factual issues related to concealment, knowledge, and due diligence that cannot be resolved on a motion to dismiss.

**I.    Collateral Estoppel Does Not Bar GM's Claims.**

Ashton's collateral estoppel argument is premised on fundamental misunderstandings of the law and GM's allegations.[4]  According to Ashton, because a federal district court dismissed a complaint in which GM asserted RICO claims against different defendants based on FCA and FCA NV's scheme of bribing UAW officials, GM is estopped from pressing any of its separate state law claims against him.  (*See* Br. 20 (asserting that "[a]ll of GM's claims in this lawsuit depend on the alleged existence of bribery and corporate espionage schemes which have already been ruled implausible by the [RICO] court, based on virtually identical factual allegations").)  That assertion is wrong.

The party seeking to apply collateral estoppel must establish several elements: "(1) the issue sought to be precluded must be the same as the one involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have

---

[4]    Ashton's argument is also based on the wrong body of law, although that ends up not mattering much.  Ashton cites New Jersey law as the relevant source for establishing collateral estoppel.  (Br. 20.)  But the underlying order is a federal court order, so this Court must apply federal law to determine its preclusive effect.  *See Doe v. Hesketh*, 828 F.3d 159, 171 (3d Cir. 2016) ("When examining the preclusive effect of a prior federal court determination, we apply federal law principles of collateral estoppel.").  In all events, "federal and New Jersey state common law regarding the principles and application of collateral estoppel (or issue preclusion) are substantively similar if not identical."  *In re Chung-Hwan Kim*, 2018 WL 671467, at \*34 (Bankr. D.N.J. Jan. 31, 2018).

been essential to the prior judgment." *In re Doctoroff*, 133 F.3d 210, 214 (3d Cir. 1997). Ashton's collateral estoppel argument fails at the threshold, for the RICO Action did not involve (let alone "actually litigate") any of "the same" issues presented here. *David v. Wells Fargo Fin. Inc.*, 2008 WL 11510645, at *2 (D.N.J. Dec. 18, 2008) (denying motion to dismiss on collateral estoppel because "the issue before this Court is not identical to the issue" before the first court); *In re Hawkins*, 231 B.R. 222, 232 (D.N.J. 1999) (collateral estoppel did not apply to issue that was "never actually litigated"); *Nat'l Med. Imaging, LLC v. U.S. Bank, N.A.*, 2019 WL 4076768, at *13 (E.D. Pa. Aug. 28, 2019) (same).

The question before this Court is whether the 1AC plausibly alleges that Ashton defrauded GM and breached his fiduciary duty to GM. That question was not before the RICO Court. The complaint the RICO Court dismissed did not allege any claims against Ashton, let alone allege claims identical (or pled identically) to the claims pressed here. (RICO Action at Dkt. No. 1.) The RICO complaint pressed different claims against different defendants supported by different allegations. Whether that complaint plausibly alleged proximate cause under RICO (an issue presently on appeal to the Sixth Circuit) has no bearing on whether the 1AC plausibly alleges that Ashton defrauded GM and breached his fiduciary duties. The question when assessing whether a claim clears the plausibility bar is whether "the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The RICO Court's conclusion that GM's RICO complaint did not allow it to draw the reasonable inference that FCA's racketeering conduct proximately caused GM injury says nothing about whether the 1AC allows this Court to draw the reasonable inference that Ashton defrauded or breached his fiduciary duties to GM.

That is perhaps best illustrated by the fact that the FCA-led bribery scheme at the heart of the RICO Action is only ***part*** of the allegations against Ashton here. GM's claims against Ashton also rest on his admitted years-long scheme of soliciting and receiving kickbacks for goods provided to the GM-funded CHR.  (*See* Section II.A.)  No allegations related to the CHR scheme were ever included in the RICO Action or otherwise before the RICO Court.  That is not the only respect in which the factual allegations in the 1AC are not identical to the factual allegations in the operative complaint, or even the proposed amended complaint, in the RICO Action. Even on just the issue of the foreign accounts, the 1AC contains more detailed allegations, including the specific financial institutions where these accounts are held.  (1AC ¶¶ 57-58.)  The RICO Court cannot possibly have resolved whether kickback allegations that it had no occasion to consider would suffice to support fraud and breach of fiduciary duty claims that were not before it.

22

Ignoring that flaw in his logic, Ashton focuses on the fact that the RICO Court, when rejecting GM's request to file an amended complaint, refused to draw the inference from the foreign accounts evidence that Ashton and others were participating in an FCA-led infiltration of a labor organization through bribery and kickbacks with the goal of directly harming GM.  But the RICO Court did not—and could not—find it implausible as a matter of *fact* that Ashton participated in such a scheme, thereby precluding GM from ever pressing such an allegation again.  It simply found the particular allegations with which it was presented insufficient to support the inferences GM asked it to draw in the context of that particular complaint and the claims it pressed.  Perhaps the RICO Court would have viewed those allegations differently had it been confronted with a complaint asserting state law claims against Ashton buttressed by additional allegations that he had already proven himself willing to participate in criminal activity at GM's expense when he orchestrated a kickback scheme involving GM funds.  One cannot know, because the RICO Court had no occasion to consider such a complaint.

