UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| GENERAL MOTORS LLC, and GENERAL MOTORS COMPANY,<br><br>        Plaintiffs,<br><br>   v.<br><br>JOSEPH ASHTON,<br><br>        Defendant. | CASE No.: 20-cv-12659<br>Honorable Robert Kugler<br>District Court Judge<br><br>Honorable Karen Williams<br>Magistrate Judge<br><br><u>Motion Returnable: December 21, 2020</u> |

## **DEFENDANT JOSEPH ASHTON'S REPLY BRIEF IN FURTHER SUPPORT OF HIS MOTION TO DISMISS**

Rodman E. Honecker, Esq.
WINDELS MARX LANE &
MITTENDORF, LLP
120 Albany Street Plaza
New Brunswick, NJ 08901
*Attorneys for Defendant Joseph Ashton*

On the Brief:
    Bradley D. Simon, Esq. (*pro hac vice* admission pending)
    Ben J. Kusmin, Esq. (*pro hac vice* admission pending)

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...............................................................1

ARGUMENT ......................................................................................2

I.   Collateral Estoppel is Applicable Here ..........................................2

II.  The Amended Complaint Does Not Satisfy the Plausibility and Particularity
     Requirements ...............................................................................10

III. GM's Non-Collective Bargaining Damages Claims ......................14

    A.   Board Compensation Damages ...........................................15

    B.   Watch Scheme Damages ....................................................16

    C.   Particularity ......................................................................18

IV.  GM's Breach of Fiduciary Duty Claim is Not Saved by Michigan's
     Equitable Tolling Statute ...............................................................19

    A.   Ashton Has Not Waived His Fraudulent Concealment
         Argument ...........................................................................20

    B.   GM Discovered Its Claim by December 2017 at the Latest ..............22

    C.   GM's Lack of Diligence Defeats Its Fraudulent Concealment
         Theory ...............................................................................25

    D.   Ashton's Mere Silence is Not Fraudulent Concealment ...................28

CONCLUSION ...................................................................................30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. McCurry*,
   449 U.S. 90 (1980)................................................................................5

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................7, 10, 13, 14

*AstenJohnson, Inc. v. Columbia Cas. Co.*,
   562 F. 3d 213 (3d Cir. 2009) .................................................................20

*Bagic v. University of Pittsburgh*,
   773 F. App'x 84 (3d Cir. 2019) .......................................................12

*Bell Atlantic v. Twombly*,
   550 U.S. 544 (2007)...............................................................7, 10, 12, 13

*David v. Wells Fargo Fin. Inc.*,
   2008 WL 11510645 (D.N.J. Dec. 18, 2008).........................................4

*Delphi Auto. PLC v. Absmeier*,
   167 F. Supp. 3d 868 (E.D.Mich. Mar. 1, 2016)..................................24

*Doe v. Roman Catholic Archbishop*,
   264 Mich. App. 632, 692 N.W.2d 398 (Mich. App. Dec. 21, 2004)21, 23, 24, 27

*Frederico v. Home Depot*,
   507 F. 3d 188 (3d Cir. 2007) ........................................................8, 19

*GM LLC v. FCA US LLC*,
   2020 U.S. Dist. LEXIS 120736 (E.D. Mich. July 8, 2020)..................3

*GM LLC v. FCA US LLC*,
   2020 U.S. Dist. LEXIS 146646 (E.D. Mich. Aug. 14, 2020).........3, 10

*Groth-Hill Land Co. v. Gen. Motors LLC*,
   2013 U.S. Dist. LEXIS 103039 (N.D. Cal. July 23, 2013) .................28

*In re Hawkins*,
   231 BR 222 (D.N.J. 1999) ..................................................................3

*Jensen v. Indianapolis Public Schs.*,
   2017 U.S. Dist. LEXIS 119524 (S.D. Ind. Jul. 28, 2017) ..................................20

*Karachi Bakery India v. Deccan Foods LLC*,
   2017 U.S. Dist. LEXIS 180404 (D.N.J. October 31, 2017) .........................15, 17

*Lerner v. Fleet Bank N.A.*,
   459 F.3d 273 (2d Cir. 2006) ..............................................................................5, 6

*Li v. Peng*,
   516 B.R. 26 (D.N.J. Aug. 22, 2014) ......................................................................5

*In re MacGregor Sporting Goods, Inc.*
   199 B.R. 502 (1995) ...........................................................................................18

*Nat'l Med. Imaging, LLC v. U.S. Bank, N.A.*,
   2019 WL 4076768 (E.D. Pa. Aug. 28, 2019) ....................................................3, 4

*Phinney v. Verbrugge*,
   222 Mich. App. 513, 564 N.W.2d 532 (Mich. App. Apr. 4, 1997)..............21, 29

*Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*,
   967 F.3d 218(3d Cir. 2020) ................................................................................11

*Precious Creation, Inc. v. Mercantile Bank Mortg. Co., LLC*,
   731 Fed. App'x 498 (6th Cir. 2018) ...................................................................28

*Progressive Sterilization, LLC v. Turbett Surgical LLC*,
   2020 U.S. Dist. LEXIS 101885 (D. Del. Jun. 10, 2020) ....................................20

*Sills v. Oakland Gen. Hosp.*,
   220 Mich. App. 303, 559 N.W.2d 348 (Mich. App. Nov. 26, 1996) ....21, 27, 28,
   29

*State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*,
   107 F. Supp. 3d 772 (E.D. Mich. 2015) .............................................................25

*United States v. Ashton*,
   2:19-cr-20738, ECF No. 26 ................................................................................16

*Villareal v. R.J. Reynolds Tobacco Co.*,
   839 F.3d 958 (11th Cir. 2016) ...........................................................................26

*Warren v. Sheriff of Cook County Thomas Dart*,
  2010 U.S. Dist. LEXIS 124671 (N.D. Ill. Nov. 24, 2010) ................................20

*Zavala v. Wal-Mart Stores, Inc.*,
  393 F. Supp. 2d 295 (D.N.J. 2005) ....................................................................13

