# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| GENERAL MOTORS LLC, et al., | : | Civil No. 20-12659 |
| Plaintiffs, | : | **OPINION** |
| v. | : | |
| JOSEPH ASHTON, | : | |
| Defendant. | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon Defendant Joseph Ashton's Motion to Dismiss (Doc. 17, "Mot. to Dismiss."). For the reasons expressed below, the Motion is **DENIED IN PART,** and the Court reserves judgment in part. The Court declines to rule on the statute of limitations issue at this time and instead orders supplemental briefing in accordance with this Opinion and accompanying Order.

## I.   BACKGROUND

In this case, Plaintiff General Motors LLC ("GM") alleges that Defendant Joseph Ashton committed fraud and a breach of his fiduciary duty to GM. During the relevant period, Ashton was an official at the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"), the Vice President of the UAW's GM Department, and a director on GM's Board of Directors. The Complaint alleges that during his tenure in the aforementioned positions, "Ashton sat at the center of two sprawling and long-running criminal schemes" that "cause[d] massive harm to GM." (Doc. 7, "FAC" ¶2.) GM brings the present suit seeking to

1

recover for that harm. The factual and procedural posture of this case is lengthy; as such, the Court recites only what is necessary to determine the currently pending motion to dismiss.

### A. Ashton's Role at GM

Ashton served as Vice President of the UAW's GM Department from 2010 to 2014. (FAC ¶58.) The Complaint alleges that, as UAW Vice President, Ashton was involved in negotiating and implementing collective bargaining agreements between the UAW and GM and influencing the terms of the UAW's collective bargaining agreements with Fiat Chrysler ("FCA"). (FAC ¶31.) In 2014, Ashton joined the GM Board of Directors and held this position until 2017. (FAC ¶33). Ashton additionally was a member of the UAW-GM Center for Human Resources ("CHR") Board. The Complaint pleads that the CHR's primary purpose is to educate and train GM's domestic union workforce. (FAC ¶20). It is governed by an eight-director board, with four members appointed by GM and four by the UAW. GM is the sole source of funding for the CHR. (FAC ¶¶3, 53.)

### B. Written Director Questionnaire

The Complaint alleges that, upon joining GM's Board, Ashton signed a written director questionnaire and agreed to comply with his fiduciary duties to GM. (FAC ¶34.) In this questionnaire, Ashton made several written representations:

- He had no "business or financial interests or relationships" with a company selling goods in the vehicle manufacturing industry;

- He had not received or been offered anything of value in consideration for his Board service;

- He would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM";

- There was no "special arrangement or understanding between [him] and any other person pursuant to which" he was nominated to the Board; and

- He adhered to GM's Code of Conduct, which, among other things, prohibits bribery and receiving improper payments.

(FAC ¶¶ 34, 119, 128.)

### C. Ashton's Alleged Misconduct

GM's claims in this case arise from two separate theories of misconduct by Ashton. The first theory is that Ashton committed fraud and a breach of his fiduciary duties to GM by participating in a "criminal kickback scheme" that siphoned money from the CHR.[1] The Complaint alleges that Ashton and several co-conspirators "deceptively solicited, influenced, and obtained contracts for CHR vendors to provide clothing and other items to UAW members." (Opp. at 7 (citing FAC ¶38.)) In return, they "demanded and accepted from [CHR vendors] hundreds of thousands of dollars in bribes and kickbacks in the form of cash, checks, and other things of value." (FAC ¶38.) As an example, the Complaint alleges that the CHR purchased 50,000 "Team UAW-GM" jackets for plant employees. (FAC ¶44.) Ashton and his co-conspirators recommended a specific vendor as the sole source of the contract, and Ashton received $300,000 in kickbacks. (FAC ¶44. As another example, the Complaint pleads that Ashton convinced an associate to loan $250,000 to a construction company. (FAC ¶46). When the company stopped paying the loan, "Ashton proposed that his associate could recoup the loan money by forming a company to sell watches to the CHR." (Opp. at 8.) The Complaint alleges that Ashton used his position at the CHR to ensure that the CHR purchased watches from this company, and Ashton received $250,000 in kickback money for the contract. (FAC ¶48) According to GM, "Ashton never disclosed the

---

[1] For ease of reference, the Court refers to this theory of liability as the "criminal kickback scheme" throughout the Opinion.

kickback scheme" and instead "affirmatively concealed the scheme through fraudulent checks, sham vendors, and other fraudulent means." (Opp. at 9) (citing FAC ¶¶ 51, 102–05.)) In November 2019, Ashton was criminally charged for his participation in the criminal kickback scheme involving the purchase of "commemorative watches" that the Court outlines above. (FAC ¶43.) Ashton pled guilty on December 4, 2019, and a court sentenced him to 30 months imprisonment. (FAC ¶43.) According to the Complaint, Ashton "admitt[ed] that he demanded and accepted hundreds of thousands of dollars in kickbacks and improperly used his position to enrich himself[.]" (FAC ¶43.)