That illustrates the basic problem with trying to ascribe collateral estoppel effect to the inferences a court was or was not willing to draw from allegations in a different complaint alleging different claims—a point Judge Cleland implicitly recognized when he rejected FCA's argument that GM had "not adequately pled that Defendant Iacobelli advanced his position in a bribery scheme with Defendant FCA

by committing corporate espionage" in its Michigan state law complaint.  (Remand Order 9-10.)  Indeed, even when RICO and state law claims rest on *the exact same* allegations, whether those allegations satisfy RICO's proximate cause standard does not determine whether they satisfy the causation for a state law claim.  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 284 (2d Cir. 2006), establishes this point clearly.

In *Lerner*, the plaintiff brought a RICO claim as well as a variety of related state law claims based on the same factual allegations.  *Id*. at 278.  The district court dismissed the RICO claim for lack of proximate cause and declined to exercise supplemental jurisdiction over the state law claims.  *Id*.  The Second Circuit affirmed the dismissal of the RICO claim, but determined that diversity jurisdiction existed over the state law claims.  *Id*.  On remand, the district court dismissed the state law claims, holding that because proximate cause was not satisfied on the RICO claim, causation must likewise fail on the state law claims.  *Id*.  The Second Circuit disagreed, holding that its conclusion "that the plaintiffs had not pleaded facts sufficient to support a finding of proximate cause in the RICO action . . . does not necessarily mean that their injuries were, under the facts alleged, not proximately caused by the banks' actions for purposes of the plaintiffs' claims under the common law."  *Id*. at 284.

This case is even more clear-cut than *Lerner*, for it does not even involve the same allegations, let alone the same complaint.  That suffices to distinguish the little

authority Ashton cites on this point, which stands for nothing more than a motion to dismiss ruling can be entitled to collateral estoppel effect.  (Br. 22-23.)  Ashton cites no case in which a court held that another court's ruling on the adequacy of the allegations in a complaint pressing one set of claims precluded the plaintiff from relying on similar allegations in a different complaint pressing different claims. Ashton thus comes nowhere close to clearing the high bar required to dismiss claims on collateral estoppel grounds.  *See Kauffman v. Moss*, 420 F.2d 1270, 1274 (3d Cir. 1970) ("Reasonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel.").

## II.    GM's Claims Easily Clear The "Plausibility" And "Particularity" Bars.

Trying the same tactic from another angle, Ashton next argues that even if the RICO Action does not support collateral estoppel, it still compels the conclusion that GM's claims are not supported by plausible or adequate allegations.  But Ashton once again ignores the fact that all of GM's claims are supported by his ***admitted*** involvement in a years-long criminal kickback scheme to embezzle money from the GM-funded CHR.  There is nothing "implausible" about a scheme to which Ashton admitted.   GM's allegations about the FCA bribery scheme in which Ashton participated are likewise plausible.  They, too, flow directly from more than a dozen criminal indictments and plea agreements.  Ashton again tries to piggyback off Judge Borman's RICO analysis, arguing that GM has not adequately alleged that this

scheme was the direct cause of various actions *by FCA*.  But again, Judge Borman's analysis of the RICO proximate cause issue has no bearing on the adequacy of GM's claims that *Ashton* defrauded and breached his fiduciary duties he owed GM.

> **A.  GM Plausibly Alleges That Ashton Accepted Kickbacks and Disclosed Proprietary Information to a Competitor.**

Ashton begins his plausibility argument with the bald assertion that "all" of GM's claims depend on "theories of bribery and corporate espionage."  (Br. 24.) That is incorrect.  Ashton ignores the fact that GM has asserted claims against Ashton that *do not rely upon the FCA bribery scheme or the existence of any foreign accounts*.  GM alleged that Ashton received kickbacks before he joined GM's Board, that he continued receiving kickbacks after he joined GM's Board, and that he never disclosed the scheme to GM.  Ashton has admitted his involvement in that illegal kickback scheme, and has admitted that the scheme defrauded GM.  He cannot deny that he hid those facts from GM.  Those acts support straightforward claims of breach of fiduciary duty and fraud that are not dependent on any of the FCA-led bribery scheme or foreign account allegations with which he takes issue. (*See* 1AC ¶ 115 (alleging breach of fiduciary duty based on CHR scheme); ¶ 120 (alleging fraud based on CHR scheme); ¶ 126 (alleging fraud by omission based on CHR scheme).)

That said, GM's bribery-based allegations readily clear the low plausibility bar.  In addition to alleging that Ashton (admittedly) participated in a kickback

scheme involving GM's funds, GM alleges that Ashton funneled GM's confidential information to FCA, GM's competitor, in exchange for bribes.  (1AC ¶ 91.)  GM alleges in detail what information Ashton received, when he received it, what information he passed to FCA, and how he was compensated for doing so.  (*Id.* ¶¶ 77, 90-91.)   Ashton cannot seriously dispute that a sitting director who funnels confidential information from a company's boardroom to a competitor in exchange for money has breached his duties to the corporation.  As Judge Cleland put it after reviewing similar allegations that GM asserted against its former employee Alphons Iacobelli: "[*I*]*t is hard to imagine a more clear-cut case for breach of fiduciary duties*."  (Remand Order 9 (emphasis added).)