**Statutes**

MCL § 600.5855 ...............................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 9(b) ..........................................................................*passim*

Fed. R. Civ. P. 12(b)(6)......................................................................7, 16

## PRELIMINARY STATEMENT

GM attempts to dodge the bulk of the devastating attacks on its implausible theory of recovery made in Defendant Joe Ashton's motion to dismiss. It criticizes as "myopic" Ashton's focus on the alleged collective bargaining damages, and suggests that it need not defend its collective bargaining theory because it has a backup damages theory based on the compensation it paid to Ashton as a member of its board of directors.  Plaintiffs' claim for "billions of dollars," outlandish as it is, received the attention commensurate with the existential threat it represents to Mr. Ashton and his family.  Ashton's attention to the collective bargaining damages was also justified as a matter of pleading.  In his opening brief, Ashton focused on the damages allegedly incurred from his conduct in the 2011 and 2015 collective bargaining negotiations between GM and the UAW because those are the only specific damages identified in GM's complaint.  The introduction to the Amended Complaint alleges that "**[i]n part due to Ashton's disloyalty and breaches of confidence, GM was forced to incur billions of dollars in increased labor costs**," (AC ¶ 5) and GM spends the rest of its 62-page complaint trying to establish this connection.   GM indignantly argues that it is also, actually, suing to recover compensation it paid to Ashton and unspecified damages it incurred by overfunding the CHR due to Ashton's $250,000 kickback scheme—GM finds it "baffling" (Opp. Br. 41) that Ashton would think otherwise.

GM's opposition brings two nagging questions to the fore:

1) Why is GM suing a retired union official for billions of dollars it knows it can never hope to recover?

2) Why is GM willing to spend millions of dollars on a lawsuit to recover at most a few hundred thousand dollars in damages for the watch scheme, and for compensation it paid Joe Ashton as a board member?

The answer is that this lawsuit is not really about Joe Ashton at all, but just a piece of GM's battle with its archrival Fiat Chrysler.  Because its RICO lawsuit against Fiat Chrysler was thrown out, GM hopes to keep this lawsuit alive long enough to extract discovery from its competitor, and from the UAW—it has already begun to harass Ashton to begin the Rule 26 process, before this motion is even fully briefed. GM used the same tactic, unsuccessfully,[1] in the now-dismissed RICO lawsuit. It is clear that GM is using Joe Ashton—and this Court—as unwitting tools in its battle with Fiat Chrysler.  For the reasons discussed in Ashton's opening brief, and additional reasons discussed herein, this farcical and abusive lawsuit should be dismissed with prejudice.

## ARGUMENT

## I.    Collateral Estoppel is Applicable Here

Ashton's motion establishes all of the required elements for collateral estoppel, and GM fails to convincingly explain why Judge Borman's decisions in

---

[1] *See* 2:19-cv-13429, ECF No. 55 (Order denying discovery).

the RICO Action cannot be given collateral estoppel effect here.  Judge Borman decided an issue central to GM's case here, finding implausible GM's central damages theory: that FCA, with the help of Ashton, manipulated the 2011 and 2015 collective bargaining negotiations to GM's detriment. *GM LLC v. FCA US LLC*, 2020 U.S. Dist. LEXIS 120736 at *2-*3, *29-*30, *34-*35 (E.D. Mich. July 8, 2020); *GM LLC v. FCA US LLC*, 2020 U.S. Dist. LEXIS 146646 at *2, *12-*14 (E.D. Mich. Aug. 14, 2020). GM's citations in its opposition brief to inapposite case law, its thinly veiled jabs at Judge Borman, and its heavy reliance on an inapplicable decision in another GM lawsuit do not support its position.

GM cites two cases for its argument that the plausibility issue was not actually litigated in the RICO Action.  Both cases are unhelpful. In *In re Hawkins*, 231 BR 222 (D.N.J. 1999) a New Jersey district court ruling on a dischargeability issue declined to give collateral estoppel effect to a default judgment entered in a previous litigation, because of the blanket rule under New Jersey law that "collateral estoppel does not apply to default judgments because such judgments are not 'actually litigated.'" *Id.* at 232. In *Nat'l Med. Imaging, LLC v. U.S. Bank, N.A.*, 2019 WL 4076768 (E.D. Pa. Aug. 28, 2019), a Delaware court was ruling on a summary judgment motion in a case where the plaintiff sought damages from financing entities who had filed involuntary bankruptcy petitions against him, allegedly destroying his business. *Id.* at *1-*3. The issue in the earlier proceeding was whether

3

the financing entities had standing to file the involuntary bankruptcy petitions at all. *Id.* at *13. Because the potential liability under the statute specifically allowing for the current damages suit had not been actually litigated in the prior proceeding, collateral estoppel was inappropriate. *Id.* Neither case suggests a finding that the plausibility issue was not "actually litigated" in the RICO Action.

The single case cited by GM on the "same issue" prong is even less relevant. In *David v. Wells Fargo Fin. Inc.*, 2008 WL 11510645 (D.N.J. Dec. 18, 2008), a New Jersey court declined to apply collateral estoppel effect to a California court's denial of conditional class certification. *Id.* at *2. The issue in the New Jersey case was not the same, defeating defendant's collateral estoppel argument, because the plaintiff proposed a narrower class for the New Jersey class action. *Id.* This case sheds no light on whether the plausibility issue here is the same as the one in the RICO Action.

The thrust of GM's argument is that a plausibility determination made in the context of a RICO action cannot be applied to an almost identical set of factual allegations that are made in the context of this state law tort suit. Opp. Br. 21-24. But cases cited in Ashton's opening brief reveal the flaw in that reasoning: courts apply collateral estoppel effect to determinations from much different types of proceedings, where ***the issue is the same***, and the other requirements for the doctrine are satisfied. "[O]nce a court has decided an issue of fact or law necessary to its

4

judgment, that decision may preclude litigation of the issue in a suit <u>on a different</u> <u>cause of action</u> involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980)(emphasis added). *See also Li v. Peng*, 516 B.R. 26, 34 (D.N.J. Aug. 22, 2014)(applying collateral estoppel in different cause of action).