The second theory of liability asserts that Ashton acted improperly in his role on GM's board during GM's 2015 collective bargaining negotiations. [2] As part of this theory, the Complaint alleges that Ashton disclosed confidential information discussed in GM board meetings to Fiat Chrysler ("FCA") and Fiat Chrysler Automobiles N.V. ("FCA NV.") The Complaint alleges that FCA and FCA NV gave millions of dollars to UAW officials to obtain advantages for FCA and secure disadvantages for GM in negotiating and implementing collective bargaining agreements. (Opp. at 9 (citing FAC ¶¶4, 55, 75–99.)) GM pleads that the scheme was two-fold. First, in return for its bribes, "FCA obtained labor cost advantages while ensuring such advantages were denied to GM[.]" (Opp. at 9 (citing FAC ¶72.)) Second, FCA and its CEO leveraged the bribery scheme in order to assist FCA NV in trying to "force a merger with GM." (FAC ¶¶75, 99–100.) GM pleads that Ashton, "as Vice President of the UAW's GM Department," could "directly influence and control the labor relations between GM and the UAW." (FAC ¶71.) Therefore, the Complaint alleges that Ashton ensured that GM did not receive the same labor advantages as FCA. GM also pleads that Ashton "acted clandestinely on FCA's behalf from inside GM's Boardroom" (FAC

---

[2] For simplicity, the Court refers to this theory of liability as the "2015 collective bargaining" theory throughout the Opinion.

¶¶33–34, 90) by receiving detailed information about GM and sharing that information with "corrupt UAW leaders and FCA and FCA NV executives[.]" (Opp. at 11).

In 2017, the federal government began unsealing indictments related to the aforementioned conduct. (FAC ¶35.) GM alleges that to date "more than a dozen FCA and UAW officials have been criminally charged, and every one of them has pleaded guilty" to the "years-long pattern of corruption and racketeering activity[.]" (FAC ¶35.) GM asserts that these officials have "admitted to numerous racketeering acts, including millions of dollars in bribes designed to corrupt the negotiation, implementation, and administration of the collective bargaining process." (Opp. at 12 (citing FAC ¶¶2–4.)) After the first indictments were unsealed in 2017, Ashton resigned from GM's Board. (FAC ¶36.)

### D. Related Cases and Procedural Posture

In November 2019, GM filed suit in the United States District Court for the Eastern District of Michigan. *See General Motors LLC v. FCA*, Case No. 19-cv-13429 (E.D. Mich.).[3] In that case, GM sued FCA, FCA NV, and three former FCA employees and UAW officials—Alphons Iacobelli, Jermone Durden, and Michael Brown. The complaint in that case pleaded causes of action for violation of RICO, unfair competition, and civil conspiracy. Ashton was not a named defendant in that suit. The defendants in that case filed motions to dismiss. The motions were heard by the Honorable Paul D. Borman. Judge Borman dismissed the RICO claim after finding that GM had failed to plead sufficient facts to show that the defendants' RICO violations proximately caused GM's injuries. *General Motors LLC v. FCA US LLC*, No. 19-13429, 2020 WL 3833058 (E.D. Mich., July 8, 2020). After dismissing the only federal cause of action, Judge Borman declined to exercise supplemental jurisdiction over the state law claims. *See id.* at *7. Following

---

[3] The Court refers to this action throughout the Opinion as the Eastern District of Michigan action.

the dismissal, GM moved to amend its complaint based on newly discovered evidence regarding the existence of foreign bank accounts. *See General Motors LLC v. FCA US LLC*, No. 19-13429, 2020 WL 4726941 (E.D. Mich. Aug. 14, 2020). Judge Borman denied that motion, finding that the "newly discovered evidence [was] too speculative to warrant reopening th[e] case." *Id.* at *1. GM has since appealed, and the appeal is pending before the Sixth Circuit.