Relying on Judge Borman's dismissal of a different complaint pleading different claims against different defendants, Ashton asks this Court to simply disregard all of these allegations as "implausible" or "conclusory."  But it is black letter law that the factual allegations in a complaint *must be taken as true* at the motion to dismiss stage.  *See Univ. of Scis.*, 961 F.3d at 208.  Allegations may be disregarded only when they "amount to nothing more than a 'formulaic recitation of the elements' of a … claim," with little or no *factual* content to support them.  *Iqbal*, 556 U.S. at 696; *see also, e.g.*, *Santiago v. Warminster Twp.*, 629 F.3d 121, 129-30 (3rd Cir. 2010).  The 1AC contains far "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  And its detailed factual

allegations may not be dismissed as "conclusory" just because Ashton maintains that they are not true.

At any rate, Ashton's re-telling ignores that FCA executives have admitted in criminal plea agreements that FCA paid millions of dollars to UAW officials to obtain competitive advantages. (1AC ¶ 4.) It also ignores that Ashton himself has admitted participating in a kickback scheme while serving as a GM director. (*Id.* ¶ 3.) And on top of that, GM alleges that FCA NV compensated Ashton and other UAW officials—including Williams, who hand-picked Ashton to serve as the UAW Trust's designee on GM's Board (*id.* ¶ 72)—with substantial funds in foreign accounts at the same time FCA was making unlawful payments to try to grease the skids with the UAW and force a merger with GM. As Vice President of the UAW's GM Department, Ashton was at the center of negotiations that resulted in Defendants causing the UAW to increase GM's labor costs in 2011; as a GM director in 2015, Ashton was at the center of sensitive discussions concerning GM's labor negotiations and FCA's merger proposals. (*Id.* ¶ 77.) No logical leaps are required to infer, as GM alleges, that Ashton, who had already proven himself more than willing to betray and victimize GM for cash, provided confidential details about GM's labor strategy and analysis of a potential merger to FCA, an entity that had already proven itself more than willing to pay bribes. (*Id.* ¶ 78.) As Judge Cleland concluded in rejecting a nearly identical effort to declare allegations of Iacobelli's

participation in this payment-for-information scheme "implausible" and "conclusory," "***This is a rather remarkable assertion, given the detailed description of the alleged conspiracy provided in the complaint***." (Remand Order 10 (emphasis added).)

Ashton protests that GM has not yet proven the precise extent to which his actions harmed GM.  But Ashton's efforts to portray the connection between his misconduct and harm to GM as byzantine rest on mischaracterizations, and the "elaborate construct" he describes is entirely his own invention.  (Br. 14.)  GM alleges that Ashton (a) participated in a criminal kickback scheme involving GM funds, (b) participated in a bribery scheme involving GM's competitor, and (c) passed GM's confidential information to a competitor in exchange for money, all while getting paid by GM to serve as a director on GM's Board.  (1AC ¶¶ 113-15.)  It hardly requires any "daisy chain" to grasp the glaringly obvious point that GM was harmed when it unwittingly accepted and compensated a director who affirmatively concealed his participation in criminal schemes to harm GM.  (Br. 14.)

Ashton's contrary argument rests on the fallacy that GM must connect his misconduct to some "strategic" or "collective bargaining" advantage ultimately obtained ***by FCA***.  (Br. 27-29.)  But Ashton's liability in this lawsuit does not depend on what FCA did with the information it bought, let alone on whether FCA's conduct is actionable under RICO (or any other law).  Thus, the Court need not wade into

whether FCA's bribes "directly" harmed GM under the (incorrect) RICO causation standard articulated and applied by Judge Borman. (*See id.* at 26 (quoting Borman order dismissing GM's RICO claims).) Nor must the Court weigh "alternative explanations" for FCA's "2015 collective bargaining behavior." (*Id.* at 27-28.) Whatever *FCA's* motivations, and however *FCA's* misconduct harmed GM, GM's allegations against *Ashton* rest on specific statements Ashton made (or did not make) to GM in his capacity as a GM board member, and how Ashton's concealment of his involvement in criminal misconduct harmed GM. Whether GM sufficiently alleged causation against different defendants under a different statute with a different causation standard has no bearing on whether those allegations suffice to state fraud and breach of fiduciary duty claims against Ashton.

In all events, that it may be *possible* to imagine alternative explanations for FCA's bargaining behavior notwithstanding GM's detailed allegations that it was the result of the admitted bribery scheme does not render those allegations *implausible*. "To survive a motion to dismiss, [GM's] allegations need not rule out all potential alternative explanations." *Deborah Heart & Lung Ctr. v. Penn Presbyterian Med. Ctr.*, 2011 WL 6935276, at *6 (D.N.J. Dec. 30, 2011). Moreover, "even assuming a different inference is also plausible, at the motion to dismiss stage, [the Court] must view the allegations in the light most favorable to [GM] and draw all reasonable inferences in [GM's] favor." *Aetna Life Ins. Co.*, 967 F.3d at 233.

30

Deciding which of two competing inferences the facts best support is the job of a jury presented with a complete record.  Ashton's speculation regarding the motivation behind FCA's and the UAW's bargaining conduct—which even Ashton does not claim was innocent—has no place in a motion to dismiss.

### B.    GM's Foreign Account Allegations Satisfy Rule 9(b).

FCA argues that GM's fraud claims were not pled with the requisite particularity.  But those claims readily satisfy Rule 9(b), under which plaintiffs "must plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Caspersen*, 441 F. Supp. 3d at 35.[5]  GM alleged in detail precisely how Ashton defrauded GM, explaining exactly what he concealed from GM, when he concealed it, and how. (*See* 1AC ¶¶ 119-20, 125-28.)