In an effort to bolster this argument (and further detract from the obvious relevance of Judge Borman's rulings), GM cites to a Second Circuit decision styled *Lerner v. Fleet Bank N.A.*, 459 F.3d 273, 284 (2d Cir. 2006), which instructs that a lack of proximate cause for RICO purposes does not necessarily mean a lack of proximate cause for common law tort purposes. Opp. Br. 24. In *Lerner*, the Court ultimately determined that the plaintiffs' theory of liability, "whether marshaled in support of a RICO claim or a common-law negligence claim, rests on assumptions that are inherently speculative." *Id.* at 286. The same lesson undoubtedly applies here. Indeed, the case provides additional guidance on the proximate cause questions raised by GM's Amended Complaint. In explaining why plaintiffs had not stated a negligence claim with respect to defendant banks where the plaintiffs did not have deposits, the Second Circuit explained the same proximate cause problem that GM has with its corporate espionage theory:

> The plaintiffs argue that if any of the banks had reported Schick's misappropriation of funds, the bar disciplinary committee would have intervened sooner and prevented Schick from defrauding his future clients. But as discussed [] above, we think that, whether alleged as a RICO claim or not, the banks' failure to report Schick's overdrafts is

5

> too far removed from the damages Schick subsequently caused to
> persons who never deposited funds with the bank and who participated
> in future transactions to which the bank was not a party.

*Id.* 287.  The same logic applies perforce to GM's theory of liability here, *i.e.*, that

if Ashton had revealed his involvement with the kickback scheme, or his alleged

corporate espionage campaign on behalf of FCA, GM would have intervened to

remove him from the board, and all of its damages would have been somehow

prevented.  But most of the damages GM complains of—the overfunding of the

CHR, the unfair withholding of labor concessions by the UAW in 2011, and the

ruinously expensive CBA it agreed to in 2015—either already happened or were

"too far removed" from Ashton's failure to confess to establish liability.

Finally, GM relies heavily on a recent decision by the Honorable Paul Cleland

of the Eastern District of Michigan, remanding GM's new lawsuit against FCA,

Iacobelli, and others back to Michigan state court following FCA's removal.  (Index

No. 3:20-cv-12668, ECF No. 22) (the "Remand Order" or "RO").  *See* Opp. Br. 14-

16, 23-24, 28-29. GM's reliance on the Remand Order is misplaced for three key

reasons.  First, the remand standard applied by Judge Cleland is more lenient than

the standard to be applied on this motion to dismiss.  Second, it did not apply the

particularity requirements of Rule 9(b).  Third, the plausibility determination

underlying the Remand Order was supported by the corrupt activity of admitted

briber Alphons Iacobelli, and not by any alleged conduct of Joseph Ashton.

In the New Michigan Action, Fiat Chrysler sought to establish that GM had fraudulently joined non-diverse defendants in order to defeat federal jurisdiction. RO 4-5. A defendant's burden of proof to establish fraudulent joinder is "exceptionally high," *id.* 5, and the plaintiff's burden to overcome it correspondingly low. In setting out the standard, Judge Cleland observed that the moving defendants "must show that . . . there is **no colorable basis** for predicting that [Plaintiffs] may recover." *Id.*, *citing Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 432-33 (6th Cir. 2012)(emphasis added). The Court also established that the standard "**is similar to, but more lenient than, the analysis applicable to a Rule 12(b)(6) motion to dismiss.**" *Id., citing* 14C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3723.1 (4th ed. 2020)(emphasis added). Applying that standard, Judge Cleland found that GM's fraud claim against Iacobelli (the joined defendant) "is not clearly invalid," *id.* 6, and that the breach of fiduciary claim against him was "not facially meritless." *Id.* 7. Remand was required because Fiat Chrysler failed to sustain its burden of showing that GM's claims had "no colorable basis for relief." *Id.* 6. Here, by contrast, GM faces a much steeper burden under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), to overcome Ashton's Rule 12(b)(6) motion to dismiss.

Judge Cleland also explained that it was inappropriate to apply the particularity requirements of Rule 9(b) in the limited context of his analysis,

7

observing that the defendants had cited no authority "that permits the court to apply an enhanced particularity requirement to the fraudulent joinder analysis." RO 15. On this motion to dismiss, of course, Rule 9(b) does apply to GM's claims of fraud and fraud by omission. *Frederico v. Home Depot*, 507 F. 3d 188, 200 (3d Cir. 2007).

The facts alleged in the New Michigan Action also distinguish it from those alleged here, and in ways that make the Iacobelli allegations more plausible. Iacobelli had worked for Fiat Chrysler years, where he was "facilitating illicit payments to union leaders" when he resigned and sought a position at GM.  RO 6. The allegations in Michigan were that Iacobelli was still in cahoots with FCA, "and wanted an executive position with [GM] to funnel confidential information to [] FCA and the UAW [to advance FCA's scheme]." *Id.* 7.  The Remand Order also credits the allegation that Iacobelli left FCA "to avoid [a] continuing [] investigation by the government into the bribery scheme at Defendant FCA." RO 7; *see* Michigan AC ¶ 172(a). Perhaps most importantly, Iacobelli has pleaded guilty to extensive acts of *actual bribery* committed to *advance FCA's interests*.[2]  It was in this context that Judge Cleland found that GM's allegations that *Iacobelli* was accepting bribes from FCA were plausible. RO 7. These additional elements are all absent here: Ashton was a complete stranger to FCA with no motive to participate in a scheme to advance FCA's interests—his only ostensible connection to FCA is the alleged bribery

---

[2] 7/13/18 Iacobelli Plea Agreement at ¶¶ 7-10; *see* AC ¶55

through the alleged offshore accounts.  1AC ¶¶ 4-5, 89-90, 99-100.  And Ashton has never committed, nor ever been accused of committing (except by GM in these lawsuits) any acts of bribery.  These factors combine to drastically reduce the precedential value of the Remand Order.