Because Judge Borman declined to exercise jurisdiction over GM's state law claims, GM subsequently filed a new lawsuit against FCA, FCA NV, and several individual defendants in Michigan state court, alleging claims of fraud, breach of fiduciary duty, and unfair competition.[4] Ashton is not a defendant in that case. FCA removed the action to federal court, *General Motors LLC v. Iacobelli*, Case No. 20-cv-12668 (E.D. Mich.), but Judge Robert H. Cleland remanded the case back to Michigan state court, where the case is currently pending.

On September 14, 2020, GM filed the present suit against Ashton in this Court. (Doc. 1.) The Court ordered GM to cure jurisdictional pleading deficiencies and to file an Amended Complaint. (Doc. 5.) GM did so and filed the operative complaint, the First Amended Complaint, on September 24, 2020. (Doc. 7.) On November 23, 2020, Ashton filed the presently pending motion to dismiss. (Doc. 17, "Mot. to Dismiss.") GM opposed (Doc. 20, "Opp."), and Ashton replied (Doc. 21, "Reply").

## II.    LEGAL STANDARD

When deciding a motion to dismiss a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the court limits its review to the face of the complaint. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 835 (3d Cir. 2011). The court must accept as true all well-pleaded factual allegations and must construe them in the light most favorable to the nonmoving party. *Phillips v. Cty. of*

---

[4] The Court refers to this as the "Michigan state court action" throughout the Opinion.

*Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). In other words, a complaint is sufficient if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The inquiry is not whether plaintiff will ultimately prevail in a trial on the merits, but whether [he or she] should be afforded an opportunity to offer evidence in support of [his or her] claims. *In re Rockefeller Ctr. Prop., Inc.*, 311 F.3d 198, 215 (3d Cir. 2002). However, legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

To determine whether a complaint is plausible on its face, courts conduct a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 131 (quoting *Iqbal*, 556 U.S. at 680). Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 680). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A complaint cannot survive where a court can infer only that a claim is merely possible rather than plausible. *Id.* In deciding a motion to dismiss, the court may rely on "the complaint, attached exhibits, and matters of public record" without converting the motion to one of summary judgment. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007).

## III.    ANALYSIS

Ashton's sixty-page brief in support of his motion to dismiss makes four primary arguments in support of dismissal: (1) collateral estoppel bars GM's claims; (2) the breach of fiduciary duty claim is time-barred; (3) GM's fraud claim fails; and (4) GM breach of fiduciary duty claim fails. The Court addresses each argument in turn.

### A.  Whether GM's Claims Are Barred by Collateral Estoppel

First, Ashton argues that the Court should dismiss the fraud and breach of fiduciary causes of action because GM is collaterally estopped from asserting these claims. (Mot. at 19.) The doctrine of collateral estoppel, or issue preclusion, prevents a party from relitigating issues that were adjudicated in a prior lawsuit. *See In re Docteroff*, 133 F.3d 210, 214 (3d Cir. 1997). Collateral estoppel exists to promote judicial consistency, encourage reliance on court decisions, and protect defendants from being forced to relitigate the same issues in multiple lawsuits. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979) ("Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation."). Collateral estoppel applies when four elements are satisfied: "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." *Burlington N. R.R. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227, 1231–32 (3d Cir. 1995) (alterations in original) (quoting *In re Graham*, 973 F.3d 1089, 1097 (3d Cir. 1992)).

Ashton asserts that collateral estoppel applies because "[a]ll of GM's claims in this lawsuit depend on the alleged existence of bribery and corporate espionage schemes which have already

been ruled implausible by the Michigan court, based on virtually identical factual allegations."

(Mot. at 20.) In response, GM asserts that Ashton's collateral estoppel argument fails even the first

element because the "RICO Action did not involve (let alone 'actually litigate') any of 'the same'

issues presented here." (Opp. at 21.) Rather, GM contends that the Eastern District of Michigan

action involved the litigation of (1) different claims, (2) necessitating different burdens of proof,

(3) against different parties.

The Court agrees with GM. First, as Ashton concedes, "GM brings different causes of

action here[.]" (Mot. at 20.) In the Eastern District of Michigan action, GM brought civil RICO

claims. *See* 2020 WL 3833058, at *1. Here, GM asserts only state law fraud and breach of fiduciary

duty claims. (*See generally* Compl.) While that is not to say that the doctrine of collateral estoppel

may only apply in cases with identical causes of action, the requirements for civil RICO claims

are decidedly different from state law fraud and breach of fiduciary claims brought under New

Jersey law.[5] Moreover, GM's allegations related to Ashton's participation in the criminal kickback

scheme were certainly not litigated in the Eastern District of Michigan action.