Ashton attacks none of this, but rather focuses myopically on the allegations concerning one particular aspect of the fraud—namely, the foreign accounts.  But setting aside the problem that GM has also pled theories that do not depend on those allegations, the account allegations likewise readily satisfy Rule 9(b).  They detail the location and name of the financial institution in which the accounts in the name

---

[5]   Rule 9(b) does not apply to GM's state law claim for breach of fiduciary duty. *See In re Fruehauf Trailer Corp.*, 250 B.R. 168, 197-98 (D. Del. 2000) ("[T]he Rule 9(b) heightened pleading requirement generally does not apply to the state law claim[] of breach of fiduciary duty. . . .").

of Ashton and/or his charity (as well as admitted participants in the FCA bribery scheme) were held, and they allege that those accounts were used for the payment of bribes to Ashton from GM's competitor.  (*See* 1AC ¶¶ 57-58.)  That plainly suffices to "provide notice of the 'precise misconduct' with which [Ashton is] charged."  *Caspersen*, 441 F. Supp. 3d at 36; *see also United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1125–26 (E.D. Pa. 1991) ("Rule 9(b) was not intended to require a plaintiff to know every detail before he or she could plead fraud.  Its purpose was to prevent general allegations of fraud that did not give defendants fair notice of the charges against them.").  (*See* Remand Order 13 (noting that "Plaintiff's [foreign account allegations] are in no way conclusory.").)  No more is required and the further details of the accounts are in Ashton's possession.  *See Hunt Const. Grp., Inc. v. Farina*, No. CIV. 11-4933 FSH PS, 2012 WL 72286, at *5 (D.N.J. Jan. 10, 2012) ("[B]ecause a significant amount of information . . . is likely in defendants' exclusive possession, plaintiff is entitled to seek that information via discovery to further develop the record, as [it] has set forth sufficient factual allegations to support [its] claims.") (quotations omitted).

Ashton argues that GM "does not set forth the factual basis" for alleging that those accounts were used to pay bribes (Br. 35), but once again, that ignores GM's detailed allegations.  To start, ***multiple FCA officials have admitted that FCA bribed UAW officials in order to obtain competitive advantages***.  (1AC ¶¶ 4, 21-

27.)  FCA NV has also admitted bribing politicians using foreign accounts—the same means used to bribe Ashton here.  (*Id.* ¶ 59.)  Moreover, Ashton was not alone in receiving the funds.  GM alleges that FCA and FCA NV bought the control of multiple UAW leaders through foreign accounts, including former President Williams, who is implicated in the bribery scheme.  (*Id.* ¶ 15.)  "[T]he only reasonable explanation that this closely connected group of individuals would have such foreign accounts in countries and financial institutions known for money laundering is that they were facilitated and funded by FCA and FCA NV."  (*Id.* ¶ 59.)  Indeed, Ashton does not even attempt to proffer an innocent explanation for why he and other UAW officials would have foreign accounts, or the means to populate them, but for the admitted bribery scheme.

Instead, Ashton faults GM for failing to provide even more detail about the accounts.  But none of the "precision" he demands—including minute details regarding which FCA entity funded the accounts and how much money was provided in bribes—would materially affect GM's claims or Ashton's ability to defend against them.  (Br. 33-34.)  Moreover, Rule 9(b) does not require omniscient knowledge of facts defendants go to great lengths to conceal.  To the contrary, courts "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants."  *Caspersen*, 441 F. Supp. 3d at 36.  Otherwise, applying Rule 9(b) "prior to discovery may permit sophisticated

33

defrauders to successfully conceal the details of their fraud." *Christidis v. First Pa. Mortg. Tr.*, 717 F.2d 96, 100 (3d Cir. 1983).  GM alleges that the foreign accounts were one means among many to conceal FCA's bribery scheme.  (1AC ¶¶ 57, 107(a).)  As Judge Cleland stated in rejecting a nearly identical attack on the foreign account information, "[d]etailed and intricate financial information, which Defendants allegedly took great efforts to conceal, is not presumably in the possession of" GM.  (Remand Order 13.)  Indeed, GM was able to uncover the information it does have only after months of extensive investigation.  (1AC ¶ 57; *see* Br. 31-32 (describing investigation that uncovered foreign accounts).)

Ashton also faults GM for making certain allegations on "information and belief."  But "pleading upon information and belief is permissible where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control."  *McDermott v. Clondalkin Grp., Inc*., 649 F. App'x 263, 268 (3d Cir. 2016) (internal quotations omitted).  In rejecting a similar argument by FCA and Iacobelli, Judge Cleland likewise recognized that information and belief pleading "is important and useful where the proof of allegations is within the possession of others."  (*See* Remand Order at 12 (citing authorities).)  "Otherwise, federal pleading rules would implicitly require pre-complaint discovery, and defendants would have little incentive and no legal obligation to comply."  (*Id*.)  Ashton does not and cannot dispute that information concerning his foreign accounts

34

is exclusively within his possession, making GM's pleadings on information and belief entirely permissible.