While attempting to distinguish the plausibility issue here from that in the Michigan Action, GM's opposition studiously avoids Judge Borman's decision on the motion to alter or amend judgment, claiming, *e.g.*, that "[t]he complaint the RICO Court dismissed did not allege any claims against Ashton." Opp. Br. 21.  As discussed in Ashton's opening brief, GM's motion to amend or alter judgment sought to add Ashton as a defendant in the RICO Action, and alleged almost the exact same facts as it does here relating to the alleged offshore accounts and Ashton's alleged use of the accounts to receive bribes from FCA. Br. 16-17; *compare* PAC ¶¶ 9, 43, 63, 88, 100, 176, 230 *with* AC ¶¶ 4-5, 57-60, 107-108. The only difference GM can muster is that in the Amended Complaint, but not in the Michigan Action, GM manages to name the Japanese and Cayman Islands banks where Ashton allegedly controls accounts. Opp. Br. 22.  There is no reason this slight difference should preclude the application of collateral estoppel. Judge Borman could not have been clearer: "GM's newly discovered evidence [of Ashton's alleged offshore accounts] does not create a reasonable inference that FCA was bribing

9

individuals to infiltrate GM as part of a scheme to directly harm GM []." *GM LLC,* 2020 U.S. Dist. LEXIS 146646 at *15.

Ultimately, this Court's decision whether to give collateral estoppel effect to Judge Borman's plausibility determination may simply collapse with its own plausibility determination.   The result is the same: GM's complaint should be dismissed because it does not plausibly plead that the conduct of Joseph Ashton proximately harmed GM.

## II.   The Amended Complaint Does Not Satisfy the Plausibility and Particularity Requirements

Seemingly oblivious to its pleading burden under *Iqbal* and *Twombly*, and their Third Circuit progeny, GM repeatedly refers to the "low bar" it must overcome to plausibly plead its causes of action and defeat Ashton's motion to dismiss.  Opp. Br. 1, 5, 26.  GM fails to meet Ashton's arguments that any alleged damages to GM arising from the 2011 and 2015 collective bargaining agreements were proximately caused by any conduct of Ashton.

GM encourages the Court to disregard Ashton's plausibility arguments related to the alleged collective bargaining damages because they rely too heavily on FCA's misconduct, claiming that "Ashton's liability in this lawsuit does not depend on what FCA did with the information it bought, let alone on whether FCA's conduct is actionable," *Id.* 29, and that FCA's motivations and misconduct are irrelevant. *Id.*

10

30.   This is a curious argument, since GM's Amended Complaint mentions non-party FCA **261 times**, and its primary theory of damages depends on the collective bargaining damages it allegedly incurred in 2011 and 2015 at the hands of FCA. Even Ashton's alleged omissions and misstatements largely involve his failure to disclose the alleged bribery scheme with FCA.  GM could have brought a complaint against Joseph Ashton based solely on his involvement with the commemorative watch scheme, and left FCA out of it—but that is not what GM did.   Having structured this multi-billion-dollar lawsuit around alleged schemes orchestrated and carried out by its rival FCA, GM must defend the plausibility of those schemes.

The authority GM offers to bolster the plausibility of its corporate espionage theory is meager.  In *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 233(3d Cir. 2020), for example, the Court ruled that an alternative explanation offered by defendants did not render the plaintiff's inferences implausible.  Be that as it may—in this case, the many alternative explanations offered by Ashton for the UAW's and FCA's collective bargaining behavior <u>do</u> render GM's inferences implausible.  Ashton's brief explains in detail why this is so, including the parties' desire to avoid a government investigation. Br. 27-28, and the many logical gaps in GM's causation theory. *Id.* 28-29. While GM is correct that "the allegations need not rule out all potential alternative explanations," Supreme Court precedent demands that a court weigh the competing inferences urged by the parties and reject

11

a plaintiff's inferences of wrongdoing when there is an "obvious alternative explanation." *Twombly*, 550 U.S. at 567.  *See also Santiago*, 629 F.3d at 133. *Deborah Heart and Lung Center*, another case cited by GM, is merely an example of a case in which defendants failed to offer a plausible alternative explanation. GM cites *Bagic v. University of Pittsburgh*, 773 F. App'x 84 (3d Cir. 2019) for the boilerplate proposition that "[w]hen considering a motion to dismiss, a district court cannot weigh competing inferences and forgo drawing a reasonable one in the plaintiff's favor." Opp. Br. 5. But in that case, the lower court inappropriately *weighed the evidence* and *made credibility determinations based on testimony in the record* in granting a motion to dismiss (*id.* *87-*88)—an obvious error with no analog here.

Meanwhile, GM is unable, or unwilling,[3] to remedy the woeful deficiencies in its allegations about the offshore accounts identified in Ashton's motion to dismiss.  Rather than provide any helpful detail about the alleged offshore accounts in response to Ashton's arguments (Br. 32-34), *e.g.,* by explaining when the accounts were created and used, who actually owned and funded them, or identifying any actual inappropriate transactions, GM scoffs at these requests for "precision."  Opp. Br. 33.  It purports to turn the tables on Ashton, challenging him to "proffer an

---

[3] As explained in the opening brief, GM appears to claim privilege over all aspects of the investigation that ostensibly revealed the existence of the offshore accounts, and is only willing to reveal certain details. Br. 32; see Karis Dec. ¶ 4.

innocent explanation for owning offshore accounts."  Opp. Br. 33.  But Joe Ashton has no obligation to justify ownership of offshore accounts that GM has not even established actually exist—the burden on this motion is for GM to defend its pleadings, not make demands.