Second, Ashton was not a party to the Eastern District of Michigan action. As such, the

Amended Complaint in this case contains far more allegations specifically related to Ashton's

conduct both in the kickback schemes and the bribery schemes than did the complaint in the

Eastern District of Michigan action. Accordingly, the pending litigation places Ashton's conduct

in direct dispute. As GM points out, the question of whether "Ashton defrauded GM and breached

---

[5] For example, as discussed more fully below, to state a claim for fraud under New Jersey law, a plaintiff must allege "(1) a material misrepresentation [or omission] of fact; (2) knowledge or belief by the defendant of its falsity; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damage." *Gennari v. Weichert Co. Realtors,* 148 N.J. 582, 691 A.2d 350, 367–368 (1997). Conversely, to state a claim for a civil RICO violation, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Poling v. K. Hovnanian Enterprises*, 99 F. Supp. 502, 508 (D.N.J. 2000) (citing *Sedima, S.P.R.L., v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985)).

his fiduciary duty to GM" was not a question before Judge Borman in the Eastern District of Michigan.

Third, and finally, the heart of the Eastern District of Michigan case was the alleged FCA-led bribery scheme. However, here, GM's claims against Ashton also include allegations related to the criminal kickback scheme, allegations which were not included or litigated in the Eastern District of Michigan case. As such, for all of these reasons, the Court concludes that GM's claims are not barred by the doctrine of collateral estoppel because the issues litigated are not identical.

### B.  Whether the Breach of Fiduciary Duty Claim is Time-Barred

Next, Ashton argues that the breach of fiduciary duty claim is barred by the statute of limitations. (Mot. at 52.) In the Third Circuit, a statute of limitations defense may be raised under Rule 12(b)(6) only if the "time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975). However, at the motion to dismiss phase, it must be "apparent on the face of the complaint" that the statute of limitations bars the claim; otherwise "[the statute of limitations] may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978).

As a threshold issue, the parties disagree over which state's substantive law applies to the breach of fiduciary duty claim. Ashton asserts that Michigan law should apply to GM's breach of fiduciary duty claim. (Mot. at 53.) Conversely, GM asserts that it is not necessary to determine at this stage which forum's substantive laws apply—rather, it does not matter which state's substantive law applies because the claim is timely under both Michigan and New Jersey law. (Opp. at 44.)

New Jersey and Michigan law regarding the statute of limitations period differ in several important ways. First, New Jersey law provides for a six-year limitations period for a breach of a fiduciary duty claim. *Levitt v. Riddell Sports (In re MacGregor Sporting Goods)*, 199 B.R. 502, 512 (D.N.J. Bankr. Nov. 27, 1995). Conversely, Michigan law provides a shorter limitations period—claims must be brought within three-years. *Sports Mgmt. Network v. Busch*, 2019 U.S. Dist. LEXIS 35663, *21 (E.D. Mich. Mar. 6, 2019). Second, the tolling doctrines differ widely between the two jurisdictions—Michigan courts apply only statutory tolling mechanisms, while New Jersey applies the common law discovery rule. *Compare Caravaggio v. D'Agostini,* 765 A.2d 182, 186 (2001) *with Sports Mgmt.,* 2019 U.S. Dist. LEXIS 35663 at *22.

GM urges that the choice of law analysis is not necessary because, even under Michigan's shorter statute of limitations period, the claim is timely. GM avers that the statute of limitations was tolled due to Ashtons's fraudulent concealment of the facts giving rise to the claim. (Opp. at 46–47.) In his Reply, Ashton argues, for the first time, that fraudulent concealment does not toll the statute of limitations. (Reply at 20.) GM notes that Ashton does not address the "core dispositive argument" of fraudulent concealment in his opening brief and accuses Ashton of "sandbagging" the argument in order to prevent GM from having a genuine opportunity to respond to Ashton's arguments. (Opp. at 45.) GM argues that Ashton's failure to raise the fraudulent concealment issue in his opening brief prejudices GM, as it "will have no opportunity to respond to any arguments on fraudulent concealment that Ashton may present in his reply." (Opp. at 46.)