## III.   GM Has Stated Actionable Fraud Claims Against Ashton.

Ashton next argues that GM failed to plausibly allege all the elements of a fraud claim under New Jersey law.  Once again, these arguments either ignore GM's allegations or refuse to accept them as true.  Under a proper application of settled pleading standards, those allegations more than suffice to state a claim against Ashton for fraud.

### A.   GM's Fraud Claims Against Ashton Are Straightforward.

Under New Jersey law, the elements of a fraud claim are: "(1.) A material misrepresentation of a presently existing or past fact; (2.) Knowledge or belief by the Defendant of its falsity; (3.) An intention that the other person rely on it; (4.) Reasonable reliance thereon by the other person; and (5.) Resulting damages." *City of Millville v. Rock*, 683 F. Supp. 2d 319, 329 (D.N.J. 2010).  New Jersey also recognizes a cause of action for fraud by omission so long as the defendant had a duty to disclose.  Fiduciaries have such a duty.  *Schechter v. Hyundai Motor Am.*, 2019 WL 3416902, at *9 (D.N.J. July 29, 2019), *reconsideration denied*, 2020 WL 1528038 (D.N.J. Mar. 31, 2020).

Ashton does not dispute that, as a director, he owed GM fiduciary duties and a duty to disclose.  And GM's fraud claims are based on conduct to which Ashton

has *admitted*:  Ashton designed a criminal kickback scheme in which he siphoned GM-funded CHR money, and he lied about this kickback scheme and failed to disclose it while serving as a director-fiduciary on GM's board.  (1AC ¶¶ 3, 119, 128.)  Contrary to Ashton's assertion, no "labyrinthine chain of causation" is required to connect that fraudulent conduct to GM's harm.  (Br. 38.)  Ashton made fraudulent misrepresentations and omissions that obscured his admitted role in the CHR kickback scheme and his receipt of illicit payments from FCA.  And because of Ashton's fraudulent conduct, GM unwittingly continued to fund the CHR with more than it would have cost but for Ashton's scheme and continued to pay his director salary notwithstanding his concealed disloyalty.  (1AC ¶¶ 118-31.)  GM thus has alleged a clear path between Ashton's fraudulent misrepresentations and omissions and harm to GM.  Whether GM can *also* prove that Ashton's conduct caused the harm that GM suffered *as a result of the 2015 CBA* is therefore beside the point at this stage, for GM has alleged straightforward theories of harm that are directly traceable to Ashton's admitted fraudulent conduct as a GM director.  Nothing more is required to withstand a motion to dismiss.

### B.  GM Sufficiently Alleged that Ashton Made Fraudulent Misrepresentations and Omissions.

Ashton maintains that GM failed to allege the misrepresentation element of its fraud claims.  In fact, GM alleged numerous material misrepresentations and omissions that Ashton made within the context of his role as a GM director-

fiduciary.  For example, GM alleged that Ashton failed to disclose the receipt of any bribes from FCA, and that Ashton failed to disclose the kickback scheme involving CHR funds.  (1AC ¶¶ 126-27.)  These omissions were plainly material.  Further, GM was relying on Ashton as a director-fiduciary "to communicate to his principal facts relating to the business which ought in good faith be made known," which Ashton failed to do.  *Morris Assocs., Inc. v. DiStefano*, 2012 WL 2019083, at *3 (Mich. App. June 5, 2012); *see also Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *14 (Del. Ch. May 18, 2009), *aff'd,* 988 A.2d 938 (Del. 2010) ("Agents owe a duty to disclose relevant information if they have notice of facts which they should know may affect the decisions of their principals as to their conduct.").  (*See* 1AC ¶¶ 125-31).

GM also alleged material misrepresentations that Ashton made, and that GM plainly relied upon given Ashton's role as a director-fiduciary.  For example, GM alleged that in specific board questionnaires that Ashton completed in 2015, 2016, and 2017, Ashton misrepresented that he had not received anything of value from a third party in consideration for his service as a GM director.  (*Id.* ¶ 119.)  But as the 1AC alleges, Ashton received compensation from third parties in the form of illicit CHR vendor kickbacks (and finally pled guilty to doing so (*id.* ¶ 3)), and accepted bribes from FCA in exchange for confidential GM information.  (*Id.* ¶ 120.)

Ashton does not dispute that he fraudulently omitted material facts that he had a duty to disclose because of his role as a director-fiduciary.  Instead, Ashton focuses on his fraudulent misrepresentations, arguing that GM failed to allege that Ashton made any false statements.  (*See* Br. 39-43.)  Ashton's arguments are meritless.

First, in December 2015 and January 2017, Ashton averred that he had no business or financial interests or relationships with a company selling goods to the vehicle manufacturing industry.  That was false:  At the time he made those statements, Ashton maintained foreign accounts that had been funded with illicit FCA payments.  (1AC ¶ 107(a).)  Ashton nonetheless argues that those statements could not have been material or harmed GM because, when he made them, the 2015 CBA that damaged GM had already been consummated.  (Br. 40.)  But that again ignores GM's actual allegations of harm.  GM relied on those misrepresentations when it agreed to employ, and then to continue employing, Ashton as a member of its board.  (1AC ¶ 122.)  Ashton cannot seriously mean to suggest that GM still would have accepted and compensated him as a director had he revealed that he had received bribes from FCA during the 2015 bargaining process.