GM also appears to concede that all of its allegations about the offshore accounts are made on information and belief, even though it neglected to apply that label faithfully in the Amended Complaint. *See* Br. 29-34. Yet it fails to respond to the case law presented by Ashton requiring it to establish a factual basis for its information and belief allegations.  Br. 35. *See, e.g.*, *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 313 (D.N.J. 2005). Instead, purporting to quote the Remand Order, it insists that this is "[d]etailed and intricate financial information, which Defendants allegedly took great efforts to conceal" and as such "is not presumably in the possession of [GM]." Opp. 34. This is absurd: How is it that GM can plead that the accounts in question exist, and collectively (Ashton's and others' combined) hold millions of dollars, AC ¶ 107(a), without being able to allege any basic information about Ashton's account(s)?  Three months after first filing this action, and four months after breathlessly informing the Michigan court that it had "newly discovered evidence" of FCA's wrongdoing, in the form of these very same accounts (2:19-cv-13429, ECF No. 84), GM is no closer to plausibly showing that they exist.

GM fails to cite any authority that convincingly rebuts Ashton's analysis finding its corporate espionage theories implausible under *Iqbal* and *Twombly*. *See* Br. 24-29. Ashton does not contest the principle that on a motion to dismiss, the Court should draw all *reasonable* inferences in the plaintiff's favor, but the inferences GM asks the Court to draw are <u>not reasonable</u>. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)). GM has not <u>shown</u> that Ashton exercised ownership or control over any foreign bank accounts; that FCA paid bribes to him through these accounts; that Ashton funneled any GM confidential information to FCA or the UAW in exchange for such bribes; or that any party used any such information to harm GM. This is all wild speculation on the part of GM, unsupported by any factual evidence and undeserving of belief.

## III. GM's Non-Collective Bargaining Damages Claims

GM appears to retrench on its outlandish claim that Ashton's omissions or misrepresentations while on GM's board were somehow a proximate cause of its alleged "billions of dollars in increased labor costs" (AC ¶ 5) arising from its 2015 collective bargaining agreement with the UAW— observing flippantly that its ability to prove the causal link is "beside the point at this stage" (Opp. Br. 36). But it insists that it has nevertheless plausibly pled its fraud claims, because it has alleged

14

"straightforward theories of harm" consisting of Ashton's director salary and amounts that it "overfunded" the CHR because of the earlier watch scheme. *Id.* This gambit does not save its claims from dismissal, because both of these damages theories are defective as well.

A.    Board Compensation Damages

GM does not explain why the recoupment of Ashton's board salary is an appropriate measure of damages for the fraud or the breach of fiduciary duty claims. Setting aside Ashton's failure to "own up to" his role in the watch scheme, or to disclose the implausibly pled and utterly fictitious corporate espionage schemes, GM does not allege that Ashton failed to carry out his board duties responsibly, or that his actions while on the board caused any monetary loss to GM. This is not a case where a board member has diverted a corporate opportunity, or embezzled the corporation's funds, or otherwise caused a specific loss to the corporation. GM simply claims that Ashton was a bad board member because of something he did before joining the board, and because of a scheme that it claims, but cannot prove, that he participated in while otherwise serving ably and appropriately on the board— and it wants its money back. GM cites no authority whatsoever for this theory of damages. Moreover, with respect to its fraud claims, it must allege the damages with particularity. *Karachi Bakery India v. Deccan Foods LLC*, 2017 U.S. Dist. LEXIS 180404, *23 (D.N.J. October 31, 2017)(*citing GMA Accessories, Inc. v. Idea Nuova,*

15

*Inc.*, 157 F. Supp. 2d 234, 243 (S.D.N.Y. Dec. 18, 2000).   Although GM is in possession of all the necessary information, it has not pled the amounts of salary and benefits it paid Ashton, or when, or which of those amounts it seeks to recoup.   No discovery was necessary to ascertain and plead these amounts.   To the extent GM claims it suffered compensation damages from Ashton's alleged fraud, those claims have not been adequately pled under Rule 12(b)(6) and Rule 9(b).

B.   <u>Watch Scheme Damages</u>

Despite GM's arguments to the contrary, it is not at all clear from the face of the Amended Complaint that GM actually, literally, seeks to recover damages directly related to the watch kickback scheme. Opp. Br. 41. Ashton adequately raised, and has not waived, this issue. Br. 49, n.11. At any rate, GM does not adequately allege the scope or amount of these alleged damages.   Does it claim the $250,000 that Ashton received in the scheme?[4] Or the entire $4 million that the CHR spent on the commemorative watches? AC ¶ 47.   Or the amount by which the watch contract was allegedly "inflated"?   AC ¶¶ 47, 51.   For that matter, does it claim as damages the payments Ashton received prior to joining the board in 2014, or only those he received afterwards? None of these threshold, common-sense questions is

---

[4] Ashton has agreed to forfeiture of the entire $250,000 in the criminal proceeding.   *See United States v. Ashton*, 2:19-cr-20738, ECF No. 26 (Judgment) at 8.

addressed in the prolix Amended Complaint, or in GM's opposition brief.[5]  GM does not need discovery from Ashton or anyone else to determine what its alleged damages are with respect to the watch scheme, and Rule 9(b) requires it to allege its damages, along with every other element of its fraud claims, with particularity. *See e.g., Karachi Bakery,* 2017 U.S. Dist. LEXIS 180404 at *23.  Its failure to intelligibly plead these damages in the Amended Complaint should foreclose them— at the very least, it excuses Ashton from fully addressing this point in his opening brief.

The other fatal flaw in GM's claim for damages allegedly arising from the watch scheme is that it cannot show that Ashton's alleged misrepresentations or omissions while on the GM board proximately caused any such damages. This is so for both the fraud claims and the breach of fiduciary duty claim.  The Amended Complaint conclusorily alleges that the later payments "caus[ed] GM to unwittingly fund over-priced expenses at the CHR" (*id.* ¶ 51) and that GM "continued to unknowingly fund inflated vendor contracts at the CHR" (*id.* ¶¶ 123, 131). These claims fail as a matter of simple logic.  GM alleges that it provided funding to the CHR at some unknown date (*id.* ¶¶ 38, 120); the watch scheme unfolded in "late 2012 or early 2013" (*id.* ¶ 47); Ashton demanded $250,000 in kickback payments in

---

[5] GM also fails to explain why this claim for damages belongs to GM at all, and not to the CHR, the separately incorporated Michigan tax-exempt corporation entity which executed and paid for the watch contract.  AC ¶¶ 3, 20.