The Court is cognizant of GM's prejudice concerns, particularly because Ashton does, as predicted, make several new arguments related to fraudulent concealment in its reply brief. (*See* Reply at 19–29.) In fact, Ashton dedicates nearly ten pages, or one-third, of his entire reply brief to discussing the fraudulent concealment issue. The Court is also cognizant of the fact that the

outcome of the decision regarding the choice of law, tolling, and fraudulent concealment issue has the potential to be dispositive of the breach of fiduciary duty claim. Given these concerns, the Court finds that justice will be best served, and prejudice avoided, by reserving judgment on the issue until both parties have had an adequate chance to be heard. Thus, pursuant to the Order accompanying this Opinion, the Court directs the parties to submit supplemental briefing on (1) which forum's substantive law applies to the breach of fiduciary duty claim; (2) whether the claim is barred by the statute of limitations; and (3) whether the statute of limitations should be tolled.

### C. Whether the Complaint States a Plausible Claim for Fraud

Ashton next argues that GM fails to state a claim for fraud. (Mot. at 24.) GM pleads two types of fraud claims: fraud and fraud by omission. To best address Ashton's arguments, the Court (1) begins its analysis with an overview of New Jersey fraud principles,[6] (2) gives a high-level overview of GM's fraud theories, and (3) then evaluates the merits of each of Ashton's arguments.

### *Overview of New Jersey Fraud Principles*

In its most "general and fundamental conception" fraud "consists of the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith." *Jewish Ctr. of Sussex Cty. v. Whale*, 432 A.2d 521, 524 (N.J. 1981). To state a claim for fraud under New Jersey law, a plaintiff must allege "(1) a material misrepresentation [or omission] of fact; (2) knowledge or belief by the defendant of its falsity; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damage." *Gennari v. Weichert Co. Realtors,* 691 A.2d 350, 367–68 (N.J. 1997). A plaintiff pleading fraud by omission must allege the same elements. *See, e.g.*, *Gennari v. Weichert Realtors*, 691 A.2d 350 (N.J. 1997); *Coba v. Ford Motor Co.*, No. 12-1622, 2016 WL 5746361, at *12 (D.N.J. Sept. 30,

---

[6] Neither party disputes whether New Jersey substantive law applies to the fraud and breach of fiduciary duty claims. As such, the Court applies New Jersey principles to these claims.

2016). However, in addition, a plaintiff must plead that the defendant had a duty to disclose. *See Coba* 2016 WL 5746361, at *12. As the Third Circuit has clarified, "where a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a special relationship." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993). The three types of relationship which establish a duty to disclose include: "(1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." *Id.* (citation omitted).

Fraud claims are subjected to a more stringent pleading standard pursuant to Federal Rule of Civil Procedure 9(b). In order to satisfy Rule 9(b), "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). Specifically, the complaint must "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* Although fraud claims are subject to the strictures of Rule 9(b), courts within this district have held that the heightened pleading standard "is somewhat relaxed in a case based on a fraudulent omission." *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 451 (D.N.J. 2012); *Weske v. Samsung Elecs., Am., Inc.*, 42 F. Supp. 3d 599, 614 (D.N.J. 2014).

### GM's Fraud Allegations

GM pleads two distinct underlying theories of liability for its fraud claim. As outlined more fully above, first there is the theory based on the criminal kickback scheme. In support of this

theory, GM pleads that Ashton represented in writing on a written questionnaire that he adhered to GM's Code of Conduct, which prohibited receiving improper payments and bribery. (FAC ¶119.) GM pleads that "Ashton failed to disclose numerous additional material facts of which he was aware, the non-disclosure of which created a false impression for GM." (FAC ¶128.) GM pleads that Ashton knew these statements were false because "[a]s Ashton admitted, between 2012 and 2016, he and two other high-level UAW officials . . . orchestrated a criminal kickback scheme to siphon money from the UAW-GM [CHR], where they served on the Board and were responsible for or had influence over the approval of contracts." (FAC ¶3.)

Second, GM pleads a theory of fraud based on the 2015 collective bargaining negotiations. In support of this theory, GM pleads that Ashton represented in writing on the same written questionnaire that he would "maintain the confidentiality of information provided to [him] in [his] capacity as a director of GM." (FAC ¶119.) Nevertheless, Ashton knew that this representation was false because, "in return for secret compensation from FCA and FCA NV through foreign accounts, Ashton had agreed to pass and was passing GM's confidential information to UAW and/or FCA leaders." (FAC ¶120.) This scheme was for the purpose of manipulating the 2015 collective bargaining process with the UAW to weaken GM with inflated labor costs, which would then pressure GM into agreeing to a merger with FCA. GM pleads that together these "fraudulent misrepresentations were intended to and did cause harm to GM because GM continued to pay Ashton compensation as a board member." (FAC ¶123.)