Second, in January 2015, December 2015, and January 2017, Ashton avowed that he had not received anything of value from a third party in consideration for his service as a GM director.  Those statements likewise were false, because Ashton failed to disclose he received CHR kickbacks or illicit payments from FCA.  Ashton

38

argues that those statements were not material for the same reason as the first set of statements—*i.e.*, because they post-dated the 2015 CBA.  (Br. 40-41.)  But GM relied on those statements in continuing to employ Ashton, a disloyal director, and they caused GM to unwittingly fund Ashton's CHR kickback scheme.  (1AC ¶¶ 121-23.)  Those allegations of harm connect directly to Ashton's lies.

Third, in April 2014 and January 2015, Ashton represented that he would maintain the confidentiality of GM's information.  Ashton argues that this misrepresentation cannot form the basis of a fraud claim because GM has not plausibly alleged the existence of FCA's underlying bribery scheme.  (Br. 41-42.)  However, as explained in Section II, GM's allegations regarding Ashton's receipt of bribes from FCA in exchange for confidential GM information readily withstand the pleading bar.  Ashton is merely inviting the Court to discredit GM's allegations, which is inappropriate at the motion to dismiss stage.

Finally, in 2017, Ashton represented that he "adhere[d]" to GM's Code of Conduct, which prohibits bribery and other improper payments.  He claims that his representation was not false because at that time, Ashton was no longer involved in the CHR kickback scheme and was not receiving improper payments from FCA.  (Br. 42-43.)  But those are factual contentions and when Ashton made this representation, he had already committed numerous breaches of GM's Code of Conduct, including through the admitted CHR kickback scheme and his receipt of

illicit payments from FCA.  (1AC ¶ 120.)  Even if Ashton received no improper payments after making this representation in 2017, the statement was still false the moment he made it.  As with Ashton's other false statements and misrepresentations, GM plainly relied on this representation to its detriment because GM would not have continued to employ Ashton as a director-fiduciary had Ashton truthfully disclosed his breaches of GM's Code of Conduct.  (*Id.* ¶¶ 121-23.)

In sum, GM alleges numerous fraudulent misrepresentations and omissions that Ashton made while serving as a GM director-fiduciary.  Ashton's self-serving insistence that some of his statements were true provides no basis to disregard GM's well-pled allegations that they were not.

### C.    GM Adequately Alleges that Ashton's Fraudulent Conduct Caused GM's Injuries.

Ashton's attack on GM's proximate cause allegations fare no better.  Under New Jersey law, proximate cause "consists of 'any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred.'" *Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015).  GM's allegations satisfy this standard.  GM alleged that Ashton fraudulently misrepresented and failed to disclose his role in the CHR kickback scheme, as well as his receipt of illicit payments from FCA.  (1AC ¶¶ 119-20, 126-28.)  Because of this fraudulent conduct, GM unwittingly continued to fund the CHR at a level higher than appropriate due to Ashton's concealed

corruption, to pay Ashton's salary, and to keep Ashton on the board even though he was a disloyal director. (*Id.* ¶¶ 123, 131.) These injuries flowed directly from Ashton's fraudulent conduct. Nothing more is required to state a claim for fraud.

Continuing the theme of his brief, Ashton does not address the causation theory GM actually alleges. Instead, in yet another effort to conflate this case with the RICO Action, Ashton insists that GM must "allege that Ashton's failure to confess his ongoing receipt of kickback payments while serving on GM's board of directors ***led directly to GM's consummation of the 2015 CBA with the UAW***." (Br. 43-44, 49 (emphasis added).) Indeed, Ashton even goes so far as to assert that "GM is not claiming damages for the $250,000 by which it allegedly overfunded the CHR because of the kickback scheme." (*Id.* at 49.) That claim is baffling. The 1AC expressly alleges that "as a result of Ashton's fraudulent misrepresentations and omissions, Ashton was nominated to GM's Board and GM paid him compensation [and] GM continued to unknowingly fund inflated vendor contracts at the CHR that lined the pockets of Ashton and his co-conspirators." (1AC ¶¶ 123, 131.) And it expressly requests as damages "the recoupment of monies paid by GM to Ashton for service as a director on GM's Board and further damage GM suffered as a result of Ashton's breaches of fiduciary duty, fraudulent statements and omissions, and other unlawful acts." (*Id.* at 60.)

Rather than address these allegations, Ashton asserts in a footnote that "If GM does claim these damages, Defendant will respond to GM's arguments on reply." (Br. 49 n.11.)  But GM has ***already*** expressly "claim[ed] these damages" in the 1AC. Ashton's deliberate decision not to address critical allegations that plainly appear on the face of the complaint constitutes waiver, as "[i]t is hornbook law that arguments raised for the first time in a reply brief are waived[.]"  *Aiellos v. Zisa*, 2009 WL 3486301, at *1 (D.N.J. Oct. 20, 2009).  At any rate, it is hard to imagine what purported pleading deficiency Ashton could conjure up with an allegation that GM would not have paid him to serve on its board had he revealed that he had orchestrated a kickback scheme involving GM funds.

### D.    GM's Fraud Damages are not Speculative.

Similar to his argument on proximate causation, Ashton erroneously insists that GM's theory of damages depends on proving that Ashton's fraud caused the harms GM suffered as a result of the 2015 CBA, as well as prior labor efficiencies that FCA received and that GM was denied.  (Br. 51-52.)  Again, Ashton miscasts GM's claim and ignores the fraud damages that are easy to trace and quantify: namely, the compensation Ashton received as a disloyal director, as well as the money GM spent in funding the CHR that Ashton corrupted and lied about.