May 2013 (*id.* ¶ 48); those payments began in May 2013, suggesting that CHR had paid the contractor by then (*id.* ¶ 50); the CHR took delivery of the watches in January 2014 (*id.* ¶ 49); and <u>then</u> Ashton made fraudulent statements or omissions to GM beginning in April 2014 in relation to joining and serving on GM's board of directors (*id.* ¶¶ 119, 128). Even if kickback payments trickled in after April 2014 (*id.* ¶ 50), the purchase of the watches by CHR was complete before Ashton joined the GM board, and GM does not allege that the purchase could have been reversed, or that GM could have recovered any amounts that it had used to fund the CHR. GM can certainly not claim that any omissions or misrepresentations Ashton made while on the board could have been a but-for or proximate cause of the <u>earlier</u> kickback payments.  Thus, GM has not established any causal link between the allegedly false statements or omissions by Ashton and any alleged injury to GM through the watch scheme.   To the extent that GM's fraud and breach of fiduciary claims depend on damages from the watch scheme, those claims should be dismissed.

## C.    <u>Particularity</u>

GM attempts to wriggle out of the heightened pleading requirements that Rule 9(b) imposes on its fraud claims, arguing that Rule 9(b) ought not be applied too strictly, lest "sophisticated defrauders . . . successfully conceal the details of their fraud." Opp. Br. 44. GM appears to forget that this potential relaxation of the particularity requirement is motivated by the concern—expressed in a string of

securities litigations—that "in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." *In re MacGregor Sporting Goods, Inc.* 199 B.R. 502, 514 (1995)(citing cases).   Here Plaintiff GM <u>is</u> the impenetrable corporation, presumably one with knowledge of its own internal corporate affairs.  Even better, GM, with its small army of well-heeled lawyers and its team of private investigators, casts 72-year-old retired union official Joe Ashton as the "sophisticated defrauder" against whom it must be protected with a lax application of Rule 9(b)!  GM must "inject precision" into its fraud claims— not because Joe Ashton says so, but because the Third Circuit says so. *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)(interpreting Rule 9(b)).

## IV.   GM's Breach of Fiduciary Duty Claim is Not Saved by Michigan's Equitable Tolling Statute

GM correctly notes that it may be able to toll the statute of limitations by two years if it establishes the requirements of Michigan's equitable tolling statute, MCL § 600.5855, which provides as follows:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

MCL § 600.5855.  Thus, by dint of the tolling statute, GM may have two years to bring its claim for breach of fiduciary duty (but not the original three years) from the time it "discovers, or should have discovered" the claim.  *Id.*  Because GM discovered its possible claim of breach of fiduciary duty by December 2017, at the latest, it had until December 2019 to file this claim, which is now time-barred.

A.    Ashton Has Not Waived His Fraudulent Concealment Argument

The Court should disregard GM's argument that Ashton waived his right to assert a statute of limitations defense because he reserved that argument. Opp. Br. 45-46.  GM cannot claim any prejudice: Ashton's opening brief highlighted the issue and cited the very statute upon which GM relies in its opposition brief, the Michigan equitable tolling statute MCL § 600.5855. Br. 59, n.14. Far from being "sandbagged" on this issue, GM had notice of it and was able to thoroughly address it in its brief. Opp. Br. 46-49. *See Warren v. Sheriff of Cook County Thomas Dart*, 2010 U.S. Dist. LEXIS 124671, at *14 (N.D. Ill. Nov. 24, 2010)(denying motion to strike portions of reply brief on motion to dismiss where plaintiff "had and took the opportunity to address the issue" allegedly first raised in reply brief); *Jensen v. Indianapolis Public Schs.*, 2017 U.S. Dist. LEXIS 119524, *9 (S.D. Ind. Jul. 28, 2017)(denying leave to file surreply where reply brief merely "provided Defendants' response to the arguments advanced by [plaintiff] in his Response Brief").

The Third Circuit has made clear that "[i]n the absence of prejudice to the opposing party, we prefer resolution on the merits of an issue to disposition of it based on an unintended waiver by counsel." *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F. 3d 213, 223 (3d Cir. 2009).  At any rate, Ashton must now counter the fraudulent concealment arguments raised in GM's answering brief, because failure to do so could be treated as a waiver.  *See Progressive Sterilization, LLC v. Turbett Surgical LLC*, 2020 U.S. Dist. LEXIS 101885, *4-6 (D. Del. Jun. 10, 2020).

As a threshold matter, GM's argument that its claim of fraudulent concealment under MCL § 600.5855 cannot be resolved on this motion to dismiss is demonstrably wrong. Michigan courts resolve such claims on summary disposition all the time. In fact, the three leading appellate cases interpreting the statute all sanction the application of the statute at the motion to dismiss stage or on summary judgment.  *See Sills v. Oakland Gen. Hosp.*, 220 Mich. App. 303, 309-310, 559 N.W.2d 348, 352 (Mich. App. Nov. 26, 1996)(affirming lower court's dismissal of complaint on statute of limitations ground because fraudulent concealment inadequately pled); *Phinney v. Verbrugge*, 222 Mich. App. 513, 562-563, 564 N.W.2d 532, 558 (Mich. App. Apr. 4, 1997)(affirming lower court's decision dismissing whistleblower claim because "plaintiff failed to plead sufficient facts to show fraudulent concealment" under § 600.5855); *Doe v. Roman Catholic Archbishop*, 264 Mich. App. 632, 649-650, 692 N.W.2d 398, 408-409 (Mich. App.

Dec. 21, 2004)(finding that plaintiff did not make out a case for fraudulent concealment under § 600.5855, and that "the trial court erred in denying defendant's motion for summary disposition"). These cases make clear that GM cannot escape the dismissal of its untimely claim by simply invoking the fraudulent concealment statute.