### *Plausibility and Particularity*

With each of these fraud theories in mind, the Court now evaluates Ashton's numerous arguments regarding GM's fraud claims. First, Ashton asserts that the fraud claim fails the *Twombly/Iqbal* plausibility standard and Rule 9(b)'s particularly standard. Ashton argues that the

"convoluted" allegations surrounding the 2015 collective bargaining negotiations fraud theory are too implausible to survive a motion to dismiss. (Mot. at 2, 27.) In doing so, Ashton premises the majority of his argument on Judge Borman's reasoning from the Eastern District of Michigan action. (*See, e.g.*, Mot. at 26–27.) As an initial matter, the Court finds Ashton's numerous references and general reliance on Judge Borman's opinion largely unhelpful to the disposition of the current motion to dismiss. As discussed above in the section on collateral estoppel, the Eastern District of Michigan action involved different claims against different parties. Judge Borman's findings regarding the plausibility of GM's claims against unrelated defendants in that case are not incredibly relevant here. For example, Ashton argues in detail regarding Judge Borman's decision regarding the alleged offshore bank accounts. (Mot. at 17–18.) However, the offshore bank accounts are only a small portion of one of the theories of fraud liability in this case; therefore, they have little relevance to the relatively straightforward breach of fiduciary duty and fraud claims that GM asserts against Ashton in the present litigation. Accordingly, the Court declines to dismiss GM's claims based on Ashton's arguments that rely on Judge Borman's reasoning from the Eastern District of Michigan action.

The Court also notes that many of Ashton's "implausibility" arguments are inappropriately asserted at the motion to dismiss phase. Throughout his moving papers, Ashton argues that GM's claims are too "convoluted" to be plausible, that GM "distorts the facts" and presents misleading allegations, and that GM's pleadings cannot be taken at face value. Ashton asks the Court to view the Complaint with a "healthy dose of skepticism." (Mot. at 13.) In making these contentions, Ashton seemingly asks this Court to disregard the well-established standard of a motion to dismiss, in which courts must accept as true all well-pleaded factual allegations in the complaint. *See, e.g.,* *Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring & Searchlight Minerals Corp.,*

441 F. Supp. 3d 23, 37 n.5 (D.N.J. 2020) ("accepting at face value the allegations within the complaint is precisely what a court is required to do at the motion-to-dismiss stage.") Therefore, the Court declines to consider any arguments Ashton makes requesting the Court to draw inferences in his favor or weigh factual allegations. *See, e.g.*, *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 233 (3d Cir. 2020). The Court rejects these arguments outright.[7]

With regard to Ashton's arguments surrounding implausibility, the Court finds that Ashton largely disregards GM's allegations related to the criminal kickback scheme. The Court finds that the allegations related to that scheme, as outlined above, combined with the fact that Ashton pleaded guilty to the commemorative watch scheme, establish that the criminal kickback scheme is sufficiently plausible to survive a 12(b)(6) motion to dismiss. GM pleads that Ashton negotiated and approved the purchase of watches from a vendor, directed the vendor to submit an inflated bid to the CHR, and used his position at the CHR to ensure that awarded the contract to that vendor. (FAC ¶¶46–47.) Ashton then demanded $250,000 as a kickback for the contract. (FAC ¶48.) Ashton failed to disclose the kickback to anyone at GM and affirmatively concealed the scheme through fraudulent checks, sham vendors, and other fraudulent means. (FAC ¶¶102–05.) These allegations support a straightforward claim of fraud, regardless of any introspection into the 2015 collective bargaining fraud theory.

However, the allegations supporting the 2015 collective bargaining theory are, at this stage, similarly sufficient to establish plausibility at the motion to dismiss stage. Although Ashton argues that GM's theory is "shot through with logical holes[] and lacks any factual support," the Court

---

[7] For example, Ashton also asks the Court to dismiss the claim because "there are obvious alternative explanations for the 2015 collective bargaining behavior of the UAW and FCA[.]" (Mot. at 27.) While that could potentially be true, the Rule 12(b)(6) standard does not allow a court to impose its own judgment to weigh which explanation is the most likely. *See Caspersen*, 441 F. Supp. at 37 n.5. Rather, the well-pleaded factual allegations *must* be accepted as true.