Instead of addressing these damages, Ashton relies on cases standing for the proposition that fraud damages cannot be too speculative, and that "a plaintiff must

also show that the defendant's conduct was a substantial factor in causing a loss." (Br. 50 (citing *Stanley Co. of America v. Hercules Powder Co.*, 108 A.2d 616, 626 (N.J. 1954)).)  That is not a controversial proposition; GM agrees that damages that are too speculative are ultimately unrecoverable.  But Ashton does not even try to argue that the CHR and salary damages, which are easily calculable and readily traceable to Ashton's fraudulent conduct, are too "speculative" to recover.  (*See* Br. 50-52.)  Moreover, he relies upon numerous cases that were in a different procedural posture and thus applied a standard of proof that is inapplicable here.  *See, e.g.*, *Churchill Downs v. NLR Entm't, LLC*, No. CV143342KMMAH, 2017 WL 899927, at *13 (D.N.J. Mar. 6, 2017) (granting a motion for ***summary judgment*** dismissing a fraud claim); *Finderne Mgmt. Co. v. Barrett*, 955 A.2d 940, 944-45 (N.J. App. Div. 2008) (reviewing a fraud claim that ***had proceeded to a jury***); *McConkey v. AON Corp.*, 804 A.2d 572, 576 (N.J. App. Div. 2002) (reviewing ***a jury verdict*** that had awarded fraud damages).

Ashton also ignores the difference between the ***fact*** of damages and the ***proof*** of damages.  "The rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, ***and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery***."  *Am. Sanitary Sales Co. v. State, Dep't of Treasury, Div. of Purchase & Prop.*, 429 A.2d 403, 406 (N.J. App. Div. 1981) (emphasis added).

43

Here, GM has plainly alleged the fact of damages insofar as Ashton's fraudulent conduct led GM to unwittingly overfund the CHR due to Ashton's corruption and pay Ashton's salary.  This is all that is required to state a claim for fraud.  Insofar as Ashton disputes whether GM can clearly trace Ashton's fraudulent conduct to the labor-related damages that GM incurred, "uncertainty as to the amount" of damages attributable to Ashton's fraud provides no basis to grant Ashton's motion to dismiss. *Cf. Caspersen*, 441 F. Supp. 3d at 35 (noting that courts "should not require plaintiffs to plead issues that may have been concealed by the defendants" because otherwise, applying Rule 9(b) "prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud") (citations omitted).

## IV.    GM's Breach of Fiduciary Duty Claims are Timely.

GM's claims are timely under both New Jersey and Michigan law.  Ashton argues at length that New Jersey would apply Michigan law to GM's fiduciary duty claims because Michigan has a more substantial connection to those claims.  GM does not concede that Ashton is correct as a matter of New Jersey law.  But this choice of law issue is purely academic because the claims are timely under either Michigan or New Jersey law.[6]  Ashton's contrary argument ignores GM's fraudulent concealment allegations—a point that even he acknowledges.

---

[6]    Ashton does not contest that these claims are timely under New Jersey's six-year statute of limitations.

### A.   Ashton Ignores, and Thus Has Waived any Challenge to, GM's Extensive Fraudulent Concealment Allegations.

Ashton's statute of limitations argument rests on the assumption that GM's claims accrued at the time of the 2015 CBA.  But while Michigan has a three-year statute of limitations, if a claim is fraudulently concealed, then the limitations period does not expire until two years after the claim is or should have been discovered. Mich. Civ. Law § 600.5855.  The 1AC expressly alleges that GM did not and could not have discovered Ashton's wrongdoing until Grimes' indictment in 2019 because "Ashton and the other co-conspirators took steps to fraudulently conceal their wrongdoing and resulting damage."  (1AC § IV; ¶ 102.)  This is followed by ten pages of allegations detailing the existence and extent of the fraudulent concealment perpetrated by Ashton and his co-conspirators.  Yet much like with GM's well-pled allegations of injury, instead of addressing these extensive allegations, Ashton purports to reserve his arguments on fraudulent concealment for his reply.  (Br. 59 n.14.)

Ashton provides no rationale for why he should be permitted to decline to address a core dispositive argument in his opening brief.  He merely notes that "[t]he burden of proving fraudulent concealment is on the plaintiff."  (*Id*.)  While true, that hardly empowers a defendant to intentionally sandbag a plaintiff in a motion to dismiss.  Obviously, the plaintiff has the burden of persuasion on *all* of its affirmative claims, but the general and well-recognized rule is that a defendant must

raise *all* arguments in its opening brief. *Khosla Ventures, LLC v. Rolls-Royce Canada Ltd.*, 2012 WL 1344822, at *2 n.2 (D.N.J. Apr. 16, 2012) (refusing to consider argument because "it was not sufficiently raised in [the] opening brief"); *Cobra Enters., LLC v. All Phase Servs., Inc.*, 2020 WL 2849892, at *1 (D.N.J. June 1, 2020) ("this Court will not accept arguments offered for the first time in the reply brief"). Allowing Ashton to sequence his arguments in his preferred manner would prejudice GM, as GM will have no opportunity to respond to any arguments on fraudulent concealment that Ashton may present in his reply. The rule requiring that arguments must be presented in the opening brief exists precisely to avoid this situation. Accordingly, Ashton's statute of limitations argument fails for the simple reason that he has waived any challenge to GM's fraudulent concealment allegations. *Zemel v. Korchmar*, 2020 WL 6391193, at *3 (D.N.J. Oct. 30, 2020) (refusing to consider argument raised for the first time in the reply brief because "Plaintiffs have not had the opportunity to respond to them").