B.    GM Discovered Its Claim by December 2017 at the Latest

Under Michigan's equitable tolling statute, if Defendant Ashton fraudulently concealed his breach of fiduciary duty, then GM had two years to file its claim from the date it "discover[ed] or should have discovered" the breach.  MCL § 600.5855. As explained below, this does not save GM's breach of fiduciary claim because any plausible discovery occurred, at the latest, in December 2017, and GM did not file its initial complaint in this action until September 14, 2020.

As alleged by GM, in July 2017 "the federal government unsealed a superseding indictment against Alphons Iacobelli" which "detailed a years-long pattern of illicit payments to and bribery of union officials by Iacobelli on behalf of FCA and FCA NV." AC ¶ 35.  At some unspecified time later in 2017, but apparently prompted by the Iacobelli indictment, "GM sought to interview Ashton related to the government's investigation into the CHR." (*Id.* ¶ 36)  Per GM, Ashton inappropriately rebuffed the interview request: "Despite GM policy requiring that Ashton submit to such an interview, Ashton refused and hired criminal counsel. GM

22

advised Ashton that if he did not submit to an interview he would be acting inconsistent with his obligations as a director." (*Id.* ¶¶ 36, 105) "Shortly thereafter, in December 2017, Ashton resigned." (*Id.* ¶ 36)   By GM's own admission, it subjectively believed that Ashton was acting "inconsistent with his obligations as a director" (*id.* ¶ 36) by refusing to submit to an interview, and hiring counsel, prior to his resignation in December 2017.   GM's claim for breach of fiduciary duty, however flawed, accrued when it developed its specific suspicion of Ashton in July 2017, or, at the latest, when Ashton "abruptly resigned" (*id.* ¶ 9) from GM's board of directors in December 2017.

GM argues that its claim first accrued, for the purposes of the equitable tolling statute, when the indictment of Michael Grimes was unsealed in the summer of 2019. Opp. Br. 47-48.   GM's own allegations, read in the light of Michigan case law interpreting § 600.5855, compel the conclusion that GM's cause of action accrued by December 2017.   In *Doe v. Archbishop*, the Michigan Court of Appeals applied § 600.5855 in evaluating the claims of a plaintiff who alleged that the Archdiocese had fraudulently concealed his claims of sexual abuse by the parish priest. 264 Mich. App. at 634-638. The Court found that the plaintiff knew or should have known he had a cause of action against the archdiocese years earlier, and rejected his claims as untimely under the statute. *Id.* 646-647. The Court held that "[f]or a plaintiff to be sufficiently apprised of a cause of action, a plaintiff need only be aware of a <u>possible</u>

23

cause of action." *Doe,* 264 Mich. App. at 643 (*citing Moll v Abbott Laboratories*, 444 Mich. 1, 5, 506 N.W.2d 816 (1993)), and that the discovery rule "applies to the discovery of an injury, not to the discovery of a later realized consequence of the injury." *Id.* at 640.  It was no defense that the plaintiff did not yet know "the details by which to establish his cause of action," *id.* at 647, because "[f]or a cause of action to accrue, the entire theory of the case need not be apparent, nor is certitude required." *Id.* at 646.

The elements of a cause of action for breach of fiduciary duty under Michigan law are (1) the existence of a fiduciary duty, and (2) a breach of that duty, (3) proximately causing damages. *Delphi Auto. PLC v. Absmeier*, 167 F. Supp. 3d 868, 884 (E.D.Mich. Mar. 1, 2016).  As of December 2017, GM knew that Ashton had a fiduciary duty to GM by virtue of his position on the board of directors, which Ashton does not contest.  It alleges that Ashton's refusal to submit to an interview about wrongdoing at the CHR was a violation of GM policy, and was "inconsistent with his obligations as a director." AC ¶ 36. While Ashton contests this, GM had a "possible" claim that Ashton had breached his fiduciary duty.  GM also believes, and alleges in the Amended Complaint, that the compensation it paid to Ashton as a director is recoverable as damages for this breach.  *See* AC ¶ 117.  With this knowledge (or belief) of duty, breach, and damages, GM knew about a possible breach of fiduciary claim against Ashton in December 2017. GM's claim accrued at

that point, whether or not it knew the extent of its alleged injuries or how it would prove them. *Doe,* 264 Mich. App. at 640, 647. Even if Ashton fraudulently concealed any wrongdoing prior to his departure from the GM board, which he contests, GM's claim accrued by December 2017 and it had only until December 2019 to bring this claim.

C.   GM's Lack of Diligence Defeats Its Fraudulent Concealment Theory

Even if GM could establish that the relevant "discovery" for purposes of the equitable tolling statute was the unsealing of the Grimes indictment in the summer of 2019, Opp. Br. 47-48, GM cannot benefit from the Michigan equitable tolling statute unless it can establish its "exercise of due diligence until discovery of the facts." Opp. Br. 46-47; *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 793 (E.D. Mich. 2015).  GM has failed to allege facts supporting diligence, with respect to either the watch kickback scheme, or the discovery of the alleged offshore accounts.

GM claims that it could not have learned about the alleged offshore accounts until "very recently," suggesting a further excuse for its failure to file its claim sooner. But, following Ashton's resignation from the GM Board in December 2017, GM did nothing for more than two years that would have revealed the alleged offshore accounts.  Attempting to defend its diligence in the Michigan Action, GM

argued that, prior to filing the Michigan Action in November 2019, it had completed

a "thorough investigation" which included

> witness interviews, review of publicly available information
> regarding criminal developments, close monitoring of the criminal
> proceedings against Defendants and their co-conspirators, review
> and analysis of internal GM documents and communications, the
> engagement of consulting experts, and an in-depth analysis of
> [CBA's].