disagrees. GM's theories for fraud are supported by factual allegations and easy to follow. GM alleges that "Ashton was included in the Board's confidential discussions surround the merger and was privy to GM's detailed analysis of and response to FCA NV's merger invitation." (FAC ¶77.) Nevertheless, Ashton "passed this information to the UAW and FCA[.]" (FAC ¶78.) GM pleads specific facts to support this conclusion: (1) "Ashton had access to extensive information concerning sensitive topics including . . . negotiation strategy and progress in connection with GM's negotiations with the UAW over the 2015 CBA, and GM's consideration of and response to merger inquiries from FCA NV"; (2) Ashton "pass[ed] this confidential information to the UAW" and "fail[ed] to disclose the ongoing schemes involving FCA and the UAW"; (FAC ¶91); and (3) Ashton took "affirmative steps to evade suspicion and prevent inquiry into [his] illegal scheme[.]" (FAC ¶107.) The Complaint's allegations sufficiently detail the information Ashton received, when he received, what information he passed to FCA, and how he was compensated. (FAC ¶¶77, 90–91.) Just as Judge Cleland concluded in the remand proceedings from the Michigan litigation, "the detailed description of the alleged conspiracy provided in the complaint" contradicts the assertion that the fraud was implausible. (Remand Order at 10.)

Ultimately, the Court finds that the fraud claims based on both theories of liability—the criminal kickback scheme and the 2015 collective bargaining scheme—plead sufficient facts to survive a Rule 12(b)(6) motion to dismiss. The Complaint contains detailed descriptions of the alleged schemes. It is not for the Court to attempt to determine the veracity of these facts, nor would it be proper for the Court to decide whether the theories are too far-fetched to be true. Rather, the Court must accept all well-pleaded allegations. *See Iqbal*, 556 U.S. at 678. Having done so, the Court holds that the Complaint states a plausible claim for fraud.

The Court similarly finds that the aforementioned allegations clear the heightened particularity standard under Rule 9(b). Under this standard, GM needed to plead the date, time, and place of the alleged fraud. *Caspersen*, 441 F. Supp. 3d at 35. In particular, Ashton argues that the allegations regarding the offshore accounts are insufficient. (Mot. at 33.) However, as GM notes, the Complaint pleads the location and name of the financial institution in which the bribery payments were held in Ashton's names. It is unclear how much more information Ashton expects GM to plead at this stage of the litigation, prior to any relevant discovery. Moreover, "pleading upon information and belief is permissible where it can be shown that the requisite factual information is peculiarly within the Defendant's knowledge or control." *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 268 (3d Cir. 2016). Therefore, the Court finds that the pleadings included in the Complaint relying on "information and belief" are sufficient, as GM would have no way of knowing the precise details of Ashton's financial information.

### *Proximate Causation and Damages*

Ashton's next asserts that the fraud claims should be dismissed because they do not adequately plead proximate causation and damages. (Mot. at 38.) Ashton makes several distinct arguments on this point. Ashton contends that the fraud claims should be dismissed, first, because GM fails to show proximate causation. (Mot. at 39.) In order to establish proximate causation, a plaintiff must show that the defendant's conduct was "a substantial contributing factor in causing [a] loss." *McCabe v. Ernest & Young, LLP*, 494 F.3d 418, 439 (3d Cir. 2007) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 58, 691(1997)). Ashton argues that the representations made on the 2015 and 2017 questionnaires did not cause any harm because "these statements occurred *after* the consummation of the 2015 collective bargaining agreement which injured GM[.]" (Mot. at 40.) Thus, by the time Ashton responded to these questionnaires, the collective bargaining process was

over, and GM does not allege that the bribery payments continued beyond the 2015 collective bargaining process. (Mot. at 40.) Therefore, Ashton concludes that GM could not have entered into the 2015 CBA in reliance on Ashton's statements that were made later. (Mot. at 40.)

Ashton's arguments miss the point—as GM notes, it is immaterial whether the 2015 CBA had already been consummated because GM's claimed harm is not related to the 2015 CBA. Rather, GM alleges that it was harmed because it relied on Ashton's representations when it agreed to employ and then continued to employ Ashton as a member of its board. GM's damage, as pled in the Complaint, is the compensation it paid Ashton to serve on GM's board. (FAC ¶123.) GM would not have done this, but for Ashton's misrepresentations and omissions. Thus, the Court finds that it is immaterial whether the first set of statements post-dated the 2015 CBA because GM continued to rely on these statements by continuing to employ Ashton.