**B.     The 1AC Sufficiently Alleges Fraudulent Concealment.**

GM adequately alleges fraudulent concealment in any event. Under Michigan law, the statute of limitations is tolled when the defendant fraudulently concealed the existence of a claim. *See* Mich. Civ. Law § 600.5855. For that statute to apply, a plaintiff must allege three elements: "1) wrongful concealment by the defendants of their actions; 2) failure of the plaintiffs to discover the operative facts that are the

basis of the cause of action within the statute of limitations; and 3) plaintiffs' exercise of due diligence until discovery of the facts." *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 793 (E.D. Mich. 2015).

The 1AC readily satisfies that standard. The 1AC contains numerous allegations of the wrongful acts of concealment perpetrated by Ashton and his co-conspirators.[7] Specifically, Ashton and his co-conspirators, including Grimes and Pietrzyk, took affirmative steps to conceal the kickbacks they were receiving from CHR vendors, including by setting up sham entities and disguising payments to hide them from both GM and the United States government. (1AC ¶¶ 103-06.) Ashton and his co-conspirators likewise actively concealed his involvement with the FCA-led bribery scheme through the use of hidden foreign accounts and other false statements. (*Id*. ¶¶ 106-07.) The 1AC alleges that GM did not become aware of the operative facts until the indictment of Ashton's co-conspirator Grimes was unsealed. (*Id.* ¶ 102 ("It was not until the summer of 2019, with the indictment of Grimes, that

---

[7]   Given (a) the self-concealing nature of the underlying scheme and (b) Ashton's fiduciary duties to GM, an affirmative act to conceal the claim may not even be required. *In re Mercedes-Benz Anti-Tr. Litig.*, 157 F. Supp. 2d 355, 371 (D.N.J. 2001) (recognizing that "self-concealing" frauds can satisfy fraudulent concealment requirements); *Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, 841 F. Supp. 212, 217 (E.D. Mich. 1993) ("Courts dispense with the requirement of an affirmative act of concealment in instances where the underlying wrong is deemed 'self concealing.' A self-concealing wrong is one in which "deception is an essential element for some purpose other than merely covering up the act.").

GM first learned of the existence and scope of wrongdoing at the CHR by Ashton.").)   Likewise, it alleges that GM could not have learned of Ashton's involvement in the FCA bribery scheme (and the funds Ashton was receiving through the foreign accounts) until very recently.  (*Id.* ¶¶ 2, 106-08.)  Finally, GM's 1AC specifically alleges that GM was diligent with respect to investigating the potential causes of action, including by closely monitoring the ongoing criminal investigations surrounding the alleged scheme.  (*Id.* ¶ 108.)

These allegations are more than sufficient to deny a motion to dismiss on statute of limitations grounds.  Courts routinely recognize that allegations related to fraudulent concealment, including the plaintiff's knowledge and due diligence, are matters of fact inappropriate for decision on a motion to dismiss.  *N. Am. Commun., Inc. v. InfoPrint Sols. Co., LLC*, 817 F. Supp. 2d 642, 650 (W.D. Pa. 2011) ("Generally, the granting of a motion to dismiss is not appropriate where the Plaintiff has pled fraudulent concealment and asserted its due diligence or reasons for the lack thereof."); *id.* ("Whether the plaintiff had adequate notice of the existence of a cause of action by virtue of the public filing cannot be resolved on motion to dismiss or a motion for summary judgment."); *In re MacGregor Sporting Goods, Inc.*, 199 B.R. 502, 513-14 (Bankr. D.N.J. 1995) ("This determination [of when a plaintiff knew or should have known of its injury] cannot be made upon a motion to dismiss or a motion for summary judgment").  To the extent the Court entertains Ashton's

arguments related to fraudulent concealment, the Court should deny Ashton's statute of limitations argument on that ground.

## CONCLUSION

For the foregoing reasons, the Court should deny Ashton's motion.

Dated: December 7, 2020

Respectfully submitted,

**KIRKLAND & ELLIS LLP**

By: *s/James E. Marina*
James E. Marina (N.J. Bar No. 050791996)
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
jmarina@kirkland.com

Hariklia Karis, P.C. (*pro hac vice pending*)
Jeffrey Willian, P.C. (*pro hac vice pending*)
Casey McGushin  (*pro hac vice pending*)
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
hariklia.karis@kirkland.com
jeffrey.willian@kirkland.com
casey.mcgushin@kirkland.com

Austin Norris  (*pro hac vice pending*)
2049 Century Park East
Los Angeles, CA 90067
Telephone:  (310) 552-4200
austin.norris@kirkland.com

Maisie Allison  (*pro hac vice pending*)
555 South Flower Street
Los Angeles, CA 90071
Telephone:  (213) 680-8400
maisie.allison@kirkland.com

*Attorneys for Plaintiffs General Motors LLC*
*and General Motors Company*