AC ¶ 56. GM does not explain why, through this thorough investigation, and within

two years of Ashton's resignation from the board of directors, it could not have

discovered the "existence"[6] of the offshore accounts.   GM alleges that the accounts

associated with Ashton "could not have been discovered earlier despite due

diligence, including because the co-conspirators actively concealed the misconduct

and by its very nature the information is self-concealing." AC ¶ 57.  But GM does

not deign to allege what its "consulting experts" or investigators ultimately did to

discover the accounts in August 2020, what Ashton did to stymie the alleged

discovery, and why they couldn't have discovered the accounts sooner.

GM suggests that its diligence included pushing aggressively for discovery in

the Michigan Action, and that the denial of its requests delayed its discovery of the

offshore account evidence. Karis Dec. ¶ 11. But the facts place the blame for GM's

lack of diligence squarely with GM. GM did not issue discovery demands or bring

---

[6] Ashton disputes the existence of any offshore accounts under his control, which are pleaded, or
should be pleaded, upon information and belief.  *See* Br. 29-34.

its discovery motion in the Michigan Action until January 2020, *see* Michigan ECF Nos. 31, 40, 48-2, 55, or hire its private investigators until April 2020. (Karis Dec. ¶ 8).  All of this activity occurred more than two years after Ashton resigned from GM's board of directors in December 2017. As one federal appeals court has observed in a similar analysis, "a plaintiff who does nothing for two years is not diligent." *Villareal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 972 (11th Cir. 2016).

With respect to its discovery of Ashton's involvement in the commemorative watch scheme, GM also fails to allege any real diligence following Ashton's resignation from the GM Board in December 2017. AC ¶¶ 35-36.  GM does not allege that it took any action whatsoever to follow up with him, to investigate his activities at the CHR, to investigate the vendor of the watches, or anything else.  It did none of these things in the two years following Ashton's abrupt resignation from the GM board, despite wanting to interview him in 2017 "related to the government's investigation into the CHR." AC ¶ 36.  GM knew at that time that Ashton had served on the board of the GM-funded CHR during the relevant period, and was "responsible for or had influence over the approval of contracts." *Id.* ¶ 3.   Rather than investigate its suspicions that Ashton was involved in wrongdoing at the CHR, it appears that GM prioritized its RICO lawsuit against the Fiat Chrysler entities and Alphons Iacobelli throughout 2018 and 2019, and simply forgot about Ashton.  GM

has not alleged the necessary diligence, under the strictures of MCL § 600.5855, to advance the "discovery" of its breach of fiduciary claim to 2019.

D.    Ashton's Mere Silence is Not Fraudulent Concealment

Irrespective of the discovery date, GM has failed to establish that it is entitled to equitable tolling for an additional, independent reason.  Under Michigan law, in order to establish fraudulent concealment, "[t]he plaintiff must prove that the defendant committed affirmative acts or misrepresentations that were designed to prevent subsequent discovery.  Mere silence is insufficient." *Sills,* 220 Mich. App. at 310 (emphasis added); *Doe,* 264 Mich. App. at 645 (same).  The only acts of fraudulent concealment that GM alleges against Ashton are that, while serving as a member of GM's board of directors, he failed to disclose his involvement in the watch scheme, including his ongoing receipt of kickback payments, AC ¶¶ 51, 103, 105, and that he did not disclose the purported FCA Bribery scheme. *Id.* ¶¶ 91, 106. These failures to affirmatively confess to the kickback scheme (and to expose a purported bribery scheme which GM has not proved existed) amount to "mere silence" which is insufficient to establish fraudulent concealment under Michigan law. *See Sills, supra*, 220 Mich. App. at 310.  GM has successfully argued in other litigation that a defendant's "failure to 'own up' to the alleged conspiracy . . . is plainly insufficient to support tolling based on fraudulent concealment." *Groth-Hill Land Co. v. Gen. Motors LLC*, 2013 U.S. Dist. LEXIS 103039, at *22-*23 (N.D.

28

Cal. July 23, 2013). The Sixth Circuit Court of Appeals has recently confirmed this common-sense standard. In *Precious Creation, Inc. v. Mercantile Bank Mortg. Co., LLC,* 731 Fed. App'x 498 (6th Cir. 2018), that Court explained that fraudulent concealment "requires a showing of affirmative concealment; mere silence or unwillingness to divulge wrongful activities is not sufficient . . . Instead, there must be some trick or contrivance intended to exclude suspicion and prevent inquiry." *Id.* at 501. GM alleges no "trick or contrivance" by Mr. Ashton, merely silence.  Mr. Ashton regrets his participation in the watch scheme. He has pled guilty, agreed to civil forfeiture, and been sentenced to 30 months' imprisonment.  But his failure to affirmatively own up to the kickback scheme does not constitute fraudulent concealment under Michigan law.

The myriad misdeeds pleaded by GM in its fraudulent concealment allegations, the "misstatements, false testimony, tax fraud, and other contrivances" (AC ¶ 107), were all committed by other actors, not the Defendant Joseph Ashton. GM spends *more than six pages* of its amended complaint describing this conduct, without even mentioning Ashton, much less attempting to explain his involvement in any of it.  *See* AC ¶¶ 107(b)-(i), 109(a)-(g).   This conduct of other actors cannot form the basis of a fraudulent concealment argument.  *See Phinney*, 222 Mich. App. at 562-563 ("The plaintiff must plead in the complaint the acts or misrepresentations that comprised the fraudulent concealment and must prove that the defendant

committed affirmative acts of misrepresentations that were designed to prevent subsequent discovery."); *Sills*, 220 Mich. App. at 310.  For all these reasons, GM has not established fraudulent concealment, and is not entitled to equitable tolling of its claim for breach of fiduciary duty beyond December 2019.

## CONCLUSION

The Amended Complaint should be dismissed with prejudice.

December 14, 2020                                    Respectfully submitted,

                                                    /s/  Rodman E. Honecker
                                                    Rodman E. Honecker, Esq.
                                                    WINDELS MARX LANE &
                                                    MITTENDORF, LLP
                                                    120 Albany Street Plaza
                                                    New Brunswick, NJ 08901
                                                    rhonecker@windelsmarx.com

                                                    *Attorneys for Defendant Joseph Ashton*