Ashton also argues that the 2014 and January 2015 questionnaire responses cannot form the basis of the fraud claim because "GM has not plausibly pled the existence of the underlying CB bribery scheme." (Mot. at 41.) This argument represents more of the same of Ashton's previously dismissed arguments related to the plausibility of the 2015 collective bargaining bribery scheme. As the Court explained above, the Court accepts as true the well-detailed factual allegations in support of the 2015 collective bargaining bribery scheme. Accordingly, the Court rejects this argument.

Ashton next argues that GM's fraud claim also fails because "it does not adequately allege that the theft of information and FCA's use of it proximately caused any damage to GM." (Mot. at 43–44.) Ashton avers that the alleged scheme could have still occurred because FCA could have found another "mole" to get information. (Mot. at 45.) These arguments again ignore GM's alternate theory of liability based on the criminal kickback scheme. GM pleads that Ashton's

fraudulent misrepresentations and omissions that obscured his role in the kickback scheme caused GM to continue to "fund the CHR with more than it would have cost but for Ashtons's scheme and continued to pay his director salary notwithstanding his concealed disloyalty." (Opp. at 36 (citing FAC ¶¶118–31.)) Therefore, GM has adequately pleaded causation, regardless of whether GM can also prove that Ashton's conduct caused the harm that GM suffered as a result of the corporate espionage scheme.

Finally, Ashton argues that the fraud claims fail because the claimed damages are too speculative. (Mot. at 50.) Ashton cites to New Jersey cases standing for the proposition that "profits which are too remote, speculative, or uncertain" may not be claimed damages. (Mot. at 50.) Ashton's arguments on this point again rely on the collective bargaining scheme fraud theory and ignore the criminal kickback fraud theory. For the criminal kickback theory of fraud, the damages are clear and traceable; GM seeks the "compensation Ashton received[], as well as the money GM spent in funding the CHR[.]" (Opp. at 42.) There is no dispute that these damages are certain enough to be calculated. Therefore, because at least one of GM's fraud theories includes traceable and calculable fraud theories, GM has stated a claim for fraud. Thus, the motion to dismiss the fraud claim is **DENIED**.

### D. Whether GM Sufficiently Pleads the Plausibility of the Breach of Fiduciary Duty Claim

In order to establish a claim for breach of fiduciary duty, a plaintiff must plead the following: (1) the defendant had a duty to the plaintiff, (2) the duty was breached, (3) injury to plaintiff occurred as a result of the breach, and (4) the defendant caused that injury. *Goodman v. Goldman, Sachs & Co.*, No. 10-1247 2010 WL 5186180, at *10 (D.N.J. Dec. 14, 2010). The Court finds that the Complaint adequately pleads each of the aforementioned elements. Ashton does not

dispute that he owed a duty to GM; nor could he. The Complaint pleads that, as a member of the GM Board, Ashton "owed GM fiduciary duties of loyalty, care, confidentiality, and disclosure." (FAC ¶113.) Moreover, the Complaint pleads adequate allegations to establish that Ashton breached his fiduciary duties; Ashton, by pleading guilty, has admitted his involvement in the criminal kickback scheme. (FAC ¶114–15.) He also failed to disclose the bribery scheme between FCA and UAW and disclosed confidential information to UAW and FCA leaders. (FAC ¶114.) These acts support a straightforward, plausible breach of fiduciary duty claim. As a result, GM pleads that it suffered financial injury as a result of Ashton's breach of fiduciary duty. (FAC ¶116.) Therefore, because all elements are pled, the Court finds that GM states a claim for breach of fiduciary duty.

## IV.    CONCLUSION

For each of the aforementioned reasons, the Motion to Dismiss is **DENIED IN PART** and the Court reserves judgment on the statute of limitations argument regarding the breach of fiduciary duty claim. In accordance with the Order accompanying this Opinion, the Court directs the parties to submit supplemental briefing on (1) which forum's substantive law applies to the breach of fiduciary duty claim; (2) whether the claim is barred by the statute of limitations; and (3) whether the statute of limitations should be tolled. Within twenty (20) days, both parties shall submit supplemental briefing on the items discussed above. Each party's supplement brief shall be no more than fifteen (15) pages in length; and within ten (10) days after receipt of such submission, each party may file a response totaling no more than ten (10) pages in length. An accompanying Order will issue.

Dated: 6/22/2020                                                  /s/ Robert B. Kugler
                                                                 ROBERT B. KUGLER
                                                                 United States District Judge